**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------- X

MARIA VELAZQUEZ, JON-ADRIAN VELAZQUEZ, JR., and JACOB VELAZQUEZ,

                             Plaintiffs,

      -against-

THE CITY OF NEW YORK, NEW YORK, a municipal entity; NYPD Detective JOSEPH LITRENTA; NYPD Lieutenant "JOHN" FALZARANO; NYPD Detective GLENN CARBONI; NYPD Detective JOEL POTTER; NYPD Detective ROBERT MOONEY; JACK ROE as Administrator of the Estate of Manhattan District Attorney Investigator GENARRO GIORGIO, JOHN and JANE DOEs #1-20, in their individual capacities.

                             Defendants.

------------------------------------------------------------------- X

**COMPLAINT**

**JURY TRIAL DEMANDED**

        Plaintiffs Maria Velazquez, Jon-Adrian Velazquez, Jr., and Jacob Velazquez, by their attorneys Newirth Linehan PLLC and Michelen Law P.C., complaining of the defendants, respectfully allege, upon information and belief, as follows:

<u>**NATURE OF THE ACTION**</u>

        1.      This civil rights action, brought pursuant to 42 U.S.C. §§ 1983 and 1988 and New York State law, seeks monetary damages for Plaintiffs—the mother and sons of Jon-Adrian Velazquez—whose constitutional rights to familial association, intimate privacy, and freedom from unreasonable state intrusion were violated by Defendants' intentional and malicious misconduct. Plaintiffs are not derivative claimants. They are independent victims of state action deliberately directed at their family relationships and private lives.

2.     Beginning in or about February 1998, Defendants intentionally initiated and pursued a malicious and fraudulent prosecution against Jon-Adrian Velazquez for a murder he did not commit. Although every eyewitness initially described the shooter as an African American man with braided hair, and Mr. Velazquez is a light-skinned person of Puerto Rican descent who did not wear his hair in braids, Defendants manufactured and coerced identifications to secure his arrest and conviction. This misconduct included the display of an illegally retained photograph of Mr. Velazquez to prime a vulnerable witness, threats of arrest against eyewitnesses to compel false identifications, unduly suggestive identification procedures, and the fabrication of a false inculpatory statement attributed to Vanessa Cepero, the mother of Mr. Velazquez's children, Plaintiffs Jon-Adrian Velazquez, Jr. and Jacob Velazquez (the "Plaintiff Children").

3.     Defendants further suppressed material exculpatory evidence identifying an alternate suspect who matched the eyewitness descriptions and was observed with one of the actual perpetrators hours before the crime. Through these affirmative acts of deception—and through the continued suppression of exculpatory evidence in the face of multiple appeals and Freedom of Information Law requests—Defendants ensured that Mr. Velazquez remained wrongfully convicted for 26 years, 7 months, and 28 days (of which he spent 23 years, 7 months, and 7 days wrongfully incarcerated, and two and a half years wrongfully subject to DOCCS supervision). The New York County District Attorney's Office ("DANY") joined Mr. Velazquez's motion for exoneration after modern DNA testing conclusively established his innocence.

4.     The constitutional injuries suffered by Plaintiffs were not incidental consequences of Defendants' misconduct, but the intended and foreseeable results of actions deliberately directed at the Velazquez family unit. Defendants affirmatively exploited the familial relationships at issue to cause the wrongful conviction. They weaponized the status and trust associated with Plaintiff

Maria Velazquez—a law-enforcement widow—to compel her son's surrender, and fabricated a false statement from Ms. Cepero to discredit Mr. Velazquez's truthful alibi and undermine the family's credibility as a unit.

5.      At trial, Defendants and their agents further attacked and distorted these family relationships by urging the jury to reject objective documentary evidence of a seventy-four-minute mother-son telephone call as "highly unlikely" and the product of "familial bias." In doing so, the State pathologized the Plaintiffs' intimate associations and explicitly relied on the existence of family bonds as a basis for discrediting exculpatory evidence. This conduct ensured the continuation of Mr. Velazquez's wrongful incarceration and the prolonged, state-imposed separation of Plaintiffs from their son and father.

6.      As a direct and proximate result of Defendants' fraudulent prosecution and continued concealment of the truth, Plaintiffs—who were never suspected of criminal wrongdoing and were subject to no individualized security determination—were coerced into "choosing" between maintaining their family relationships solely through channels controlled, monitored, recorded, and scrutinized by the State, or abandoning their relationship with Mr. Velazquez. This was, effectively, no choice at all; Plaintiffs would never abandon their father and son. So, for more than twenty-three years, Plaintiffs were compelled to preserve their familial relationships through communications and contact that were conducted solely through the means permitted by the State and that were systematically intercepted, recorded, reviewed, and permanently memorialized by state actors.

7.      Defendants further violated Plaintiffs' constitutional rights by conditioning the maintenance of their familial bonds on the surrender of their intimate privacy. By mandating that all communication and association occur strictly within the surveillance apparatus of DOCCS,

Defendants presented Maria Velazquez and the Plaintiff Children with an unconstitutional false choice: to either abandon their relationship with Mr. Velazquez entirely or to "consent" to the state's invasive recording and review of their most private lives. Because the wrongful conviction of Mr. Velazquez was the sole catalyst for this predicament, any purported consent given by the Plaintiffs to have their phone calls recorded, their mail read, and their physical persons searched was a product of state-sponsored coercion and is thus legally invalid.

8.     Every telephone call between Plaintiffs and Mr. Velazquez was recorded; every letter between them was opened and read; every in-person visit was conditioned on invasive searches and demeaning security procedures; and every physical meeting was monitored through audio, video, or in-person surveillance. As a result, Defendants seized and reviewed Plaintiffs' most intimate communications, including discussions concerning medical care, financial hardship, parenting, and psychological distress, notwithstanding that Plaintiffs themselves were private citizens entitled to constitutional protection from this very type of intrusion.

9.     Because Mr. Velazquez's conviction and incarceration were the direct products of Defendants' intentional and unlawful conduct, the prolonged surveillance and monitoring of Plaintiffs' private communications lacked any legitimate penological or security justification. While correctional authorities may, in limited circumstances, monitor communications to ensure institutional safety, such deference cannot extend to a surveillance regime predicated entirely on a wrongful conviction obtained through fraud and maintained through the suppression of exculpatory evidence. Defendants' continued monitoring of Plaintiffs' communications  was thus an unreasonable and unauthorized intrusion into the private lives and intimate associations of citizens who were drawn into the State's carceral control solely by Defendants' misconduct.

10.    The foreseeable consequences of this state-imposed separation and surveillance were severe and enduring. Plaintiff Maria Velazquez was compelled to abandon her professional aspirations and personal life to raise Mr. Velazquez's children in his absence and to assume the financial, physical, and emotional burdens created by his wrongful imprisonment. Under the sustained pressure of these circumstances, she suffered serious stress-related medical events, including a heart attack and a debilitating stroke.

11.    Deprived of their father's presence during their formative years, the Plaintiff Children experienced profound psychological harm, including depression and trauma, the effects of which continue to this day.

12.    Throughout the period of Mr. Velazquez's incarceration, Defendants fraudulently concealed the illegality of the prosecution and conviction by suppressing, among other evidence, alternate-suspect material documented in police reports ("DD5 93"), fabricated identifications, the fabricated statement attributed to Ms. Cepero, and proof of law enforcement misconduct. This official deception foreclosed Plaintiffs' ability to seek timely judicial intervention to protect their family integrity and private lives. This action seeks to hold Defendants accountable for the decades-long deprivation of Plaintiffs' constitutional rights and for the permanent intrusion into and degradation of their most intimate familial associations.

## JURISDICTION, VENUE, AND CONDITIONS PRECEDENT

13.    This action arises under 42 U.S.C. §§ 1983 and 1988 and under the common law of the State of New York.

14.    The acts and omissions giving rise to this complaint occurred in New York County.

15.    Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1343, as this action seeks redress for the violation of Plaintiffs' constitutional and civil rights.

16.     Supplemental jurisdiction is conferred upon this Court by 28 U.S.C. § 1367(a) over any and all state law claims that are so related to the federal claims that they form part of the same case or controversy.

17.     Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(2), as this is the judicial district in which the events giving rise to Plaintiff's claims took place.

18.     This action has been commenced within the applicable period for each claim.

19.     On or about December 29, 2024, Plaintiffs served the City of New York timely notice of the present claims, in accordance with N.Y. Gen. Mun. Law. § 50-e.

20.     On July 8, 2025, the City of New York conducted a hearing in accordance with N.Y. Gen. Mun. Law § 50-h.

21.     More than 90 days have elapsed since Plaintiffs' submission of their notice of claim and Ms. Velazquez's 50-h hearing. Plaintiffs have duly complied with all the conditions precedent to the commencement of this action and the City has not compromised the action.

## JURY DEMAND

22.     Plaintiffs demand a trial by jury in this action on each and every one of their claims for which a jury trial is legally available.

## PARTIES

23.     Plaintiff Maria Velazquez is a citizen of the United States and the State of New York. At all times relevant to this Complaint, Plaintiff Maria Velazquez was a resident of the State of New York. Plaintiff Maria Velazquez presently resides in the State of New York, County of Rockland.

24.    Plaintiff Jon-Adrian Velazquez, Jr. is a citizen of the United States and the State of New York. At all times relevant to this Complaint, Plaintiff Jon-Adrian Velazquez, Jr. was a resident of the State of New York. Plaintiff Jon-Adrian Velazquez, Jr. presently resides in the State of New York, County of Westchester.

25.    Plaintiff Jacob Velazquez is a citizen of the United States and the State of New York. At all times relevant to this Complaint, Plaintiff Jacob Velazquez was a resident of the State of New York. Plaintiff Jacob Velazquez presently resides in the State of New York, County of Bronx.

26.    Defendant City of New York was and is a municipal corporation that is a political subdivision of the State of New York, was the employer of the individual Detective and Investigator Defendants and is and was at all times relevant to this Complaint responsible for the policies, practices, and customs of the New York City Police Department ("NYPD") and the New York County  District Attorney's Office ("DANY" or the "District Attorney's Office").

27.    Defendant JOSEPH LITRENTA, at all relevant times, was a detective employed by the NYPD, and acted toward Velazquez under color of the statutes, ordinances, customs, and usage of the State of New York, and acted within the scope of his employment. He is sued in his individual and official capacities. Based on information and belief, he is entitled to indemnification under New York General Municipal Law Section 50-k and by contract.

28.    Defendant "JOHN" FALZARANO, whose first name is presently unknown to Plaintiff, at all relevant times, was a lieutenant employed by the NYPD, and acted toward Velazquez under color of the statutes, ordinances, customs, and usage of the State of New York, and acted within the scope of his employment. He is sued in his individual and official capacities.

Based on information and belief, he is entitled to indemnification under New York General Municipal Law Section 50-k and by contract.

29.     Defendant GLENN CARBONI, at all relevant times, was a detective employed by the NYPD, and acted toward Velazquez under color of the statutes, ordinances, customs, and usage of the State of New York, and acted within the scope of his employment. He is sued in his individual and official capacities. Based on information and belief, he is entitled to indemnification under New York General Municipal Law Section 50-k and by contract.

30.     Defendant JOEL POTTER, at all relevant times, was a detective employed by the NYPD, and acted toward Velazquez under color of the statutes, ordinances, customs, and usage of the State of New York, and acted within the scope of his employment. He is sued in his individual and official capacities. Based on information and belief, he is entitled to indemnification under New York General Municipal Law Section 50-k and by contract.

31.     Defendant ROBERT MOONEY, at all relevant times, was a detective employed by the NYPD, and acted toward Velazquez under color of the statutes, ordinances, customs, and usage of the State of New York, and acted within the scope of his employment. He is sued in his individual and official capacities. Based on information and belief, he is entitled to indemnification under New York General Municipal Law Section 50-k and by contract.

32.     Defendant "JACK ROE," whose actual name Plaintiffs have been unable to ascertain notwithstanding reasonable efforts to do so, but who is sued herein by the fictitious designation "JACK ROE," is the Administrator of the Estate of GENARRO GIORGIO, who is deceased. GENARRO GIORGIO, at all relevant times, was an investigator employed by DANY, and acted toward Velazquez under color of the statutes, ordinances, customs, and usage of the State of New York. JACK ROE, as Administrator of the Estate of GENARRO GIORGIO, is sued

for the acts and omissions of GENARRO GIORGIO undertaken in his individual capacity. Based on information and belief, GIORGIO and/or Jack Roe, as Administrator of the Estate of GENARRO GIORGIO, is entitled to indemnification under New York General Municipal Law Section 50-k and by contract.

33.     Defendant Does #1 through 20, whose actual names Plaintiffs have been unable to ascertain notwithstanding reasonable efforts to do so, but who are sued herein by the fictitious designations "John Doe" and "Jane Doe," represent those officers, detectives, investigators, supervisors, and/or other agents and employees of the NYPD or DANY, acting under color of law and in their individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York, who participated in the misconduct described herein. Based on information and belief, they are entitled to indemnification under New York General Municipal Law Section 50-k and by contract. They are sued in their individual and official capacities.

## ALLEGATIONS

### A. OVERVIEW

34.     Jon-Adrian Velazquez is the only son of Plaintiff Maria Velazquez and her late husband, Adrian Velazquez, who served as an Amtrak Police Officer for approximately twenty years.

35.     Plaintiff Jon-Adrian Velazquez, Jr., is the oldest son of Jon-Adrian Velazquez and his former domestic partner Iris "Vanessa" Cepero, and the first grandson of Plaintiff Maria Velazquez.

36.     Plaintiff Jacob Velazquez is the youngest son of Jon-Adrian Velazquez and Ms. Cepero, and the second grandson of Plaintiff Maria Velazquez.

37.     In 2000, Jon-Adrian Velazquez was wrongfully convicted of a crime he did not commit: the January 27, 1998 murder and robbery of former NYPD detective Albert Ward, in his illegal Harlem gambling establishment.

38.     As is set forth in his civil rights complaint, a copy of which is attached hereto as Exhibit A and is specifically incorporated herein by reference, Jon-Adrian Velazquez's wrongful arrest and conviction was the direct result of Defendants' misconduct, including the fabrication of inculpatory evidence, coercion of witnesses, and suppression of exculpatory and impeachment material in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). *See, e.g.,* Exhibit A at ¶¶ 56-254.

39.     Jon-Adrian Velazquez's innocence was finally established conclusively by post-conviction DNA testing in 2024, which led to his exoneration on September 30, 2024.

40.     For 26 years, 7 months, and 28 days Jon-Adrian Velazquez was wrongly convicted of the robbery and murder of Ward. Of this time, Mr. Velazquez spent 23 years, 7 months, and 7 days wrongfully incarcerated, and two and a half years wrongfully subject to DOCCS supervision.

41.     The misconduct of the NYPD and other state actors resulted not only in Jon-Adrian Velazquez's wrongful conviction and incarceration, but also in the prolonged and involuntary separation of Plaintiffs from Jon-Adrian Velazquez, their father and son.

42.     The Plaintiff Children spent their entire childhood and adult lives navigating a world without their father's support, guidance, and presence, while Plaintiff Maria Velazquez was forcibly separated from her only child for over twenty-threeyears, which led her to devote her entire life to caring for her incarcerated son and his children, all while fighting to bring to light the injustice of Mr. Velazquez's wrongful conviction.

43.     As is discussed in greater detail *infra*, while the Plaintiffs each suffered in unique ways—mental, physical, emotional, and financial—their suffering was reasonably foreseeable to

Defendants when they engaged in the misconduct that led to Jon-Adrian Velazquez's wrongful conviction.

### B.  THE UNDERLYING CRIME AND INVESTIGATION

### 1.  **Albert Ward Is Murdered By Two African American Men While Jon-Adrian Velazquez Is Home With His Children, Plaintiffs Jon-Adrian Velazquez, Jr. And Jacob Velazquez, Speaking To His Mother, Maria Velazquez, By Telephone**

44.    The crime underlying this case occurred in Harlem at 1:30 pm on January 27, 1998. Two African American men entered an illegal gambling establishment owned by Albert Ward, a retired NYPD detective, to commit an armed robbery.

45.    One assailant carried duct tape; the other brandished a handgun. The men announced a robbery, told patrons to get on the floor, and the man with the duct tape began binding patrons' hands together. Albert Ward pulled out his handgun and was shot fatally by the man with the gun.

46.    The shooter, who had visited the location earlier that day, handled a betting slip that was preserved by police and later became the key to establishing Jon-Adrian Velazquez's innocence through DNA testing.

47.    At the time of Ward's murder, Jon-Adrian Velazquez was three to four miles away, at his home in the Bronx with Ms. Cepero, Plaintiff Jacob Velazquez, who was then six weeks old, and Plaintiff Jon-Adrian Velazquez, Jr., who was then three years old.

48.    At the time of Ward's murder, Jon-Adrian Velazquez and Plaintiff Maria Velazquez were speaking from each of their residence's landline telephones, as their phone records confirmed. The two were discussing the family's plans to honor the birthday of Adrian Velazquez, Mr. Velazquez's father and Plaintiff Maria Velazquez's husband, which was the next day, January 28, 1998. The date was particularly significant because it was Adrian's first birthday since his death in 1997.

49.    The telephone call was memorable because it was about Adrian's upcoming birthday, an emotional topic for both Mr. Velazquez and Plaintiff Maria Velazquez.  It was also memorable because Plaintiff Maria Velazquez and Mr. Velazquez's domestic partner, Ms. Cepero, had had a falling out and were not speaking, and Mr. Velazquez and Plaintiff Maria Velazquez were discussing how to bring the whole family together to celebrate despite this rift.

2.    **Eyewitnesses Describe The Perpetrators As Two African American Men; Mr. Velazquez Is Not African American**

50.    A number of eyewitnesses saw the shooting at close range inside of Ward's gambling establishment. Eyewitnesses interviewed by police in the aftermath of the crime described the assailants clearly and consistently as two African American men. The one carrying duct tape was described as dark-skinned, while the shooter was described as lighter skinned and, according to all but one eyewitness, wearing his hair in braids.

51.    Because Mr. Ward was a retired NYPD detective who had served in the 28th Precinct—the very Precinct where he was murdered—the police response was immediate and intense.

52.    Defendant Detective Joseph LITRENTA was assigned to be the lead detective on the case.

53.    Defendant Lieutenant FALZARANO was assigned to supervise the investigation into Ward's murder, including the work of Defendants LITRENTA, CARBONI, POTTER, MOONEY, and others.

54.    Shortly after the shooting, police obtained descriptions of the culprits from eyewitnesses to the crime.

55.    All of the eyewitnesses were African American.

56.     Seven of the nine eyewitnesses were able to describe the culprits, and those seven described the shooter consistently:  an  African American male,  in his twenties with a lighter complexion than the other African American assailant.  Of the eyewitnesses who described the shooter's hair, all but one recalled that he was wearing his hair in braids. The other eyewitness described the shooter's hair as curly.

57.     Mr. Velazquez did not match this description. First, he is not African American. He was, and is, a light-skinned man of Puerto Rican descent. At the time of the crime, Mr. Velazquez wore his hair in a short, close cropped, Caesar style haircut.

58.     Nor did Mr. Velazquez have any connection to Mr. Ward, the gambling establishment he ran, or the part of Harlem where the gambling establishment was located and the crime occurred.

59.     That Mr. Velazquez was not African-American and did not otherwise match the description given by seven eyewitnesses was evident to each of the Defendants, as the following photographs—one taken two weeks before the crime, and the other taken on the day of his arrest— make clear.



60.     These facts alone should have disqualified Mr. Velazquez as a suspect in this murder.

### 3.  Eyewitnesses Identify Derry Daniels, An African American Man, As The Assailant With The Duct Tape

61.     On January 28, 1998, the day after Ward's murder, eyewitness Phillip Jones, the brother of eyewitness Robert Jones, was at the 28th Precinct to look through the precinct's binders of mugshot photos.

62.     After viewing approximately ten mugshot books, Phillip Jones identified a photograph of a man named Derry Daniels as the man carrying the duct tape during the robbery.

63.     Daniels, who is African American, had a significant criminal history for drugs, assault, and robbery.

64.     Daniels had been arrested on April 6, 1990, within the confines of the 28th Precinct, for an armed robbery with shots fired at a different illegal gambling establishment in Harlem.

65.     Daniels matched the eyewitnesses' description of the assailant with the duct tape.

66.     Once Phillip Jones identified Daniels from a photograph, Daniels was placed into a live lineup.

67.     Phillip Jones viewed the lineup and positively identified Daniels as the man carrying the duct tape.

### 4.  Daniels, Who Has No Connection Whatsoever To Mr. Velazquez, Is Arrested And Charged With Ward's Murder[1]

68.     Phillip Jones viewed the lineup and positively identified Daniels as the man carrying the duct tape.

69.     After being identified as the man with the duct tape, Daniels was arrested.

---

[1] Daniels ultimately pleaded guilty to lesser charges and received a reduced sentence.

70.     Mr. Velazquez had never met or heard of Derry Daniels.

71.     Mr. Velazquez had no connection whatsoever to Daniels.

72.     No connection between Daniels and Mr. Velazquez has ever been produced by police, prosecutors, or anyone else.

**C.  THE INDIVIDUAL DEFENDANTS' FABRICATION OF EVIDENCE, SUPPRESSION OF *BRADY* MATERIAL, AND TUNNEL VISION, AND THE DEFENDANT CITY'S POLICIES AND PRACTICES DURING THE RELEVANT PERIOD, CAUSE AND CONTINUE MR. VELAZQUEZ'S WRONGFUL CONVICTION AND INCARCERATION, AND THE ATTENDANT SUFFERING OF HIS MOTHER AND CHILDREN**

73.     The specific acts and omissions by the Defendants, which caused Mr. Velazquez to become a suspect in and be arrested for the Ward robbery and murder and which caused and continued his wrongful conviction and incarceration are set forth in Exhibit A, which is specifically incorporated herein. *See* Exhibit A ¶¶ 56-313. We repeat herein certain facts relevant to the Plaintiffs' claims.

74.     In their concerted effort to solve quickly the high profile murder of a retired NYPD officer, the individual Defendants, NYPD officers charged with solving Ward's murder, including Defendants FALZARANO, LITRENTA, CARBONI, POTTER, and MOONEY, and others, used strategies that were both illegal and created a grave risk that an innocent person—in this case, Mr. Velazquez—would be wrongfully identified, arrested, prosecuted, and convicted of Ward's murder.

75.     In so doing, they also created a grave risk that Mr. Velazquez's mother and children would suffer the trauma of being deprived of their son's and father's daily presence, care, guidance, and emotional support, and that they would lose all privacy in their relationship and communications with Mr. Velazquez, for more than twenty-three years.

76.    The improper investigative strategies used by Defendants FALZARANO, LITRENTA, CARBONI, POTTER, and MOONEY included using highly suggestive and unreliable identification procedures; threatening witnesses with arrest or prosecution for Ward's murder and other serious crimes in order to obtain statements and identifications against Mr. Velazquez; fabricating evidence against Mr. Velazquez; and suppressing exculpatory and impeachment evidence.

77.    Defendants FALZARANO, LITRENTA, CARBONI, POTTER, and MOONEY, and others, also intentionally failed to follow up on important leads that did not comport with the police theory of the case.

78.    Defendants FALZARANO, LITRENTA, CARBONI, POTTER, and MOONEY, and others, pursued these investigative tactics despite the fact that (a) Mr. Velazquez bore no resemblance to the person who shot Albert Ward; (b) no physical, forensic, or ballistics evidence connected him to the crime; (c) no connection whatsoever existed between Mr. Velazquez and the man police arrested as the assailant who carried the duct tape; (d) no conceivable motive for Mr. Velazquez to have committed the homicide existed; and (e) Mr. Velazquez had an alibi, supported by objective proof, placing him three to four miles from the crime at the precise moment it occurred.

79.    It was foreseeable to the Defendants that their improper and wrongful conduct would have a harmful impact on the Plaintiffs.

80.    Prior to developing probable cause to arrest Mr. Velazquez, Defendants learned through official searches that Mr. Velazquez lived with his children and Ms. Cepero, and that his father, who was Plaintiff Maria Velazquez's husband, was a law enforcement officer.

81.     Defendant LITRENTA and/or others falsely told eyewitness Robert Jones that the gun used by Mr. Velazquez belonged to Mr. Velazquez's father, a law enforcement officer, in order to coerce that witness to falsely identify Mr. Velazquez as the shooter.

82.     At all times beginning with his arrest in this case, Mr. Velazquez maintained his innocence. Once convicted, he fought to overturn his conviction through appeals in state and federal courts, and in multiple post-conviction filings.

83.     DANY vigorously opposed all of Mr. Velazquez's efforts to overturn and/or vacate his conviction and, in doing so, continued to advance the false narrative used to convict him, which narrative relied upon fabricated evidence inculpating Mr. Velazquez and the suppression of the very exculpatory and impeachment evidence that could have led to his exoneration.

84.     Mr. Velazquez also sought evidence hidden from him by Defendants through multiple Freedom of Information Law (FOIL) requests. Despite these FOIL requests, Defendants continued to suppress from Mr. Velazquez critical exculpatory and impeachment evidence.

85.     Because Defendants fabricated so much false evidence against him, and hid so much exculpatory evidence, and because they continued to actively conceal their own corruption and misrepresent that they had committed no misconduct, it took more than 26 and a half years for Mr. Velazquez to be exonerated.

86.     In December 2024, a Manhattan state court vacated Mr. Velazquez's conviction after DNA excluded him from the betting slip handled by the real perpetrator just before Ward's murder. *See* Exhibit B.

87.     After years of opposing Mr. Velazquez's efforts to uncover the truth and vacate his conviction, the New York County District Attorney ("DANY") joined Mr. Velazquez's motion to vacate his conviction and then moved to dismiss the indictment.

88.     When he was finally exonerated, Mr. Velazquez was 49 years old; Plaintiff Jacob Velazquez, who was a newborn when Mr. Velazquez was arrested, was 27-years-old, and Plaintiff Jon-Adrian Velazquez, Jr., who was a toddler when Mr. Velazquez was arrested, was 30-years-old. By this time, both Plaintiff Children had become fathers themselves.

89.     At the time of Mr. Velazquez's exoneration, Plaintiff Maria Velazquez was 75 years old; she was by then a great-grandmother three times over. She had spent the latter part of her adulthood fighting for her son's release and caring for, and raising, her grandsons—not pursuing her own ambitions and interests as she'd planned to do.

### D. THE INDIVIDUAL DEFENDANTS SPECIFICALLY TARGET PLAINTIFFS TO FACILITATE MR. VELAZQUEZ'S WRONGFUL ARREST, PROSECUTION, AND CONVICTION

#### 1. **Defendants Falzarano, Litrenta, Carboni, and Others Target the Velazquez Family's Status as a Law Enforcement Family and Their Close Relationship to Obtain Mr. Velazquez's Surrender When They Had No Probable Cause to Arrest Him**

90.     Once Jon-Adrian Velazquez's illegally retained photograph was used in connection with the false "identification" Defendants attributed to eyewitness Augustus Brown, Defendants FALZARANO, LITRENTA, CARBONI and others actively searched for Mr. Velazquez, including by visiting and contacting Mr. Velazquez's father's domestic partner and other family members and telling them that Mr. Velazquez was wanted for a serious crime.

91.     Defendants FALZARANO, LITRENTA, CARBONI and others knew, or should have known, that Mr. Velazquez's family—whose patriarch had been a law enforcement officer with a deep-seated respect for the law—would compel Mr. Velazquez to surrender.

92.     Defendants FALZARANO, LITRENTA, CARBONI and others relied on and exploited the background and values of the Velazquez family to effectuate the arrest of Mr. Velazquez. They knew the family's commitment to the rule of law would lead them to encourage

Mr. Velazquez's surrender, weaponizing their trust in and belief that the legal system would recognize and respect his innocence.

93.    As a result, Mr. Velazquez learned from his family that he was being sought by police.

94.    At the time of his wrongful arrest, Mr. Velazquez was a 22-year-old father of a toddler and a newborn—Plaintiffs Jon-Adrian, Jr. and Jacob Velazquez, respectively. Together, Mr. Velazquez, Plaintiffs Jon-Adrian, Jr. and Jacob, and their mother, Iris "Vanessa" Cepero, lived in the Bronx.

95.    Mr. Velazquez had no criminal record.

96.    As anticipated by Defendants FALZARANO, LITRENTA, CARBONI and others, once Plaintiff Maria Velazquez learned that her son was being sought in connection with a murder, she  urged him to turn himself in at the 28th Precinct in order to clear his name.

97.    Plaintiff Maria Velazquez and Mr. Velazquez have always had an especially close relationship, in part because Mr. Velazquez was Plaintiff Maria Velazquez's only child. Due to their lifelong closeness, Mr. Velazquez trusted and relied upon his mother's advice. He agreed to follow Plaintiff Maria Velazquez's advice and turned himself in to the 28th Precinct on February 2, 1998.

98.    Neither Plaintiff Maria Velazquez nor Mr. Velazquez knew or could even imagine that Defendants FALZARANO, LITRENTA, CARBONI, MOONEY, POTTER or others would engage in misconduct to frame Mr. Velazquez for a murder he did not commit.

99.    In fact, Plaintiff Maria Velazquez and Mr. Velazquez believed that the criminal justice system would seek the truth and so Mr. Velazquez's innocence would set him free.

100.    On February 2, 1998, when Plaintiff Maria Velazquez brought Mr. Velazquez to the 28th Precinct and watched him enter the building. It was the last time she saw her son as a free man for more than 23 years.

### 2.    Defendants Litrenta and Giorgio Target the Velazquez Family Unit to Destroy Mr. Velazquez's Legitimate Alibi

101.    Two months after Mr. Velazquez's arrest, Mr. Velazquez's attorneys provided his alibi notice to DANY.  In substance, this notice detailed that, at the time of the crime, Mr. Velazquez was at home in the Bronx with the Plaintiff Children and his partner, Vanessa Cepero, and was talking on the telephone to his mother, Plaintiff Maria Velazquez, who was at her own home in Rockland County.

102.    Approximately one month later, in response to Mr. Velazquez's alibi notice, Defendant LITRENTA decided to visit Vanessa Cepero, the mother of Plaintiff Children, at their home.

103.    Defendant LITRENTA did not intend to investigate Mr. Velazquez's alibi in good faith; rather he intended to fabricate evidence that would destroy Mr. Velazquez's truthful alibi.

104.    Defendant LITRENTA asked Defendant GIORGIO to accompany him, because he and GIORGIO were "friends," having previously worked together as detectives with the NYPD. GIORGIO also had a reputation within the NYPD for getting witnesses to say what he wanted them to say—whether it was truthful or not. LITRENTA, as a friend of GIORGIO, knew of this reputation.

105.    GIORGIO agreed to go with LITRENTA out of loyalty to his friend and out of his interest to help secure a conviction on his friend's case. GIORGIO was not asked or directed to conduct this interview by anyone at DANY, and accompanied LITRENTA based on their personal relationship.

106.    Ms. Cepero, however, refused to speak with Defendants LITRENTA and GIORGIO.

107.    Rather than truthfully document that Ms. Cepero refused to speak with them, Defendant LITRENTA, with GIORGIO's full knowledge and approval, fabricated a false report of a conversation with Ms. Cepero that never happened.

108.    Defendant GIORGIO made no record, apart from the fact, date, and location of the meeting, of any statement by Cepero.

109.    According to the fabricated statement, Ms. Cepero claimed she had been sleeping between 8:00 am and 1:30 pm on the day of the murder. Thus, she allegedly could not vouch for Mr. Velazquez's presence in their home at the time of the crime.

110.    The fabricated statement was inconsistent with Mr. Velazquez's alibi insofar as it created the possibility that Mr. Velazquez was not home at the time of the crime.

111.    The fabricated statement created the false impression, later exploited by the assigned DANY prosecutor at trial, that Plaintiff Maria Velazquez was lying about her phone call with her son in order to cover up his crime.

112.    DANY and NYPD hid this fabricated report from Mr. Velazquez and his attorneys, and did not provide notice of an alibi rebuttal case, waiting instead until after Ms. Cepero and Plaintiff Maria Velazquez testified to ambush them with the fabricated report at trial. Nor did either LITRENTA or GIORGIO ever disclose to DANY that they fabricated this evidence and that, in truth, Ms. Cepero refused to speak with them.

113.    LITRENTA and/or GIORGIO's fabrication of the report, their false testimony about the fabricated statement, and DANY's ambushing the defense with it at trial, undermined Mr. Velazquez's truthful alibi, created a false basis to impeach Mr. Velazquez's alibi witnesses,

including Plaintiff Maria Velazquez, and prevented his attorneys from establishing his innocence.

**3.   At Trial, The Prosecution Targets the Velazquez Family with Fabricated Evidence and False and Misleading Argument to Defeat the Defense Case**

114.    At trial, the defense called Mr. Velazquez, his mother Maria Velazquez, and Vanessa Cepero to testify to the telephone call between Mr. Velazquez and his mother on January 27, 1998, beginning at 11:44 am and ending at 12:58 pm.

115.    The defense also offered in evidence the telephone records reflecting the call between Mr. Velazquez and his mother.

116.    The telephone records showed that the call was made from Mr. Velazquez's home address, 1344 University Avenue, Bronx, New York—approximately four miles from where the shooting occurred in a completely different borough of New York, to Ms. Velazquez's home in Rockland County.

117.    The defense also offered in evidence a photograph of Mr. Velazquez taken two weeks prior to the murder, showing Mr. Velazquez's hair in a short Caesar style haircut, as well as an arrest photograph of Mr. Velazquez, taken six days after the crime, showing the same hairstyle. *See* Exhibit A ¶ 43, with corroborating witness testimony that this was the hairstyle worn by Mr. Velazquez at all relevant times.

118.    Mr. Velazquez and Ms. Cepero also testified to Mr. Velazquez's presence in their home in the Bronx at the time of the crime.

**a.   The Prosecution Defeats the Defense Case with a Fabricated Rebuttal Case Targeting the Integrity and Testimony of Plaintiff Maria Velazquez and Ms. Cepero, the Mother of the Plaintiff Children**

119.    The prosecution then called as rebuttal witnesses Defendants LITRENTA and GIORGIO.

120.    LITRENTA and GIORGIO falsely testified about the false statement they fabricated and attributed to Ms. Cepero, *i.e.*, that she was asleep during the time of the crime.

121.    Because Cepero had denied, on her direct testimony, giving police any such statement, and testified to being awake and being with Mr. Velazquez during the relevant period, this false testimony caused Cepero's credibility to be impeached and undermined the alibi defense in general.

122.    LITRENTA and GIORGIO falsely testified that Cepero purportedly said that she was sleeping between 8:00 am and 1:30 pm, creating the false impression that it was possible that Mr. Velazquez was not at home at the time of Ward's murder and that the alibi had been fabricated by the three defense witnesses who attested to the alibi.

123.    The sworn police documents purporting to record Ms. Cepero's statement to Defendants LITRENTA and GIORGIO were fabricated by Defendants LITRENTA and GIORGIO.

124.    Defendants LITRENTA and GIORGIO's trial testimony concerning Ms. Cepero's alleged statements to them was false.

**b.    The Trial Prosecutor's Summation Misconduct Targeted the Velazquez Family Unit, Including the Integrity of Plaintiff Maria Velazquez and the Plaintiff Children's Mother, Ms. Cepero**

125.    In summation, the trial prosecutor, ADA Eugene Hurley capitalized on the false alibi rebuttal evidence LITRENTA and GIORGIO fabricated that impugned the credibility of Mr. Velazquez's alibi defense and targeted Plaintiff Maria Velazquez and Ms. Cepero, the mother of Plaintiff's Children.

126.    With respect to the seventy-four minute call between Plaintiff Maria Velazquez and Mr. Velazquez that was supported by objective proof, ADA Hurley argued:

The claim here is that a twenty-two-year-old man had a seventy-four-minute conversation with his mother. Now, this is not his girlfriend or his boyfriend. This is his mother... I think that you'll admit, if you think about that, that that is a highly unlikely event... I obviously don't want to do any gender stereotyping here, but two women who know each other well... it stands to reason that they could have that conversation whereas the twenty-two-year-old son is unlikely to have had.

127.    ADA Hurley knew or was recklessly indifferent to the truth, as there was no evidence that Mr. Velazquez, or any other twenty-two-year-old man would not have a seventy-four minute conversation with his mother, particularly on the eve of his father's first absent birthday. By arguing this on summation, the trial prosecutor made false, sexist, and misleading summation arguments.

128.    Additionally, ADA Hurley:

(a) acted as an unsworn witness, testifying to facts not in evidence regarding the social habits of adult males, and introduced no expert or statistical evidence to support this gender-based generalization; and

(b) invited the jury to nullify objective documentary evidence—the phone bill—based on prejudice rather than proof;

129.    By arguing these facts on summation, the trial prosecutor made false and misleading summation arguments.

130.    This false and misleading argument attacked and distorted the family relationship between Plaintiff Maria Velazquez and her son by urging the jury to reject objective documentary evidence of the seventy-four-minute mother-son telephone call as "highly unlikely" and the product of "familial bias." In doing so, the State pathologized the Plaintiffs' intimate associations and explicitly relied on the existence of family bonds as a basis for discrediting exculpatory evidence. This conduct ensured the continuation of Mr. Velazquez's wrongful incarceration and the prolonged, state-imposed separation of Plaintiffs from their son and father.

131.    Finally, ADA Hurley improperly commented on the credibility of Plaintiff Maria Velazquez and Ms. Cepero, arguing that they were "willing to stretch the truth" because of their familial bias towards Mr. Velazquez.

### E.  THE JURY, UNAWARE OF THE SUPPRESSED FAVORABLE EVIDENCE, CONVICTS MR. VELAZQUEZ WHO IS THEN SENTENCED TO LIFE IMPRISONMENT WITH A MINIMUM OF 25 YEARS

132.    ADA Hurley did not inform the jury of the information FALZARANO, LITRENTA, CARBONI, POTTER, MOONEY and others concealed from DANY in convincing them to prosecute Mr. Velazquez.  He did not inform them of the evidence he himself concealed, including DD5 93, the police report documenting alternate suspects.

133.    The prosecutor presenting Velazquez's case did not inform the jury of the false and/or misleading testimony of witnesses.

134.    The prosecutor presenting Velazquez's case amplified the false and misleading testimony of witnesses.

135.    Relying on the foregoing incomplete, false, and misleading presentation, the jury voted to convict Mr. Velazquez.

136.    On October 29, 1999, the jury, unaware of the above exculpatory, false, misleading, and fabricated evidence, found Velazquez guilty for Ward's murder and the robbery of his gambling establishment.

137.    On March 7, 2000, Mr. Velazquez was sentenced to life imprisonment with a minimum of 25 years for the murder of Mr. Ward, to run concurrent with sentences imposed on the other counts of the indictment.

138.    Prior to being sentenced, Mr. Velazquez passionately asserted his innocence and stated that he had never been to Ward's establishment or seen any of the witnesses against him, all of whom, he said, testified falsely.

### F. PLAINTIFFS' RIGHTS TO FAMILIAL ASSOCIATION, INTIMATE PRIVACY, AND FREEDOM FROM UNREASONABLE STATE INTRUSION ARE REPEATEDLY VIOLATED THROUGHOUT THE PERIOD OF MR. VELAZQUEZ'S WRONGFUL INCARCERATION

139.    At the time of Mr. Velazquez's arrest and prosecution:

    (a) Plaintiff Maria Velazquez was a working mother with a successful career. She and her only child, Mr. Velazquez, maintained a close, loving, and regular relationship prior to his arrest, speaking frequently by telephone and seeing one another in person on a regular basis;

    (b) Plaintiff Maria Velazquez was also a devoted grandmother to Plaintiff Children;

    (c) Plaintiff Maria Velazquez was and is a law-abiding citizen who was previously married to Amtrak Police Officer, Adrian Velazquez, who was recently deceased at the time these events took place;

    (d) Plaintiff Jon-Adrian Velazquez Jr. was approximately three years old, and Plaintiff Jacob Velazquez was approximately one month old. Neither child had the capacity to understand why their father suddenly disappeared from their lives.

140.    The moment of Mr. Velazquez's wrongful arrest triggered an immediate and violent separation, severing the foundational bond between Plaintiffs and Mr. Velazquez:

    (a) Plaintiff Children were deprived of their father's daily presence, care, guidance, and emotional support;

    (b) Plaintiff Children repeatedly asked Plaintiff Maria Velazquez where their father had gone, leading her to undertake extraordinary efforts to preserve the relationship between her son and Plaintiff Children, including transporting both children to jail and prison visits every weekend and on holidays;

(c) These visits were emotionally difficult and logistically burdensome. Ms. Velazquez often placed infant Jacob directly into his father's arms during prison visits so that a bond could form between them.

141.    In the sudden absence of Mr. Velazquez, their primary breadwinner and protector, the family's stability collapsed, rendering Ms. Cepero and the Plaintiff Children homeless and forcing them to seek refuge in a municipal shelter.

142.    When Mr. Velazquez was wrongfully arrested, Maria Velazquez experienced immediate and profound emotional devastation. Maria Velazquez lived in constant fear for her son's safety. Having had no prior exposure to the penal system, she was deeply afraid that her innocent son would be harmed while incarcerated. This fear drove her to maintain near-daily contact with him and to structure her life around frequent jail and prison visits.

143.    As the legal proceedings transitioned from an arrest to a wrongful conviction, the romantic relationship between Mr. Velazquez and Ms. Cepero, the mother of his children, succumbed to the insurmountable strain of a life sentence, ending their union and leaving the children in a broken home and without the love, companionship, and guidance of their father.

144.    As a direct result of their father's incarceration, Plaintiff Children Jon-Adrian Velazquez, Jr. and Jacob Velazquez grew up without a stable home, without daily parental care from both parents, and under the stigma and disruption associated with having an incarcerated parent. Beginning with Mr. Velazquez's arrest and continuing through his September 2024 exoneration, the Plaintiff Children:

(a) experienced the traumatic dissolution of their family unit, losing the daily love, companionship, and guidance of their father from the respective ages of three years old and six weeks old;

(b) endured the emotional and psychological strain of intergenerational incarceration, with Jon-Adrian Velazquez, Jr. ultimately following a trajectory of repeated incarceration as a direct consequence of being deprived of his father's protection and mentorship;

(c) witnessed their father's suffering and their grandmother's physical decline— including her stress-induced heart attack and stroke—as the entire family's stability collapsed under the weight of the wrongful conviction;

(d) navigated a childhood defined by the confines of prison visiting rooms, spending significant portions of their weekends for the first ten years of their lives in high-security facilities rather than participating in normal social activities, sports, or family gatherings;

(e) suffered the social stigma and peer isolation of being children of an incarcerated parent, often forced to defend their father's innocence to a doubting community and facing the emotional void of his absence at major life milestones, including confirmations, communions, graduations, birthdays, school-related "father-son" events;

(f) experienced profound developmental anxiety and fear, exemplified by Jacob Velazquez becoming an introvert who was afraid to leave the house for years, believing his own incarceration was an inevitable fate;

(g) lost the financial and structural stability of a traditional two-parent home, which forced them into a state of homelessness and reliance on a municipal shelter immediately following their father's arrest;

(h) deprived of their father's presence during critical health crises, including Jacob Velazquez's childhood hospitalizations for epilepsy and Jon-Adrian Velazquez, Jr.'s childhood hospitalization for asthma, both of which occurred without the comfort or support of their father;

(i) inherited a legacy of systemic trauma and anger, leading to behavioral outbursts and legal struggles in adolescence that were the direct fruit of the poisonous tree of their father's wrongful removal from their lives and incarceration.[2]

145.    Plaintiff Maria Velazquez was forced to abandon her own life and aspirations to step into the void, assuming the exhausting dual responsibility of supporting her incarcerated son while raising his children in his stead. Beginning with Mr. Velazquez's arrest and continuing through his September 2024 exoneration, Ms. Velazquez:

(a) subordinated her professional advancement and financial stability to the demands of Mr. Velazquez's incarceration and fight to prove his innocence, refusing career promotions to maintain a flexible schedule that allowed her to manage the legal battle and visit her son regularly;

(b) sacrificed her financial security and retirement benefits by opting for early retirement in 2011 at age sixty-two—resulting in a permanent reduction of her

---

[2] *See* Conway, James M.and Jones, Edward T., Connecticut State University, Dept. of Psychological Science Journal, *Seven out of Ten Not Even Close? A Review of Research on the Likelihood of Children with Incarcerated Parents BecomingJustice-Involved* (March 2015) *available at:* https://imrp.dpp.uconn.edu/wp-content/uploads/sites/3351/2021/09/March-2015-Seven-out-of-ten.pdf (children of incarcerated parents are three times more likely than children without incarcerated parents to get involved in the criminal justice system); Morsy, Leila and Rothstein, Richard, Economic Policy Institute, *Mass Incarceration and Children's Outcomes,* page 13, (December 2016)("Visiting a parent behind bars is stressful. There is usually no place to play. Waiting times can be long. Sometimes, physical contact between child and parent is limited or prohibited. In combination, these are traumatic for a child" and documenting that children with incarcerated parents are 48 percent more likely to have attention deficit hyperactivity disorder (ADHD) than children with nonincarcerated parents. They are 23 percent more likely to suffer from developmental delays. Children with incarcerated parents, especially sons of incarcerated fathers, are 43 percent more likely to suffer from behavioral problems.)

Social Security benefits—because the combined weight of her demanding job, caring for Plaintiff Children and her incarcerated son, and the crusade for her son's freedom became insurmountable;

(c) assumed the role of primary caregiver and parent to her grandchildren, filling the structural and emotional vacuum left by her son's absence to ensure the children remained connected to their father and the family unit remained intact;

(d) shouldered an extreme financial burden for nearly three decades, funded by high-interest loans and home equity, to pay for her son's legal defense, private investigators, and DNA testing in a desperate, years-long effort to prove his innocence thwarted by Defendants' continuing suppression of exculpatory and impeachment evidence and advancement of the fabricated narrative that Mr. Velazquez was in fact guilty;

(e) depleted her personal income to provide for the daily survival of two generations, paying for her grandsons' Catholic school tuition, clothing, and necessities, while simultaneously sending monthly stipends and packages of food, warm clothing, and boots to her son to mitigate the harsh conditions of his incarceration;

(f) endured a near-total loss of social and personal life, spending her weekends traveling to prisons and her weeknights in a state of perpetual emotional distress;

(g) suffered catastrophic physical health consequences directly linked to the chronic stress of her son's wrongful conviction and her role as a primary caretaker to the Plaintiff Children, including a stress-induced heart attack in the form of cardiomyopathy and a subsequent stroke in 2017;

(h) continues to experience permanent physical impairment, including numbness in her face, mouth, and hand, a loss of taste, and a loss of balance that requires the use of a cane.

146. This state of forced separation, the interference with Plaintiffs' familial integrity, and the invasion of Plaintiffs' privacy was not a temporary hardship but a permanent reality that spanned decades, defining the entirety of the Plaintiff Children's childhood, teenage years, and early adulthood and Plaintiff Maria Velazquez's middle and senior years.

147. As a direct result of Mr. Velazquez's wrongful conviction and incarceration, all communication and contact between the Plaintiffs and their son and father was subjected to the arbitrary and restrictive rules of the Department of Corrections and Community Supervision ("DOCCS"). These regulations dictated when, where, how, and for how long the family could be together or speak to one another, effectively presenting Maria Velazquez and the Plaintiff Children with the false choice of abandoning their foundational family relationships or agreeing to state-mandated terms that fundamentally violated their constitutional rights to familial association and privacy. Because the Plaintiffs were forced to submit to these conditions as a prerequisite for any contact whatsoever, their purported consent to DOCCS monitoring was not valid, but was instead a product of state-sponsored coercion. Consequently, the Plaintiffs:

(a) suffered a continuous invasion of their privacy as every phone call was recorded, reviewed, and maintained by state actors, forcing the Plaintiffs to discuss highly private and confidential matters under constant government surveillance;

(b) endured the state's interference with their personal correspondence, as all mail and packages sent by Plaintiffs to Mr. Velazquez (and the reverse) were subject to being read, inspected, and sometimes withheld by correctional staff;

(c) navigated family visits conducted in restrictive rooms under the direct observation and recording of state actors, where the simple act of maintaining a familial bond was treated as a monitored transaction rather than a fundamental right;

(d) subjected themselves—including Plaintiff Children, when they were minors—to invasive and dehumanizing physical searches by correctional officers as a mandatory condition of entry into the facility, a process that treated the Plaintiffs, as family members of a wrongfully convicted man, as potential criminals;

    i. on numerous occasions, Plaintiffs were subjected to pat-down searches and other intrusive screening procedures, and at times Plaintiff Maria Velazquez was required to partially disrobe or endure humiliating searches;

(e) disclosed sensitive medical information and private health crises, including details regarding Plaintiff Maria Velazquez's cardiomyopathy and stroke, and the Plaintiff Children's hospitalizations for epilepsy and physical injuries, all while under the scrutiny of state actors;

(f) shared intimate details regarding the family's financial health, including the depletion of equity in the family home and the struggle to fund basic necessities and Catholic school tuition, while knowing the state was reviewing these communications;

(g) discussed the deepest psychological impacts of the wrongful conviction, including shared trauma, battles with depression, and the Plaintiff Children's development and educational issues, which were laid bare for review by the same government actors responsible for their suffering;

(h) coordinated complex legal strategies and private investigations through monitored channels, granting the state persistent insight into Plaintiffs' efforts to challenge the integrity of Mr. Velazquez's conviction;

(i) experienced the dehumanizing imposition of physical boundaries and contact rules that dictated the extent of Plaintiffs' association with Mr. Velazquez, stripping them of the ability to interact as a normal family and replacing it with the state-monitored "scraps" of contact.

148.    The pervasive nature of this state-mandated surveillance deeply scarred the psychological development of the Plaintiff Children, fundamentally altering their perception of authority, privacy, and safety. Growing up within a system where their most intimate family interactions were a matter of public record for the state, the Plaintiff Children:

(a) developed a profound and lasting distrust of legal and law enforcement institutions, viewing the state not as a protector but as a predator that continuously monitored and recorded their grief and trauma;

(b) internalized a sense of perpetual "criminalization by association," as the mandatory physical searches and observed visits taught them from infancy that their family was a target of state suspicion;

(c) experienced a chilling effect on their emotional expression, learning to suppress their authentic feelings and needs to avoid the scrutiny of the correctional officers and state actors who stood over every family interaction;

(d) suffered from chronic developmental anxiety and "hyper-vigilance," exemplified by Jacob Velazquez's years of introversion and fear of leaving the home, rooted in

the belief that the state's surveillance was an inescapable precursor to his own

eventual incarceration;

(e) endured the "intergenerational trauma" of witnessing their father's dehumanization

in real-time, which destroyed their sense of security and led to the displacement of

anger and behavioral struggles during their adolescence.

149.    As a direct result of the state's continuous surveillance, Plaintiff Maria Velazquez

was systematically deprived of her ability to provide maternal guidance and support, while

simultaneously being denied the companionship and protective services of her son. This "loss of

services" was not merely a byproduct of physical separation, but was exacerbated by the DOCCS

monitoring apparatus which dictated the boundaries of their relationship. Consequently, Maria

Velazquez:

(a) experienced the total loss of her son's physical and emotional support during her

own critical health crises, including her heart attack and stroke, where she was

forced to navigate recovery without the presence of her only child;

(b) suffered the permanent displacement of her son's role as her future protector and

assistant with daily errands and heavy tasks, forcing her to rely on the "scraps" of

assistance he could coordinate through others while he remained in state custody;

(c) endured the destruction of her maternal role as a source of private comfort, as she

could not provide guidance to her son without the intrusive presence of state actors

listening to and recording their most vulnerable conversations;

(d) witnessed the intergenerational destruction of her family, as her efforts to maintain

a maternal bond were undermined by the state's classification of her son as a

"monster" or high-security threat, which intentionally sought to alienate her from him;

(e) assumed the exhausting dual responsibility of being both the sole emotional anchor for her incarcerated son and the primary parent to her grandsons, a void she was forced to fill because the state had maliciously removed the family's primary breadwinner and protector;

150.    The damage to Plaintiffs' most important, intimate relationships, and the suffering experienced by Plaintiffs were foreseeable consequences of Defendants' conduct and wrongdoing.

151.    Plaintiffs' nightmare was only partially resolved when Mr. Velazquez was exonerated December 30, 2024, after DNA testing conclusively established his innocence:

(a) Plaintiff Maria Velazquez suffers severe and persistent physical effects and emotional distress as a result of her son's wrongful imprisonment, requiring ongoing medical and mental-health treatment for herself following his release.

(b) The psychological toll of Jon-Adrian Velazquez's incarceration extended into the next generation, as his children struggled with the long-term effects of family separation, instability, and trauma commonly experienced by children of incarcerated parents.

152.    At every stage—from investigation and arrest, through incarceration, and long after exoneration—the harm to the Velazquez family was a predictable and direct consequence of the unconstitutional conduct that removed Jon-Adrian Velazquez from his family for more than two decades.

## G. DEFENDANTS' MISCONDUCT, INCLUDING THEIR FRAUDULENT CONCEALMENT OF THAT MISCONDUCT, DEPRIVED PLAINTIFFS OF ACCESS TO THE COURTS

153.    Following Jon-Adrian Velazquez's conviction, Defendants engaged in acts and omissions that concealed material exculpatory evidence and investigative misconduct, thereby obstructing Plaintiffs' ability to pursue timely and meaningful post-conviction relief and related civil claims.

154.    Specifically, Defendants withheld, concealed, and failed to disclose evidence undermining the credibility of key witnesses and the integrity of the investigation, including information that would have supported challenges to Mr. Velazquez's conviction and exposed the unconstitutional practices used to secure it. This concealment persisted for years after conviction and through the period in which Plaintiffs reasonably sought to investigate and challenge the legality of Mr. Velazquez's prosecution.

155.    As a result of Defendants' concealment, Plaintiffs were unable to access the courts in a meaningful manner to vindicate their rights. Plaintiffs lacked access to the facts necessary to pursue post-conviction relief, to seek redress for constitutional violations, and to protect themselves from the ongoing harms caused by Mr. Velazquez's wrongful incarceration.

156.    Defendants' actions caused concrete and actual injury. Plaintiffs' ability to pursue legal remedies was delayed until exculpatory evidence finally came to light, during which time witnesses' memories faded, documentary evidence was lost or degraded, and Plaintiffs continued to suffer the consequences of prolonged family separation, surveillance, and emotional harm without meaningful access to judicial relief.

157.    Defendants' obstruction of Plaintiffs' access to the courts was not incidental, but the foreseeable result of investigative misconduct and subsequent concealment designed to shield

that misconduct from scrutiny. Plaintiffs' access to the courts was restored only after the disclosure of suppressed evidence led to Mr. Velazquez's exoneration.

158.    At all relevant times, Defendants owed a duty to disclose material information concerning the investigation and prosecution of Jon-Adrian Velazquez, including evidence bearing on his innocence and the lawfulness of Defendants' conduct.

159.    Defendants breached that duty by knowingly concealing material facts, including the fabrication of evidence, coercion of witnesses, and suppression of exculpatory information, while affirmatively maintaining the appearance that Mr. Velazquez's conviction was lawfully obtained. Defendants' concealment occurred through the maintenance of false or misleading investigative records, the failure to disclose material information, and the continued suppression of evidence despite repeated opportunities and obligations to correct the record.

160.    Defendants knew or should have known that Plaintiffs—immediate family members of Mr. Velazquez—were actively seeking to understand, challenge, and remedy the wrongful conviction and would reasonably rely on the absence of disclosed misconduct as confirmation that no such misconduct existed.

161.    Plaintiffs reasonably relied on Defendants' concealment and omissions, as they lacked access to the suppressed information and had no independent means of discovering the concealed misconduct. Defendants' actions prevented Plaintiffs from learning the true facts underlying Mr. Velazquez's conviction and from timely pursuing legal remedies.

162.    As a direct and proximate result of Defendants' fraudulent concealment, Plaintiffs suffered damages, including the delayed pursuit of post-conviction relief and civil claims, prolonged family separation, continued surveillance and intrusion into family life, emotional

distress, and other injuries that would have been mitigated or avoided had the concealed information been disclosed earlier.

163.    Defendants' concealment continued until the suppressed evidence was ultimately disclosed and Mr. Velazquez was exonerated, at which point Plaintiffs first learned the material facts necessary to assert their claims.

## H. THE HARM CAUSED TO PLAINTIFF WAS THE REASONABLY FORESEEABLE OUTCOME OF WRONGFUL CONVICTIONS THAT WERE THE PRODUCT OF DEFENDANT CITY'S POLICIES AND PROCEDURES

164.    Mr. Velazquez's lawsuit names the City of New York because the unconstitutional conduct that led to his wrongful arrest, prosecution, and conviction—and the resulting devastation of his family—was not the product of isolated misconduct by individual officers, but rather the foreseeable result of longstanding policies, practices, and customs of the New York City Police Department ("NYPD") and the New York County District Attorney's Office ("DANY"), for which the City is responsible.

165.    At all relevant times, the City, through its final policymakers, maintained and tolerated widespread and persistent practices within the NYPD and DANY in homicide and other serious felony investigations and prosecutions, including the use of suggestive and coercive interrogation techniques; the fabrication or embellishment of inculpatory evidence; the suppression of exculpatory and impeachment material; the failure to conduct adequate investigations when evidence did not align with a preferred theory of guilt; the presentation of false and fabricated evidence and the suppression of exculpatory and impeachment material from grand juries, petit juries, defendants, and trial courts; summation misconduct; and the failure to adequately supervise, discipline, or retrain officers and prosecutors who engaged in such misconduct.

166.    These practices were not aberrational. They were sufficiently widespread, persistent, and well-known within the NYPD and DANY to constitute de facto municipal policy. NYPD detectives and DANY prosecutors routinely employed these tactics to secure arrests and convictions in serious cases, particularly those involving the killing of a law enforcement officer or other high-profile crimes, without regard for the risk of convicting innocent people.

167.    Long before the wrongful conviction of Jon-Adrian Velazquez, the City and its policymakers were on actual and constructive notice that these investigative and prosecutorial practices caused wrongful convictions. This notice arose from repeated judicial findings, civil rights lawsuits, overturned convictions, internal reviews, and extensive public reporting documenting that NYPD officers had coerced witnesses, fabricated evidence, and suppressed exculpatory information in homicide investigations during the same time period.

168.    The City was also on notice that wrongful convictions obtained through such practices predictably inflict severe and lasting harm not only on the wrongfully accused, but also on their immediate family members. Publicly reported exonerations and civil actions arising from NYPD investigations and DANY prosecutions in the 1990s and early 2000s documented the destruction of parent-child relationships, prolonged family separation, psychological trauma, loss of housing and financial stability, and the forced subjection of family relationships to surveillance and state control during incarceration.

169.    By way of representative example, widely reported wrongful convictions arising from NYPD homicide investigations—including the cases of Fernando Bermudez and Barry Gibbs—demonstrated that prolonged wrongful incarceration foreseeably transforms intimate family relationships into relationships defined by enforced separation, surveillance, and long-term psychological harm, requiring years of effort to repair after release. These consequences were

neither incidental nor speculative, but obvious and recurring outcomes of unconstitutional investigative practices.

170.    Public reporting and sworn accounts documented that Bermudez's incarceration profoundly disrupted his family life. His daughter, Carissa Bermudez, was born while he was imprisoned and was approximately eight years old at the time of his release. Upon his return home, Bermudez struggled to adjust to life outside prison, and his relationship with his daughter was initially strained as he attempted to learn how to parent a child he had never been permitted to raise. His wife, Crystal Bermudez, publicly described the emotional toll of his wrongful imprisonment on their family and his post-release struggles with trauma, including panic attacks, hypervigilance, and feelings of guilt and unworthiness after receiving a civil settlement.

171.    Publicly available accounts of Bermudez's case—including widely circulated articles and a photographic essay depicting his interactions with his children after release—illustrated the difficulty of rebuilding family bonds after years of enforced separation. These materials highlighted how wrongful incarceration transforms intimate family relationships into relationships defined by absence, surveillance, and emotional distance, requiring years of effort to repair.

172.    Following Mr. Bermudez's release, Crystal Bermudez experienced symptoms of PTSD, including migraines, lack of focus, severe depression, high blood pressure, and panic when having to walk through a metal detector.

173.    In another well-known example, Barry Gibbs was wrongfully convicted of murder and incarcerated for approximately seventeen years before his exoneration. Media coverage and documentary accounts documented the profound impact of Gibbs's wrongful conviction on his family, particularly his relationship with his son. Following his release, Gibbs publicly described

his struggle to reconnect with his child after years of forced separation and psychological trauma. A documentary film, Chains, followed Gibbs as he attempted to overcome the lasting effects of incarceration, rebuild his relationship with his son, and cope with the emotional loss of his parents, whom he never saw again before their deaths.

174.     These cases—among many others—were not obscure or isolated. They were the subject of extensive media coverage, civil litigation, public settlements, academic analysis, and policy discussions within New York City. They made unmistakably clear that wrongful convictions obtained through coercive interrogations, fabrication of evidence, and suppression of exculpatory material predictably inflict deep and lasting harm on families, including the deprivation of parent-child relationships, erosion of personal dignity, and long-term psychological injury.  Additionally, the damage a wrongful conviction inflicted on the family members of the wrongfully convicted was inherently obvious, particularly to the City.

175.     Despite this notice, the City failed to take reasonable steps to correct known deficiencies in NYPD or DANY training, supervision, documentation, disclosure compliance, and accountability. The City did not implement reforms sufficient to prevent the fabrication of evidence, the coercion of witnesses, or the suppression of exculpatory material, nor did it meaningfully discipline officers who engaged in such conduct.

176.     The City's failure to act amounted to deliberate indifference to the constitutional rights of individuals investigated by the NYPD and prosecuted by DANY and to the foreseeable harm inflicted on their families when wrongful convictions occur. The City's policies, customs, and deliberate indifference were the moving force behind the unconstitutional investigation, arrest, prosecution, and conviction of Jon-Adrian Velazquez.

177.    As a direct and proximate result of these municipal policies and practices, Plaintiffs Maria Velazquez, Jon-Adrian Velazquez, Jr., and Jacob Velazquez suffered the deprivation of their constitutional rights, including the destruction of normal parent-child and mother-son relationships, the invasion of their private family life, and severe and lasting emotional harm

## DAMAGES

178.    Plaintiff Maria Velazquez was an experienced and successful union organizer whose life and plans were abruptly derailed by the false arrest and malicious prosecution of her only son, Mr. Velazquez.

179.    From the date of Mr. Velazquez's arrest, through the 23-plus years of his incarceration, Plaintiff Maria Velazquez provided substantial, sustained financial, physical, and emotional support directly to the Plaintiff Children and to their mother, Ms. Cepero, to help raise them and supported them through this period of time.

180.    Plaintiff Maria Velazquez routinely and regularly visited Mr. Velazquez in prison, bringing along the Plaintiff Children to make sure they maintained whatever relationship was possible with him while he was incarcerated.

181.    Plaintiffs Jon-Adrian Jr. and Jacob Velazquez lost the services, companionship, support, and guidance of their father; lost his financial support; lost him as a viable and available role model; and were traumatized by his false arrest and malicious prosecution; moreover, Plaintiffs were caused to suffer emotional distress, anxiety, physical ailment, and mental anguish.

182.    Plaintiff Maria Velazquez lost the services, companionship, and support of her son; and suffered direct financial and emotional loss as a result of the false arrest and malicious prosecution of Mr. Velazquez; moreover, Plaintiff Maria Velazquez  was caused to suffer emotional distress, anxiety, physical ailment, and mental anguish.

183.    All three Plaintiffs lost the right and freedom to do what they wanted to with their time and with their family. Instead, to have any relationship with Mr. Velazquez, they had to expend time, money, and energy throughout Mr. Velazquez's incarceration, to travel to visit him.

184.    All three Plaintiffs suffered stigma, embarrassment, ostracization, and other societal harms by virtue of the false arrest, malicious prosecution, and wrongful conviction and incarceration of Mr. Velazquez.

185.    All of the above pecuniary and non-pecuniary damages are permanent or have had permanent consequences.

186.    All the acts and omissions committed by the Defendants described herein for which liability is claimed were done intentionally, unlawfully, maliciously, wantonly, recklessly, negligently and/or with bad faith, and said acts meet all the standards for imposition of compensatory and punitive damages.

## FIRST CAUSE OF ACTION

### 42 U.S.C. § 1983
### Deprivation of the Right to Intimate Association Under the First and Fourteenth Amendments
*Against Defendants Litrenta, Falzarano, Carboni, Potter, Mooney, Jack Roe (as Administrator of the Estate of Gennaro Giorgio), and John and Jane Doe Defendants #1–20*

187.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

188.    At all relevant times, Plaintiffs Maria Velazquez, Jon-Adrian Velazquez, Jr., and Jacob Velazquez shared close, intimate, and constitutionally protected familial relationships with Jon-Adrian Velazquez, including parent-child and mother-son relationships.

189.    At all relevant times, Defendants, acting under color of state law, engaged in conduct that intentionally, recklessly, and/or with deliberate indifference interfered with and substantially impaired those familial relationships.

190.    Defendants wrongfully arrested, prosecuted, and caused the conviction and incarceration of Jon-Adrian Velazquez through, inter alia, the fabrication of evidence, coercion of witnesses, suppression of exculpatory material, and other unlawful investigative acts.

191.    As a direct and foreseeable result of Defendants' conduct, Jon-Adrian Velazquez was removed from his family for more than two decades, during which Plaintiffs were deprived of his companionship, care, guidance, emotional support, and presence during critical formative years.

192.    Defendants knew or should have known that their conduct would sever or substantially impair Plaintiffs' intimate familial relationships, particularly where Jon-Adrian Velazquez was a young father of minor children and the sole son of Plaintiff Maria Velazquez.

193.    Defendants' conduct constituted a substantial and unjustified interference with Plaintiffs' rights to familial association and family integrity.

194.    As a direct and proximate result of Defendants' actions, Plaintiffs suffered damages, including emotional distress, loss of companionship, loss of familial support, and other injuries to be proven at trial.

## SECOND CAUSE OF ACTION

### 42 U.S.C. § 1983
### Deprivation of the Right to Privacy Under the First and Fourteenth Amendments
*Against Defendants Litrenta, Falzarano, Carboni, Mooney, Jack Roe (as Administrator of the Estate of Gennaro Giorgio), and John and Jane Doe Defendants #1–20*

195.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

196.    Plaintiffs possessed constitutionally protected rights to privacy, family integrity, and autonomy in their intimate family relationships.

197.    Defendants, acting under color of state law, engaged in arbitrary, conscience-shocking, and unjustified conduct that intruded upon Plaintiffs' private family life by causing it to be conducted under conditions of state surveillance, control, and coercion.

198.    Defendants wrongfully arrested, prosecuted, and caused the conviction and incarceration of Jon-Adrian Velazquez through, inter alia, the fabrication of evidence, coercion of witnesses, suppression of exculpatory material, and other unlawful investigative acts.

199.    Through Defendants' unlawful actions, Plaintiffs were forced to conduct their family relationships under conditions of state control, surveillance, and coercion, including monitored communications, restricted visitation, and invasive searches.

200.    Defendants' actions were not justified by any legitimate governmental interest and instead resulted from unlawful investigative and prosecutorial misconduct.

201.    As a direct and proximate result of Defendants' actions, Plaintiffs suffered invasions of their privacy, loss of family autonomy, emotional distress, and other damages.

### THIRD CAUSE OF ACTION

**42 U.S.C. § 1983**
**Denial of Access to the Courts**
*Against Defendants Litrenta, Falzarano, Carboni, Potter, Mooney, Jack Roe (as Administrator of the Estate of Gennaro Giorgio), and John and Jane Doe Defendants #1–20*

202.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

203.    At all relevant times, Plaintiffs possessed a constitutional right of access to the courts to seek post-conviction relief and to pursue civil claims arising from the unconstitutional investigation, prosecution, and conviction of Jon-Adrian Velazquez.

204.    Defendants, acting under color of state law, engaged in conduct that obstructed Plaintiffs' access to the courts by concealing, withholding, and suppressing material exculpatory evidence and information concerning investigative misconduct, as alleged above.

205.    As a direct and proximate result of Defendants' conduct, Plaintiffs were deprived of the information necessary to pursue timely relief and related civil claims, and their ability to seek judicial redress was substantially delayed.

206.    Defendants' conduct caused actual injury to Plaintiffs, including the loss or degradation of evidence, the fading memories or unavailability of witnesses, prolonged family separation, and the continued invasion of Plaintiffs' rights and interests without meaningful access to judicial relief.

207.    Defendants' actions were intentional, reckless, and/or undertaken with deliberate indifference to Plaintiffs' constitutional right of access to the courts.

208.    As a direct and proximate result of Defendants' conduct, Plaintiffs suffered damages, including those alleged herein.

## FOURTH CAUSE OF ACTION

**New York State Constitutional Due Process Pursuant to *Respondeat Superior* Against Defendant City of New York**

209.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

210.    Defendants LITRENTA, FALZARANO, CARBONI, POTTER, MOONEY,

GIORGIO, and JOHN DOEs 1-20,  by virtue of their acts and omissions detailed above, violated Plaintiffs' rights under the Due Process and Equal Protection provisions of the New York State Constitution to (a) familial association, (b) intimate privacy, (c) freedom from unreasonable state intrusion into their private lives, and (d) not to be deprived of familial consortium with an actually innocent son and father due to conscience-shocking  governmental misconduct, including investigating officers' fabrication of false or misleading evidence, and the use of such evidence at trial.

211.    As a direct and proximate result of these defendants' acts and omissions, for 23 years, 7 months, and 7 days while Plaintiffs' father and son, Jon-Adrian Velazquez, was wrongly incarcerated, Plaintiffs were deprived of the daily presence, care, guidance, and emotional support of their father and son; were forced to consent to the state's incursion into their private communications and information; and suffered other grievous and continuing injuries set forth in ¶¶ 178-186, above.

212.    The Defendants' actions violated Plaintiffs' New York State Constitutional right to due process and caused the damages set forth in ¶¶ 178-186, above.

213.    The City is liable under *respondeat superior* for the acts and omissions of LITRENTA, FALZARANO, CARBONI, POTTER, MOONEY, GIORGIO, and JOHN DOEs 1-20, within the scope of their employment, for these  damages.

## FIFTH CAUSE OF ACTION

### Intentional Infliction of Emotional Distress (New York Law)
*Against Defendants Litrenta, Falzarano, Carboni, Potter, Mooney, Jack Roe (as Administrator of the Estate of Gennaro Giorgio), and John and Jane Doe Defendants #1–20*

214.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

215.    Defendants engaged in extreme, outrageous, reckless conduct, which would shock the conscience of any reasonable person  hearing of such conduct and which any reasonable person would find intolerable and outside the normal bounds of decency  including fabricating evidence, coercing witnesses, suppressing exculpatory material, and causing the wrongful conviction and decades-long incarceration of Jon-Adrian Velazquez.

216.    Defendants knew that their conduct would cause severe emotional distress to Plaintiffs, who were the immediate family members of Jon-Adrian Velazquez.

217.    Plaintiffs' emotional distress was a direct, foreseeable, and proximate result of Defendants' conduct.

218.    Plaintiffs suffered severe emotional distress, psychological injury, and other damages as a result of Defendants' actions.

219.    Defendants' conduct was intentional, and/or reckless and occurred without regard for the devastating emotional consequences to Plaintiffs.

## SIXTH CAUSE OF ACTION

### Negligent Infliction of Emotional Distress (New York Law)
*Against Defendants Litrenta, Falzarano, Carboni, Potter, Mooney, Jack Roe (as Administrator of the Estate of Gennaro Giorgio), The City of New York, and John and Jane Doe Defendants #1–20*

220.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

221.    Defendants engaged in extreme, outrageous, reckless, and/or negligent conduct, which would shock the conscience of any reasonable person  hearing of such conduct and which any reasonable person would find intolerable and outside the normal bounds of decency

including fabricating evidence, coercing witnesses, suppressing exculpatory material, and causing the wrongful conviction and decades-long incarceration of Jon-Adrian Velazquez.

222.    Defendants knew or should have known that their conduct would cause severe emotional distress to Plaintiffs, who were the immediate family members of Jon-Adrian Velazquez, yet Defendants engaged in such conduct without exercising any reasonable care to avoid inflicting emotional distress on the Plaintiffs.

223.    Plaintiffs' emotional distress was a direct, foreseeable, and proximate result of Defendants' conduct.

224.    Plaintiffs suffered severe emotional distress, psychological injury, and other damages as a result of Defendants' actions.

225.    Defendants' conduct was intentional, and/or  reckless, and/or negligent, and occurred without regard for the devastating emotional consequences to Plaintiffs.

226.    Defendant The City of New York is responsible for the foregoing conduct and resultant damages under the doctrine of respondeat superior.

## SEVENTH CAUSE OF ACTION

### Fraudulent Concealment (New York Law)
*Against Defendants Litrenta, Falzarano, Carboni, Potter, Mooney, Jack Roe (as Administrator of the Estate of Gennaro Giorgio), and John and Jane Doe Defendants #1–20*

227.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

228.    At all relevant times, Defendants possessed material information concerning the investigation and prosecution of Jon-Adrian Velazquez, including evidence bearing on his innocence, Defendants' own misconduct, and the falsity of the alibi rebuttal evidence they fabricated to discredit Mr. Velazquez's alibi defense.

229.    Defendants knowingly concealed, withheld, and failed to disclose this material information, while affirmatively maintaining that Mr. Velazquez's arrest, prosecution, and conviction were lawfully obtained.

230.    Defendants knew or should have known that Plaintiffs were actively seeking to understand, challenge, and remedy their separation from Mr. Velazquez, and the conditions imposed upon them by his wrongful incarceration, and would reasonably rely on the absence of disclosed misconduct as confirmation that no such misconduct existed.

231.    Plaintiffs reasonably relied on Defendants' concealment and omissions and lacked independent means of discovering the concealed information.

232.    As a direct and proximate result of Defendants' fraudulent concealment, Plaintiffs were delayed in pursuing civil claims and suffered damages, including prolonged family separation, continued intrusion into family life, emotional distress, and other injuries alleged herein.

233.    Defendants' concealment continued until the suppressed evidence was disclosed and Mr. Velazquez was exonerated.

### EIGHTH CAUSE OF ACTION

**42 U.S.C. § 1983**
***Monell* Liability Based on the Conduct of the NYPD**
*Against Defendant City of New York*

234.    Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further alleges as follows:

235.    The foregoing violations of Mr. Velazquez's federal constitutional rights and injuries were directly, foreseeably, proximately, and substantially caused by conduct chargeable to the CITY, amounting to unconstitutional policies, practices, and/or customs with respect to the

rights of persons, including Mr. Velazquez, who are investigated by NYPD officers and subsequently prosecuted for alleged criminal offenses.

236.    Under the principles of municipal liability for federal civil rights violations, the CITY's Police Commissioner and/or his authorized delegates, during all times relevant to this action, had final responsibility as municipal policymakers for training, instructing, supervising, and disciplining police officers and other employees of the NYPD with respect to the investigation and prosecution of criminal matters, including but not limited to constitutional obligations prohibiting the use of psychological coercion during the questioning or interrogation of suspects and witnesses; requiring officers to refrain from manufacturing, or causing the manufacturing of, false or unreliable identification evidence, false or unreliable witness statements, and false or materially misleading or incomplete reports for use against criminal suspects and defendants in criminal prosecutions and trials; prohibiting officers from giving false testimony against a criminal suspect; and prohibiting the initiation of prosecutions without probable cause.

237.    In his role as policymaker, the New York City Police Commissioner and/or his authorized delegates maintained a policy, custom, or practice of violations by NYPD employees of the foregoing constitutional obligations, or were deliberately indifferent to such violations by NYPD employees, and to the obvious need to train, supervise, and discipline NYPD employees with respect to these obligations.

238.    Before Mr. Velazquez's arrest, policymaking officials at the NYPD knowingly failed to implement adequate policies, procedures, regulations, practices, customs, training, supervision, or discipline concerning the foregoing constitutional obligations.

239.    During all periods relevant to this lawsuit, the New York County District Attorney was the chief law enforcement officer for New York County and, personally and/or through

authorized delegates, had final authority and constituted a City policymaker with respect to the use of evidence gathered by NYPD officers and detectives during criminal proceedings.

240.    The New York County District Attorney, and/or authorized delegates, had final managerial responsibility for training, instructing, supervising, and disciplining assistant district attorneys and other employees in that office regarding their conduct in connection with the initiation and prosecution of criminal matters.

241.    The New York County District Attorney, personally and/or through authorized delegates, at all relevant times had final authority to promulgate and implement administrative and managerial policies and procedures, including policies and procedures concerning personnel hiring, training, supervision, and discipline, with respect to the Office's performance of its duties.

242.    In the role as policymaker for the City, the New York County District Attorney and/or authorized delegates maintained a policy, custom, or practice of deliberate indifference to violations by NYPD officers and detectives of their constitutional obligations; to the risk that such violations would and did produce false or unreliable evidence, testimony, and convictions; and to the risk of future such violations by NYPD employees.

243.    The aforesaid deliberate or de facto policies, procedures, regulations, practices, and/or customs, including the failure to properly instruct, train, supervise, and/or discipline employees with respect thereto, were implemented or tolerated by policymaking officials for the CITY, including but not limited to the NYPD Commissioner and the New York County District Attorney, who knew or should have known to a moral certainty that such policies, procedures, regulations, practices, and/or customs concern issues that regularly arise in the investigation and prosecution of criminal cases; that such issues either present police employees with difficult choices of the sort that instruction, training, and/or supervision will make less difficult, or that the

need for further instruction, training, supervision, and/or discipline was demonstrated by a history of police employees mishandling such situations, as well as the incentives police employees have to make the wrong choice; and that the wrong choice by such employees concerning such issues will frequently cause the deprivation of the constitutional rights of criminal suspects or defendants and cause them constitutional injury, and that those criminal suspects or defendants will have close family members who will be directly affected by these constitutional violations.

244.    The aforementioned policymaking officials had the knowledge and notice described above based upon, among other circumstances, credible allegations—many substantiated by judicial decisions—finding that NYPD detectives had manufactured false or unreliable identification and other evidence through improper suggestion, promises, or coercion, and/or knowingly given false or misleading testimony; civil lawsuits, some of which resulted in substantial civil settlements, credibly alleging that police officers had falsified or exaggerated evidence and/or conducted searches or made arrests without probable cause; numerous decisions of the United States Supreme Court, the United States Court of Appeals for the Second Circuit, federal district courts, the New York Court of Appeals, and the New York Appellate Division addressing the difficult issues that regularly arise under the probable cause requirement of the Fourth Amendment; judicial decisions placing the NYPD on notice that the City could be held liable for failure to adequately train police officers and investigators regarding their obligation to provide truthful testimony; formal reports of the New York City Comptroller's Office and the Association of the Bar of the City of New York criticizing the NYPD and the New York City Law Department for failing to follow up substantial civil settlements for police misconduct with disciplinary or other remedial action; the Mollen Commission Report, dated July 7, 1994, following a two-year investigation and a year of hearings, which found a culture of corruption

within the NYPD, pervasive misconduct by officers and detectives including fabrication of evidence and testimony, and tolerance of that misconduct by Department leadership; and the inherent and obvious need to train, supervise, and discipline police officers in such obligations to counteract the pressures and powerful incentives officers face to close cases and obtain arrests and convictions.

245.    Many of the foregoing illegal practices, their toleration by NYPD and DANY policymakers, and the culture of corruption created by such indifference were documented prior to Mr. Velazquez's 1998 arrest and subsequent prosecution and conviction in the Mollen Commission Report, formally known as the Report of the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the New York City Police Department.

246.    The Mollen Commission was formed in 1992 following widespread reports of police corruption, including the fabrication of evidence in criminal investigations.

247.    The Commission conducted an extensive investigation and held highly publicized hearings over a two-year period, culminating in the issuance of its final report on July 7, 1994, less than two years before Mr. Velazquez's arrest.

248.    The Commission found that the NYPD's unwillingness to address corruption "manifested itself in every component of the Department's corruption controls from command accountability and supervision, to investigations, police culture, training and recruitment."

249.    The Commission found that officers commit falsification to serve what they perceive to be legitimate law enforcement ends, often based on the belief that the defendant is guilty regardless of the legality of the arrest, leading to the manufacture of false narratives. Frustrated by what they perceive to be unrealistic legal constraints and by their inability to control crime through lawful means, officers take the law into their own hands, resulting in police

falsification.

250.    The Commission further observed that the practice of police falsification was so common in certain precincts that it had spawned its own term: "testilying."

251.    In at least one NYPD unit, the Commission found that the commanding officer not only tolerated but affirmatively encouraged the unlawful practices of falsifying documents and committing testimonial perjury.

252.    The Commission concluded that there existed a deep-rooted perception among officers of all ranks within the Department that compromising facts to fight crime was necessary and justified, even if unlawful, and that this belief was so entrenched—particularly in high-crime precincts—that officers expressed disbelief when confronted with evidence of perjury, asserting that defendants were guilty regardless.

253.    The Commission also concluded that the Department's top commanders bore responsibility for this culture, noting the absence of sanctions against supervisors or commanders for permitting perjury or falsification, the lack of self-initiated Internal Affairs investigations into patterns of perjury and falsification, and the failure of Police Commissioners and Internal Affairs leadership to focus on eliminating these practices.

254.    Consistent with the Mollen Commission's findings, NYPD and DANY policymakers were aware, prior to Mr. Velazquez's prosecution, that many detectives routinely violated proper police protocols in homicide and felony investigations, including through the use of unduly suggestive identification procedures, coercive or suggestive interview and interrogation techniques, and the preparation of false or misleading documentation.

255.    Despite this knowledge, NYPD and DANY policymakers did little or nothing to prevent such misconduct, resulting in numerous wrongful arrests, prosecutions, and convictions

directly attributable to their deliberate indifference.

256.    NYPD detectives also used improperly suggestive identification procedures, as they did in this case, to manufacture false or unreliable identification evidence in numerous homicide and other serious felony cases, including a number that resulted in the wrongful conviction of innocent people.

257.    In 1991, NYPD detectives employed coercive and suggestive investigative tactics that resulted in the wrongful conviction of Fernando Bermudez for a homicide, despite the fact that Bermudez did not match eyewitness descriptions of the shooter in any material respect. Multiple witnesses described the perpetrator as significantly shorter, slimmer, and lacking the distinctive physical characteristics Bermudez possessed, and several witnesses who were present at close range failed to identify Bermudez or affirmatively stated that he could not have been the shooter. Rather than crediting these non-identifications and description mismatches, detectives conducted improperly suggestive photo identification procedures, directing witnesses' attention to Bermudez's photograph, and repeatedly exposing witnesses to Bermudez as the suspect police believed to be responsible.

258.    Witnesses were also pressured to conform their accounts to the prosecution's theory, and alternative suspects who more closely matched the descriptions were not meaningfully pursued. At pretrial hearings and at trial, detectives falsely testified that the identifications were the product of independent witness recollection and that identification procedures had been conducted properly, while concealing the suggestive nature of those procedures and the witnesses' prior failures to identify Bermudez. At the same time, detectives and prosecutors suppressed exculpatory evidence, including non-identifications, inconsistencies in witness accounts, and evidence pointing to other suspects, depriving the defense of the ability to meaningfully challenge

the reliability of the identification evidence. This manufactured identification evidence, and the suppression of favorable evidence, led to Mr. Bermudez's wrongful conviction. He spent 18 years in prison before courts determined that the identification procedures were constitutionally tainted and that the testimony used to secure his conviction was unreliable, leading to the vacatur of his conviction. As described *supra*, Mr. Bermudez's wrongful conviction led to his separation from his daughter, who suffered as a result.

259.    In 1992, Luis Kevin Rojas was wrongfully convicted of murder in connection with a shooting in Manhattan based on eyewitness identifications manufactured by the NYPD. As in Mr. Velazquez's case, although Mr. Rojas bore no resemblance to the descriptions of the shooter provided by 911 callers, police officers arrested him. They then directed him to change his jacket to match the shooter's reported clothing, and then brought him to the crime scene for show-up identifications. The following morning, officers conducted a lineup in which none of the fillers resembled Mr. Rojas. As a result of these unduly suggestive procedures, Mr. Rojas was wrongly identified. In 1995, Mr. Rojas's conviction was overturned, and a jury subsequently acquitted him at retrial.

260.    After the arrest of Kareem Bellamy in 1994 for a stabbing death, an NYPD detective conducted a lineup that included Bellamy. The only known eyewitness could not positively identify Bellamy. The detective took the witness into a private room for an improper private meeting, after which the witness suddenly claimed to be certain that Bellamy was the perpetrator. The witness's identification of Bellamy was a significant cause of Bellamy's conviction at trial. Bellamy was imprisoned for 14 years before his conviction was overturned and the charges against him dismissed.

261.    In 1994, NYPD detectives investigating a murder in Queens put Jaythan Kendrick

in a lineup and showed the lineup to 10-year-old witness Brandon Rogers. Rogers selected a filler, number six. Detectives had Rogers review and sign a Line-Up Report that identified number three, Kendrick, as the police "Subject." Detectives then took Rogers and Rogers's mother into a private room, where Rogers heard a detective say that Rogers had selected the wrong person. Rogers, having learned that number three, Kendrick, was the police suspect, now told the detectives that number three was his "second choice." Rogers testified to this manufactured identification of Kendrick at trial, and Kendrick was convicted and spent almost 25 years in prison before forensic evidence that exculpated Kendrick came to light and his conviction was vacated and the indictment dismissed.

262.    In 1996, an NYPD detective conducted a lineup in the investigation of Emmett Wheaton for a robbery. At the lineup, Wheaton heard Gillen saying to the witness, "Is it number four? Is it number four? Is it number four?" The witness picked out number four, Wheaton, and Wheaton was arrested and charged. Wheaton was acquitted at trial, but only after spending almost a year in jail.

263.    In 1996, NYPD detectives investigating a homicide employed coercive interview tactics and improperly suggestive identification procedures to manufacture evidence against Pablo Fernandez. Witnesses initially failed to identify Fernandez, provided descriptions of the shooter that did not match Fernandez in any material respect, or affirmatively stated that Fernandez was not the person they had seen. Rather than crediting those non-identifications and description mismatches, detectives repeatedly re-interviewed witnesses, pressured them to change their accounts, and conveyed—explicitly and implicitly—that Fernandez was the person the police believed to be responsible for the crime. Fernandez was arrested in 1997, despite the fact that the identifications obtained against him contradicted the witnesses' original descriptions and

observations. The fabricated and/or coerced eyewitness identifications became central to the prosecution's case and Fernandez was wrongly convicted and spent approximately 24 years in prison before a federal district court granted his habeas petition and vacated his conviction, finding that the evidence used to convict him—including the eyewitness identifications—was unreliable and the product of improper police conduct.[3]

264.    In 1997, NYPD detectives employed coercive and suggestive investigative tactics that resulted in the wrongful conviction of Jabar Walker for a double homicide. Although eyewitnesses who knew Walker personally failed to identify him as the shooter, detectives persisted in pursuing Walker as a suspect. These non-identifications were suppressed from the defense, and detectives used suggestive and coercive identification procedures, including presenting witnesses with Walker's photograph and steering their accounts to conform to the prosecution's theory to obtain positive identifications of Walker. Detectives also relied on coerced and incentivized testimony from a jailhouse informant who later recanted and admitted that his testimony was fabricated under pressure from law enforcement. This manufactured evidence was central to the prosecution's case. Walker was convicted and spent more than twenty-five years in prison before his conviction was vacated and the indictment dismissed, after prosecutors determined that the evidence used against him was unreliable and the product of improper police conduct.

---

[3] *Accord* Civil Complaint in *Negron v. City of New York*, 18 CV 6645 (DG) (RLM) (E.D.N.Y.) (Doc. # 1) (11/20/2018) at ¶¶ 212-373, incorporated here by reference (detailing numerous additional instances of police misconduct which provided the NYPD with notice of its officers misconduct, and establish the NYPD's policy of acquiescence, ratification, and the failure to train, supervise, and discipline); First Amended Civil Complaint in *Buari v. City of New York*, 18 CV 12299 (MKV)(BCM) (S.D.N.Y.)(Doc. # 58) (11/11/2019) at ¶¶ 304, 308-312, incorporated here by reference (same); *Buari v. City of New York*, 530 F. Supp. 3d 356, 402 (S.D.N.Y. 2021) (Vyskocil, J.) (denying City' motion to dismiss and holding such allegations "plausibly alleged a failure by the NYPD to train, supervise, and discipline.")

265.    In 1999, NYPD detectives brought Jason Chambers, who had witnessed a murder, to view a lineup containing suspect Pierre Jenkins. Chambers picked Jenkins. The next year at a pretrial hearing, Chambers testified that he had picked Jenkins only after the detectives had told him: "you got to pick somebody. It was like, you got to get him. Pick somebody." Chambers then recanted his identification of Jenkins. Asked why he had picked Jenkins originally, Chambers said: "Because the detectives were, like, you had to pick somebody. I just wanted to go home and they were just, like, forcing me to pick somebody." After Chambers's recantation, prosecutors dropped the murder charges against Jenkins.

266.    In 1999, NYPD detectives investigating a deadly shooting conducted a lineup containing suspect Ronald Ambrose. Witness Edgar Rivera had, within an hour of the shooting, identified another man as the perpetrator. Rivera viewed the lineup containing Ambrose and did not identify Ambrose. Detective Jose Rosario then took Rivera into an office at the police precinct. Approximately 20 minutes later, Rosario and Rivera returned, and Rivera identified Ambrose as one of the shooters. After this identification, Ambrose was indicted for murder. Based on independent exculpatory evidence, Ambrose was acquitted at trial, but only after having served over two years in pretrial detention.

267.    In 2005, Detective Robert Moscoso presented a lineup containing Julio Negron to an eyewitness to a Queens shooting. The eyewitness made an equivocal statement about whether he recognized Negron as the shooter. Moscoso then manufactured the witness's positive identification of Negron by showing the witness a Line-Up Report that identified Negron, in capital letters, as the police "SUSPECT," and taking the witness into a private room and speaking to him for at least 15 minutes. Negron spent nearly 10 years in prison before the New York Court of Appeals reversed his conviction.

268.    Other examples of such misconduct by the NYPD can be found in a report issued

by the Conviction Review Unit ("CRU") of the Brooklyn DA's office in July 2020. Titled 426

Years: An Examination of 25 Wrongful Convictions in Brooklyn, New York, the report examined

the first 25 convictions identified by CRU since its inception in 2014.[4] Of the wrongful convictions

examined in the CRU report, most occurred in the 1980s and 1990s and involved homicides. In 25

percent of the cases examined, the CRU concluded that the wrongful convictions involved

unreliable identifications by eyewitnesses—including obvious limitations on the witness's ability

to view the suspect, inconsistencies in the identification over time, and the use of in-court show

ups, as well as likely police coaching as to whom the witness should select.

269.    There are numerous other examples of homicide investigations in the late 1980s

and 1990s in which NYPD officers used similar unlawful tactics to manufacture false testimony

by witnesses. In many of those cases, police officers also failed to disclose exculpatory evidence

or follow obvious leads that would lead to another suspect. Such wrongful convictions include

those of Clifford Jones in 1981, Scott Fappiano in 1985, Rafael Ruiz in 1985, Anthony Faison in

1988, Barry Gibbs in 1988, Charles Shepherd in 1988, Derrick Deacon in 1989, William Lopez in

1989, Bernie Pollard in 1989, Mark Denny in 1989, Shabaka Shakur in 1989, Jonathan Fleming in

1990, Jeffrey Blake in 1991, Huwe Burton in 1991, Carlos Davis in 1991, Ruben Ortega in 1991,

John Dwayne Bunn in 1992, Derrick Hamilton in 1992, Rosean Hargrave in 1992, Sharrif Wilson

and Antonio Yarbough in 1992, Reginald Connor and Everton Wagstaffe in 1993, Jose Garcia and

Carlos Morillo in 1993, Ruddy Quezada in 1993, Jabbar Collins in 1994, Carlos Weeks in 1995,

---

[4] Post-incident evidence is relevant to a claim of municipal liability as it may "shed some light on what policies existed in the city on the date of an alleged deprivation of constitutional right." *Bordanaro v. McLeod*, 871 F.2d 1151, 1167 (1st Cir. 1989); *see also Henry v. County of Shasta*, 132 F.3d 512, 519 (9th Cir. 1997) ("[W]e reiterate our rule that post-event evidence is not only admissible for purposes of proving the existence of a municipal defendant's policy or custom, but is highly probative with respect to that inquiry.")

Hector Gonzalez in 1996, and Richard Rosario in 1998. In all of these cases, these individuals had their convictions reversed or vacated after police misconduct came to light, and only after serving many years in prison. Many of these individuals were separated from loving parents and children when wrongly incarcerated, who suffered as a result.

270.    Until 2010, the NYPD had no policy, practice, or procedure to learn about and investigate allegations in lawsuits, settlements in lawsuits, or judicial findings of improper or illegal behavior by police officers concerning investigations, arrests, and prosecutions. This was even though, since 1992, the NYPD had been admonished by two different New York City Comptrollers, as well as the Bar Association of the City of New York, to impose discipline on officers involved in settled civil cases in which constitutional violations were alleged, and to institute new training in response to such claims and/or other remedial action.

271.    In a 1992 report, then-Comptroller Elizabeth Holtzman recommended that the NYPD "monitor claims and lawsuits involving charges of police misconduct in addition to complaints filed with the Civilian Complaint Review Board and correlate the data from all three sources," and to "use the data from claims and lawsuits, as well as civilian complaints, to identify and correct problems in training or other procedures and policies; and identify individual police officers and take appropriate follow-up action, including additional training or other assistance" in order to "improve the functioning of the NYPD."

272.    In a 1999 report, then-Comptroller Alan Hevesi recommended that the City "[r]eview settled claims data," and re-train and discipline officers accordingly.

273.    In a 2000 report, The Association of the Bar of the City of New York concluded that the City's "policy" of failing to re-train or discipline officers involved in settled civil rights lawsuits "has resulted in a situation in which the City consistently misses opportunities to increase

the protection of the rights of persons in the City."

274. The NYPD took no official action in response to any of these reports and recommendations.

275. In a report issued in 2010, then-Comptroller John Liu reported that, for the first time, the City paid out more money in the 2009-10 fiscal year for lawsuits against the NYPD than against any other City agency. He again recommended that the NYPD monitor incidents and practices that would give rise to claims.

276. The NYPD failed to act despite its being put on notice, in the 1990's and early 2000's, to officers' misconduct by numerous civil lawsuits credibly alleging officers' violations of individuals' constitutional rights.

277. In the following civil rights lawsuits, the City paid substantial monetary settlements to plaintiffs for their claims that NYPD officers manufactured evidence, gave false testimony or statements, initiated prosecutions without probable cause, or otherwise violated the constitutional rights of the accused:

(a) *Almonte v. City of New York*, et al., 99-cv-519 (E.D.N.Y.) (settled 7/12/00, $30,000): plaintiff arrested on drug sale charges without probable cause; indictment dismissed by the court one year, eight months after arrest.

(b) *Boland v. City of New York*, et al., 93-cv-5058 (E.D.N.Y.) (settled 8/6/96, $30,000): plaintiff arrested without probable cause; held in custody for two nights.

(c) *Bradley v. City of New York*, et al., 97-cv-4076 (E.D.N.Y.) (settled 10/14/98, $20,000): plaintiff ordered to pull car over without probable cause; falsely arrested based on outstanding Illinois warrant issued for a different person; and held in custody for three days despite evidence that she was not the person being sought by

the warrant.

(d) *Carthens v. City of New York*, et al., 94-cv-8764 (S.D.N.Y.) (settled 3/18/97, $200,000): plaintiff arrested without probable cause; police fabricated that plaintiff had dropped a bag that contained cocaine and a weapon; police swore to a Criminal Court complaint with false allegations.

(e) *Castro v. City of New York*, et al., 94-cv-5114 (S.D.N.Y.) (settled 1/14/97, $72,500): plaintiff arrested on weapons possession charges without probable cause; charges dropped after plaintiff was held in custody for several hours. Complaint alleged that an NYPD officer responded to plaintiff's complaints about wrongful arrest by saying that he would not release her, but if the arrest were in error she could "always sue the City, [because] they got a lot of money."

(f) *Coleman*, et al. v. *City of New York*, et al., 00-cv-2019 (E.D.N.Y.) (settled 1/2/01, $60,000): two plaintiffs arrested without probable cause; charges pending for 2 ½ months before dismissal. Complaint alleged that the NYPD had a policy, custom, and/or practice of arresting individuals without probable cause in lower income areas and areas with high reports of crime, which resulted in plaintiffs' false arrest and malicious prosecution.

(g) *Cotto v. City of New York*, et al., 00-cv-1341 (E.D.N.Y.) (settled 12/01/00, $30,000): plaintiff arrested without probable cause; charges pending for one month before dismissal by the court.

(h) *Crespo v. City of New York*, et al., 93-cv-8847 (S.D.N.Y.) (settled 8/29/06, $25,000): plaintiff arrested without probable cause on weapons possession charges. Complaint alleged a Monell claim based on the NYPD's "fostering [of] a policy to

which perjury and the falsification of documents were methods of securing indictments and convictions of innocent individuals."

(i)  *Dabbah v. City of New York*, et al., 95-cv-2952 (S.D.N.Y.) (settled 3/12/96, $35,000): plaintiff arrested without probable cause; charges dismissed on the People's motion eight months after arrest.

(j)  *Daniels v. City of New York*, et al., 00-cv-1981 (S.D.N.Y.) (settled 3/15/00, $28,500): plaintiff arrested without probable cause on weapons charges; charges dismissed by the court eight months after arrest.

(k)  *Davis v. City of New York*, et al., 00-cv-387 (S.D.N.Y.) (settled 1/19/00, $175,000): plaintiff arrested without probable cause; spent four months in jail before jury acquittal; during criminal trial, the trial court found that plaintiff's arrest was "illegal and outrageous," that he was arrested solely because of his race, and that police took plaintiff's photo and showed it to the complainant unlawfully and without probable cause.

(l)  *Deluise v. City of New York*, et al., 98-cv-4535 (S.D.N.Y.) (settled 3/18/99, $28,000): plaintiff arrested without probable cause.

(m) *Denizard v. City of New York*, et al., 98-cv-423 (E.D.N.Y.) (settled 6/4/99, $64,000): plaintiff arrested without probable cause for disorderly conduct and resisting arrest; charges dismissed on the People's motion eight months after arrest.

(n)  *Dennis v. City of New York*, et al., 98-cv-5355 (E.D.N.Y.) (settled 5/26/99, $15,000): plaintiff threatened, assaulted, and arrested without probable cause; false charges filed against plaintiff.

(o)  *Espinal v. City of New York*, et al., 95-cv-9759 (S.D.N.Y.) (settled 6/7/96,

$800,000): plaintiff arrested without probable cause; police falsely testified before the grand jury; after plaintiff's guilty plea, the conviction was vacated and the indictment was dismissed as procured by false and/or perjured testimony.

(p) *Fields v. City of New York*, et al., 99-cv-8130 (E.D.N.Y.) (settled 7/28/00, $15,000): plaintiff arrested without probable cause; prosecution continued for four months before dismissal by the court.

(q) *Frantino v. City of New York*, et al., 96-cv-3725 (S.D.N.Y.) (settled 4/15/97, $50,000): two plaintiffs arrested without probable cause and issued Desk Appearance Tickets; district attorney declined prosecution; parking summons issued by police dismissed for facial insufficiency.

(r) *Gager v. City of New York*, et al., 97-cv-4718 (S.D.N.Y.) (settled 6/1/98, $105,000): plaintiff issued false summonses for criminal trespass and disorderly conduct; charges dismissed on the People's motion.

(s) *Gallion v. City of New York*, et al., 93-cv-5180 (S.D.N.Y.) (settled 7/18/94, $25,000): plaintiff arrested without probable cause; charges were dismissed.

(t) *Gallo v. City of New York*, et al., 95-cv-2105 (E.D.N.Y.) (settled 7/5/94, $13,334): plaintiff arrested for robbery without probable cause; charges subsequently dismissed.

(u) *Gaylock*, et al. v. *City of New York*, et al., 96-cv-6183 (E.D.N.Y.) (settled 3/6/98, $90,000): plaintiffs arrested without probable cause on weapons charges, which were pending for 10 months before dismissal by the court.

(v) *Golston v. City of New York*, et al., 98-cv-4206 (E.D.N.Y.) (settled 10/26/00, $25,000): plaintiff arrested on false charges of criminal harassment, which were

dismissed after four months.

(w) *Gordon v. City of New York*, et al., 97-cv-8035 (S.D.N.Y.) (settled 11/12/98, $40,000): plaintiff arrested without probable cause based on false allegations in felony complaint made by NYPD officers; charges dismissed by the prosecutor three months after arrest.

(x) *Gurley v. City of New York*, et al., 95-cv-2422 (E.D.N.Y.) (settled 8/21/97, $1,750,000): conviction obtained in 1972 was vacated more than 20 years later based on prosecutor's withholding of exculpatory evidence, including an NYPD ballistics report; complaint contained a malicious prosecution claim.

(y) *Howlen v. City of New York*, et al., 97-cv-6544 (S.D.N.Y.) (settled 12/22/97, $200,000): plaintiff arrested without probable cause; police swore to a false complaint; police testified falsely during preliminary hearing and in the grand jury; police admitted to committing perjury in connection with plaintiff's case.

(z) *Jefferson v. City of New York*, et al., 98-cv-1097 (E.D.N.Y.) (settled 4/14/99, $175,000): plaintiff, a corrections officer, arrested on drug charges without probable cause; charges pending for five months before grand jury returned no true bill; complaint alleged that NYPD officers failed to inform prosecutors of their knowledge of plaintiff's innocence during the prosecution.

(aa)     *Kadlub v. City of New York*, et al., 95-cv-1080 (E.D.N.Y.) (settled 12/11/96, $34,000): plaintiff arrested without probable cause on drug possession and sale charges.

(bb)     *Lindo v. City of New York*, et al., 98-cv-9066 (S.D.N.Y.) (settled 11/21/00, $85,000): plaintiff arrested without probable cause; police swore to a false felony

complaint; district attorney agreed to dismissal of charges.

(cc)     *Lopez*, et al. v. *City of New York*, et al., 93-cv-6516 (S.D.N.Y.) (settled 1/2/96, $80,000): two plaintiffs were arrested without probable cause and unlawfully strip searched; district attorney declined to prosecute.

(dd)     *Lovell v. City of New York*, et al., 00-cv-0002 (S.D.N.Y.) (settled 10/20/00, $40,000): plaintiff arrested without probable cause for turnstile jumping based on false statements made by an NYPD officer in a criminal complaint.

(ee)     *Mahase v. City of New York*, et al., 96-cv-6105 (E.D.N.Y.) (settled 6/16/00, $75,000): plaintiff arrested and detained without probable cause; charges dismissed on the district attorney's motion due to lack of probable cause.

(ff) *Marino v. City of New York*, et al., 97-cv-9003 (S.D.N.Y.) (settled 6/4/98, $90,000): plaintiff arrested and strip-searched without probable cause; released when the district attorney declined to prosecute the case.

(gg)     *Martinez v. City of New York*, et al., 96-cv-289 (E.D.N.Y.) (settled 4/12/99, $50,000): plaintiff assaulted and arrested without probable cause when police entered her apartment with a battering ram looking for her son.

(hh)     *McCaskill v. City of New York*, et al., 96-cv-3687 (E.D.N.Y.) (settled 7/10/97, $100,000): plaintiff arrested for disorderly conduct without probable cause.

(ii) *Nakajima*, et al. v. *City of New York*, et al., 94-cv-857 (E.D.N.Y.) (settled 3/8/95, $51,000): two plaintiffs arrested without probable cause while driving in a rental car, despite providing a valid rental agreement.

(jj) *Napoli v. City of New York*, et al., 97-cv-1255 (E.D.N.Y.) (settled 4/9/99, $60,000):

plaintiff arrested and indicted on weapons possession and assault charges based on false testimony by NYPD officers in the grand jury; plaintiff acquitted approximately one year after arrest.

(kk)     *Nieves v. City of New York*, et al., 94-cv-1491 (E.D.N.Y.) (settled 4/25/96, $50,000): plaintiff, a security officer with the City's Department of Business Services with a Special Patrolman's license, was arrested without probable cause in a baseless drug sweep, but never arraigned; due to the incident, plaintiff's employer revoked his license; an officer concocted a false story preventing plaintiff from defending himself at a hearing pertaining to the revocation of his license.

(ll) *Paster v. City of New York*, et al., 95-cv-10316 (S.D.N.Y.) (settled 3/23/98, $115,000): plaintiff arrested without probable cause; charges against him were dismissed.

(mm)     *Perez v. City of New York*, et al., 98-cv-2331 (S.D.N.Y.) (settled 1/16/99, $15,000): plaintiff arrested without probable cause; charges dismissed by the court approximately one month after arrest.

(nn)     *Rojas v. City of New York*, et al., 96-cv-8728 (S.D.N.Y.) (settled 3/31/97, $800,000): plaintiff arrested without probable cause; police falsely charged plaintiff and testified falsely in the grand jury; plaintiff's conviction was vacated and indictment dismissed.

(oo)     *Sharp v. City of New York*, et al., 97-cv-4236 (S.D.N.Y.) (settled 3/17/98, $55,000): plaintiff arrested and strip-searched without probable cause; falsely charged; charges were subsequently dismissed.

(pp)     *Sierzputowski*, et al. v. *City of New York*, et al. (E.D.N.Y.) (settled 12/1/97,

$55,000): two plaintiffs arrested without probable cause while driving a rental car, despite producing proof of valid rental; plaintiffs held in custody for 41 hours until arrests voided.

(qq)     *Silver v. City of New York*, et al., 97-cv-5384 (E.D.N.Y.) (settled 3/2/99, $40,000): plaintiff arrested without probable cause; charges were dropped approximately four months later.

(rr) *Sweazie v. City of New York*, et al., 99-cv-419 (E.D.N.Y.) (settled 10/20/99, $20,000): plaintiff arrested on weapons possession charges; prosecution continued based on NYPD officers' false statements in felony complaint; charges dismissed when grand jury voted no true bill.

(ss) *Taousse v. City of New York*, et al., 95-cv-7965 (S.D.N.Y.) (settled 12/4/96, $16,000): plaintiff arrested without probable cause and falsely charged with violating traffic laws; charges were dismissed.

(tt) *Tomback v. City of New York*, et al., 96-cv-3972 (E.D.N.Y.) (settled 2/9/98, $20,000): plaintiff arrested without probable cause; charges dismissed due to lack of evidence.

(uu)     *Tong v. City of New York*, et al., 95-cv-7965 (S.D.N.Y.) (settled 10/4/95, $35,000): plaintiff arrested and strip searched for a traffic violation, which was later dismissed.

(vv)     *Udofia v. City of New York*, et al., 00-cv-4872 (E.D.N.Y.) (settled 1/4/01, $30,000): plaintiff arrested and detained without probable cause; was not prosecuted.

(ww)     *Victor v. City of New York*, et al., 96-cv-243 (S.D.N.Y.) (settled 6/17/96,

$725,000): plaintiff arrested without probable cause; police falsely charged plaintiff and committed perjury in the grand jury; plaintiff's conviction was vacated and indictment dismissed.

(xx)     *Williams v. City of New York*, et al., 98-cv-5917 (S.D.N.Y.) (settled 2/1/99, $300,000): plaintiff arrested without probable cause for possessing a controlled substance; police falsified evidence to effect an unlawful arrest.

(yy)     *Ziehenni v. City of New York*, et al., 98-cv-3763 (S.D.N.Y.) (settled 3/5/99, $55,000): plaintiff arrested without probable cause; charges pending for 2 ½ months before they were dismissed by the court; complaint alleged the arrest was made in retaliation for plaintiff's prior CCRB complaint.

278.    The NYPD did not discipline any of the officers involved for their conduct, despite paying out the above settlements.

279.    The aforementioned policies, customs, and/or practices of the NYPD and/or DANY regarding, and policymakers' deliberate indifference to, coercion of false statements, fabrication of evidence including manufacturing eyewitness identifications through suggestion, and initiation of arrests and prosecutions without probable cause directly, foreseeably, proximately, and substantially caused the violations of Mr. Velazquez's federal constitutional rights in this case and his resulting injuries, as well as those of Plaintiffs.

280.    It was foreseeable to the City of New York that these policies and practices would have a direct harmful impact on the falsely accused and the families of the falsely accused, such as Plaintiffs.

281.    By virtue of the foregoing, under 42 U.S.C. § 1983, and *Monell v. Dept. of Social Services of the City of New York,* 436 U.S. 658 (1978), Defendant City of New York is liable for

the misconduct of NYPD officers which caused Mr. Velazquez's wrongful prosecution and conviction and all his consequential damages, and the reasonably foreseeable damages to the Plaintiffs herein.

**NINTH CAUSE OF ACTION**
**42 U.S.C. § 1983**
*Monell* **Liability for Actions of the New York County District Attorney's Office**
*Against Defendant City of New York*

282.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

283.    Prior to, at the time of, and subsequent to Mr. Velazquez's criminal prosecution, including during the period that the New York County District Attorney's Office was opposing Mr. Velazquez's efforts to overturn his unconstitutionally-obtained conviction and causing the continuation of his constitutional injuries, the New York County District Attorney, as the manager and chief administrator of the New York County District Attorney's Office, a New York City agency, maintained a policy, custom or practice of deliberate indifference to violations by his employees of the constitutional right to due process and a fair trial guaranteed to all criminal suspects and defendants under the Constitution and laws of the United States and the State of New York.

284.    Such violations included the knowing, reckless, or negligent use of false or misleading evidence and argument in the grand jury and at trial and the failure to correct such false or misleading evidence and argument, as well as the deliberate, reckless, or negligent withholding of exculpatory and impeachment evidence favorable to the defense and required to be disclosed as "*Brady* material" by the Due Process and Fair Trial Clauses of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. See *Brady v. Maryland*, 373 U.S. 83 (1963).

285.    Prosecutors in New York County (and NYPD detectives working with them on

criminal investigations and prosecutions) were permitted and in fact instructed by their Offices to refrain from making any record of false or inconsistent out-of-court statements of prospective prosecution witnesses, or information bearing upon their potential motives to lie, in order to avoid creating "*Rosario* material" that would have to be disclosed to the defense under State law, even though this policy also predictably resulted in prosecutors ultimately not disclosing the same information as *Brady* material.

286.    New York County prosecutors were permitted to make informal promises, or to provide informal inducements, to "cooperating" witnesses, without recording them or disclosing them to the defense.

287.    DANY permitted ADAs to present false or misleading testimony and argument denying their witnesses' motives to lie, to fail to correct such false or misleading testimony and argument, and to improperly vouch for the credibility of such witnesses through the prosecutors' own arguments and unsworn "testimony" during their summations.

288.    DANY permitted ADAs to maintain the "deniability" of impeachment information that they were required to disclose by deliberately avoiding acquiring direct or actual knowledge of it, and then presenting false or misleading testimony and argument that was contradicted by the undisclosed information. In the unlikely event that the defense was able to uncover and expose the information, the prosecutors would then argue that they were not guilty of personal misconduct because they lacked actual knowledge of the information, and the Office would not discipline them.

289.    DANY further allowed prosecutors, in violation of their *Brady* disclosure obligations, to refrain from disclosing statements of uncalled witnesses which tended to favor the defense, including statements suggesting the defendant's innocence.

290.    DANY would deny or defend the aforementioned types of misconduct in order to defeat or delay defendants' efforts to expose it and to overturn their wrongful convictions. Policymaking officials at DANY would almost always defend such behavior when it was challenged, including on direct appeal and on collateral attack, thereby teaching all employees of the Office that such conduct would be tolerated or was even approved by the District Attorney and was consistent with the policies of the Office, and thereby causing additional such violations to occur.

291.    Pursuant to the aforementioned policies, customs, and/or practices of the New York County District Attorney's Office, the assigned ADAs in Mr. Velazquez's case consciously avoided gaining actual knowledge of information that would have impeached or contradicted the testimony of the prosecution's witnesses at trial and that DANY was obligated to disclose under *Brady*, *Rosario*, and other rules and requirements; deliberately avoided recording the statements of witnesses that the ADAs knew would impeach their credibility for the purpose of preventing the defense from obtaining such information; deliberately, recklessly, or negligently failed to disclose information the ADA did know about that the ADA was required under *Brady* to disclose; knowingly, recklessly, or negligently presented witness testimony and their own arguments in the grand jury and at trial that they knew or should have known were false or misleading; knowingly, recklessly, or negligently failed to correct such false testimony and arguments; and improperly vouched, including as an unsworn "witness," for the credibility of witnesses they knew or should have known had given false or misleading testimony and the lack of credibility of defense witnesses and claims, and engaged in other summation misconduct as detailed in Exhibit A ¶¶ 212-254.

292.    Furthermore, pursuant to the aforementioned policies, customs, and/or practices of

the New York County District Attorney's Office, when the assigned ADAs' misconduct was revealed, the District Attorney's Office ratified and defended the ADAs' behavior and argued that it was consistent with the Office's due process and fair trial obligations. The Office denied at every level—the State Supreme Court, the Appellate Division, the Court of Appeals, and the federal District Court—that any misconduct had occurred at all.

293.    But this is not the only proof that the assigned ADAs' misconduct was consistent with, and resulted from, the unlawful policies, customs or practices of the Office to encourage, tolerate, and/or acquiesce in such behavior. There were numerous other instances of similar misconduct, before Mr. Velazquez's trial and during the period that the Office fought to save his wrongful conviction. In virtually all such instances, some of which are described below, others of which are known only to the District Attorney's Office and may be ascertained in discovery, the Office defended the misconduct when it was exposed, thereby revealing that the conduct was consistent with and caused by the policies of the Office.

294.    In *People v. Wallert*, 98 A.D.2d 47 (1st Dep't 1983), the Appellate Division found the prosecutor guilty of a "clear *Brady* violation," and of denying the defendant "a fair trial in violation of due process," based upon the prosecutor's argument in summation that the complainant in a sex crime case had no motive to lie when the prosecutor knew, but had concealed, that the complainant had consulted with a civil attorney and was waiting for the outcome of the trial before suing for monetary damages. The court reversed the conviction.

295.    In *People v. Novoa*, 70 N.Y.2d 490 (1987), the Court of Appeals unanimously reversed the defendant's New York County murder conviction because "the prosecutor here breached a duty to disclose . . . promises, to correct the witness's testimony that she was promised nothing, and to refrain from misstatements in summation." The prosecutor had elicited the

witness's flat denial that "anyone had promised anything with respect to your pending case," and had then argued that she was a "forthright woman" who had no reason to lie because "she wasn't promised anything, ladies and gentlemen." In fact, the witness's Special Narcotics prosecutor had promised to consider the totality of her cooperation, including in the homicide case.

296.    In *People v. Conlan*, 146 A.D.2d 319 (1st Dep't 1989), the Appellate Division reversed another New York County murder conviction because of the prosecutor's "particularly disingenuous" denials that she had made any promise of consideration to a crucial prosecution witness, when the witness expected assistance with his own case based upon assurances of another assistant district attorney. The prosecutor "was certainly not warranted in disclaiming a deal simply because she had not personally made it," the court reasoned, continuing: "Not only did she neglect to correct [the witness's] misleading statements relating to the existence of any promises, but she reaffirmed those statements by means of her own rebuttal, as well as by her . . . summation . . . . However, the law is established that the failure of the prosecutor to correct a witness' erroneous impression that he had no reason to expect lenient treatment 'constitutes error so fundamental, so substantial, that a verdict of guilt will not be permitted to stand.'"

297.    In *People v. Grice*, 188 A.D.2d 397 (1st Dep't 1992), the trial court vacated the defendant's conviction because the prosecutor "did not ascertain and disclose the full details of a cooperation agreement entered into by a material witness" in which his cooperation in Manhattan would likely benefit him in his own case in the Bronx. The People, denying any fault and blaming the defense, appealed, but the Appellate Division affirmed the lower court's ruling. The court reasoned that it had been "incumbent upon the prosecutor herein to investigate and disclose [the] substantially beneficial plea promise" that had been made to the witness and that the defense was entitled to rely upon the prosecutor's misleading summation falsely minimizing the promise made

to the witness.

298.    In *People v. Jones*, 70 N.Y.2d 547 (1987), the Court of Appeals reversed a first-degree narcotics conviction due to the trial prosecutor's "total failure" to deliver interview notes with a key informant which would have revealed significant "discrepancies" in his trial testimony affecting his apparent honesty and overall credibility.

299.    In *People v. Curry*, 164 Misc.2d 969 (Sup. Ct., New York Co. 1995), a Supreme Court justice overturned another drug conviction, even though the defendant had pleaded guilty, because, on May 13, 1993, the People misrepresented to the defense that it had no *Brady* material regarding the case, induced the defendant to plead guilty to a reduced charge, and after its failure to disclose the *Brady* material, defended the conviction.

300.    Notwithstanding the foregoing decisions, DANY's policy to withhold impeachment information continued. In *People v. Williams*, 7 N.Y.3d 15 (2006), a *Brady* violation occurred at a pretrial suppression hearing, conducted in 2002, when the assigned prosecutor was kept in the dark by others in the office about a perjury investigation of the only witness, a police officer, in a contemporaneous, similar, but unrelated case. When the assigned prosecutor learned the information, he still wrongfully withheld it. Disclosure was made only when the defense subpoenaed the witness to testify for the defendant at trial. Although the Court of Appeals upheld the hearing judge's decision to allow the People to reopen the suppression hearing and rely on a different witness, it condemned the prosecution's behavior: "There was no excuse for the People's failure to make the hearing judge aware of the perjury investigation of [the witness]—at the same time that the People were asking the hearing judge to rely on [the witness's] testimony to deny suppression. At best, the People now concede, they were guilty of a significant misjudgment."

301.    In *People v. Jackson*, 131 A.D.2d 179 (1st Dep't 1997), the Appellate Division,

citing *Brady*, vacated a 1992 attempted murder conviction because of the prosecution's failure to turn over police reports that the defense had "specifically requested" which were "significantly at variance with the prosecution's evidence at trial and were clearly evidence that was favorable to the accused." The purported difficulties that the District Attorney's office had with obtaining the reports from the Internal Affairs Division of the Police Department were no excuse.

302.    In *People v. Gantt*, 13 A.D.3d 204 (1st Dep't 2004), the Appellate Division affirmed a lower court decision vacating the defendant's 2001 murder conviction due to the prosecution's failure to disclose the prior inconsistent statement of its main witness, a career criminal who had waited six years to come forward, which called into question his claim that he witnessed the shooting.

303.    In *People v. Sinha*, 84 A.D.3d 35 (1st Dep't 2011), *aff'd on other grounds*, 19 N.Y.3d 932 (2012), the Appellate Division reversed a 2007 bribery conviction in the interest of justice "because the prosecution failed to fulfill basic disclosure obligations that are essential to a fair trial," including withholding emails to a witness's mother containing extravagant promises of consideration if her son would cooperate and revealing benefits he already had received, as well as other information bearing upon the witness's motive to lie and criminal history. The court wrote: "The trial court correctly characterized the tardy disclosure of the e-mails as 'inexcusable.' We add that for the prosecution to fail in three distinct respects to fulfill its disclosure obligation is intolerable."

304.    Significantly, in the *Sinha* case, one of the ADAs who withheld the email evidence was a bureau chief.

305.    In *People v. Ortiz*, 85 A.D.3d 588 (1st Dep't 2011), the Appellate Division, for the second time, reversed the defendant's conviction for criminal facilitation of murder. The first

conviction, after a full trial in 2002, had been reversed for pervasive misconduct by the prosecutor. *People v. Ortiz*, 33 A.D.3d 432 (1st Dep't 2006). The second conviction was reversed because the prosecution had convinced the trial judge to deny the defense permission to use reports of the District Attorney's Office to contradict the crucial testimony of an assistant district attorney because it was unclear whether the same ADA had been the author of the reports. However, two justices, in a concurring opinion, found that the conviction also should have been reversed for a *Brady* violation: the failure to disclose another document which proved that the reports in question in fact had been authored by the same ADA-witness.

306.    During the periods preceding and following Mr. Velazquez's conviction, there were additional unpublished findings by lower courts of Brady and related discovery violations, as well as credible allegations of such violations, known to DANY, which did not result in reversals of convictions on that specific basis.

307.    In many instances during the relevant time period, courts reversed convictions for what amounted to *Brady* violations, but addressed the issue only as to whether the documents should have been disclosed under New York law as *Rosario* material. *See, e.g.: People v. Watkins*, 189 A.D.2d 623 (1st Dep't 1993) (drug conviction reversed for prosecutor's failure to disclose officer's notes containing "important impeachment material"); *People v. Jackson*, 114 A.D.2d 552 (1st Dep't 1991) (conviction reversed in the interest of justice where prosecutor falsely represented at a conditional hearing that all *Rosario* material had been disclosed while not disclosing until after the witness had been deported his initial, three-page statement to police); *People v. Green*, 140 A.D.2d 213 (1st Dep't 1988) (prosecutor failed to disclose handwritten police report and then misrepresented in summation that it confirmed the officer's testimony when in fact it contradicted it); *People v. Quinones*, 139 A.D.2d 404 (1st Dep't 1988) ("incomprehensible" failure by

prosecutor to disclose various police documents, including one that undercut possession of stolen property charge); *People v. Thompson*, 71 N.Y.2d 918 (1988) (burglary and sodomy conviction reversed where prosecution sandbagged defense by holding back key document that undermined defense strategy); *People v. Dixon*, 209 A.D.2d 274 (1st Dep't 1994) (1990 murder conviction reversed for prosecutor's inexcusable failure, despite "repeated defense requests," to disclose police notes); *People v. Kest*, 185 A.D.2d 160 (1992) (failure to disclose police report plainly required to be disclosed under Court of Appeals precedent); *People v. Dennis*, 265 A.D.2d 271 (1st Dep't 1999) (reversing 1988 murder conviction because of prosecutor's failure to disclose and to preserve detective's handwritten notes which he used to refresh his recollection during his pretrial hearing testimony); *People v. Jordan*, 207 A.D.2d 700 (1st Dep't 1994) (reversing 1991 drug conviction because prosecution "prejudiced" the defense by failing to disclose police notes relating "directly to the primary issues contested at trial"); and *People v. Jennings*, 248 A.D.2d 265 (1st Dep't 1998) (reversing 1994 narcotics conviction where prosecutor inexcusably failed to disclose a significant police report).

308.    In numerous other cases, convictions were reversed for misconduct by the prosecutor in improperly vouching for the credibility of the People's witnesses and thereby denying the defendant his constitutional right to a fair trial, for providing "testimony" in an unsworn manner during the prosecutor's summation, or for overall pervasive misconduct, including: *People v. Rivera*, 75 A.D.2d 544 (1st Dep't 1980); *People v. Bolden*, 82 A.D.2d 151 (1st Dep't 1981); *People v. Dowdell*, 88 A.D.2d 239 (1st Dep't 1982); *People v. Bendell*, 111 A.D.2d 878 (1st Dep't 1985), *rev'd on other grounds*, *People v. Bendell*, 67 N.Y.2d 119 (1986); *People v. Coates*, 137 A.D.2d 192 (1st Dep't 1988); *People v. Hansen*, 141 A.D.2d 411 (1st Dep't 1988); *People v. Blake*, 139 A.D.2d 110 (1st Dep't 1988); *People v. Clemons*, 166 A.D.2d 363 (1st

Dep't 1990); *People v. Norton*, 164 A.D.2d 343 (1st Dep't 1990); *People v. D'Alessandro*, 184

A.D.2d 114 (1st Dep't 1992); *People v. Tolbert*, 198 A.D.2d 132 (1st Dep't 1993); *People v. Bell*,

191 A.D.2d 361 (1st Dep't 1993); *People v. Nevedo*, 202 A.D.2d 183 (1st Dep't 1994); *People v.

Collins*, 12 A.D.3d 33 (1st Dep't 2004); *People v. Ortiz*, 33 A.D.3d 432 (1st Dep't 2006); and

*People v. Moye*, 52 A.D.3d 1 (1st Dep't 2008), aff'd, 12 N.Y.3d 743 (2009).

309.    Prior to Mr. Velazquez's trial, DANY also had a history of withholding exculpatory

information tending to demonstrate defendants' innocence. In *People v. Lee Earl Johnson*, Ind.

No. 6571/74 (Sup. Ct., New York Co.), reported at 173 N.Y.L.J. 15 (5/22/75), Justice McQuillan

decried as "misconduct . . . [that] shocks the conscience" the prosecutor's one-month failure to

disclose his interviews with two witnesses who completely exculpated the defendant, and then off-

handedly disclosing the witnesses when it was too late for the defense to fully investigate their

information. Acquitting the defendant at a non-jury trial, Justice McQuillan called the prosecutor's

"explanation to the court for his nonfeasance . . . sheer hogwash," and admonished the District

Attorney's Office regarding training and supervision.

310.    In *People v. Hunter*, 126 Misc.2d 13 (Sup. Ct., New York Co. 1984) (Atlas, J.S.C.),

the court dismissed an indictment for grand larceny because the prosecutor, in violation of the

defendant's Federal due process rights, had withheld from the defendant, during grand jury

proceedings, the statement of a witness that proved the defendant's absolute innocence.

311.    Similarly, in *People v. Isla*, 96 A.D.2d 789 (1st Dep't 1983), the Appellate Division

admonished the District Attorney for misleading the grand jury by reporting the first half of the

defendant's statement—that he had shot the alleged victim—without presenting the second half—

that he had acted in self-defense—thereby depriving the defendant of his right to have the Grand

Jury hear the full story so that it could make an independent probable cause determination.

312.    In *People v. Porter*, 128 A.D.2d 248 (1st Dep't 1987), a narcotics case, the Appellate Division directed a hearing into the materiality of a police report that supported the defense that the drugs were found in a third person's, not the defendant's, possession. The court concluded that the disclosure violation was, at a minimum, "regrettable," but if committed knowingly, represented a "disturbing error in judgment."

313.    In *People v. Davis*, 81 N.Y.2d 281 (1993), the Court of Appeals reversed a 1988 assault and robbery conviction where the prosecutor had knowingly misled the defense and the jury about information which, if accurately disclosed, would have supported the defense that the People's identification witness had misidentified another alleged perpetrator. The Court found "especially troublesome" the prosecutor's misleading summation discounting that any such misidentification had occurred.

314.    In *People v. Bermudez*, 25 Misc.3d 1226(A), 2009 WL 3823210 (Sup. Ct., New York Co. Nov. 9, 2009), the court overturned a false murder conviction obtained by the New York County D.A.'s Office in 1992 having close similarities to Mr. Velazquez's case, as detailed *supra* ¶¶ 257-58, above. The court found that the trial prosecutor had known, but had failed to reveal, that the key accomplice witness had indicated that an individual other than the defendant was the shooter, had failed to correct the witness's false testimony, and had made false summation arguments advocating the witness's credibility. Additionally, the prosecutor had "testified" in summation as an unsworn "witness" to explain why the witness had not been charged as an accessory to the crime. Condemning the District Attorney's continued opposition to vacating the conviction after a wrongfully convicted man had spent nearly 18 years in prison, the court concluded: "The People's position that this court should uphold a conviction based [o]n materially false testimony is untenable in our system of justice . . . ." As discussed *supra*, Mr. Bermudez's

wrongful conviction and incarceration removed him from his child, causing her great suffering.

315.    In *People v. Ennis*, 41 A.D.3d 271 (1st Dep't 2007), the Appellate Division held under *Brady* that the prosecutor at the 2001 trial should have disclosed an uncalled witness's statement that someone other than the defendant was the perpetrator of the shooting. While the Court of Appeals upheld the denial of a new trial, it also concluded that the prosecutor's failure to disclose the statement, made directly to him, "cannot be condoned," 11 N.Y.3d 403, 414 (2008).

316.    In *People v. Colon*, 13 N.Y.3d 343 (2009), the Court of Appeals vacated the murder convictions of Danny Colon and Anthony Ortiz, finding that the DANY trial prosecutor at their 1993 trial withheld *Brady* material, including benefits provided to a key witness and notes of conversations with two uncalled witnesses providing leads to alleged alternate suspects, failed to correct the witness's false and misleading testimony concerning the benefits received, and "compounded" the *Brady* violations by "repeating and emphasizing the misinformation during summation." DANY vigorously opposed every effort made by Colon and/or Ortiz to vacate their convictions, denying for sixteen years that the trial ADA had done anything wrong, thereby ratifying her conduct.

317.    In *Fernandez v. Capra*, 916 F.3d 215 (2019), the Second Circuit found that, at Pablo Fernandez's 1996 trial, DANY prosecutors withheld favorable and impeaching evidence relating to the lead investigator's prior criminal conduct, although this was not the basis for the vacatur of the conviction. Instead, the Second Circuit vacated the conviction on the basis of "prosecutorial misconduct" through the presentation of perjured eyewitness testimony. Throughout Fernandez's twenty-three year effort to vacate his conviction, DANY denied any wrongdoing by the trial ADAs, thereby ratifying their conduct.

318.    Upon information and belief, none of the prosecutors who were responsible for the

misconduct described above were investigated or disciplined by DANY, or referred for discipline by any outside body. There is no record of any Manhattan prosecutor being publicly sanctioned for the misconduct described above.  To the contrary, such prosecutors continued to receive regular pay raises and performance bonuses despite the adverse court decisions.  The absence in New York prosecutors' offices of any disciplinary rules or procedures, or history of sanctioning prosecutors for misconduct during the time period at issue, has been documented. *See generally* Joel B. Rudin, The Supreme Court Assumes Errant Prosecutors Will Be Disciplined by Their Offices or the Bar: Three Case Studies that Prove that Assumption Wrong, 80 Fordham L. Rev. 537 (2011).[5] *See also* Final Report of the N.Y. State Assn's Task Force on Wrongful Convictions 19, 29–31 (2009). The City of New York has settled lawsuits containing allegations of unlawful D.A. policies and practices regarding *Brady* disclosure and related constitutional violations, including the failure to discipline or supervise prosecutors responsible for such violations.

319.    Indeed, the New York County District Attorney, during all relevant times, had no employee handbook, manual, or other document setting forth any disciplinary process for such misconduct, or potential sanctions for it, nor was any such process made known to employees as a deterrent. The knowledge that there would be no personal consequence for violations of the due process and fair trial rights of criminal defendants encouraged prosecutors, including Plaintiff's prosecutor, to commit such violations.

320.    The District Attorney's policy, custom, and/or practice of approval or ratification of, toleration or acquiescence in, or deliberate indifference to, violations of his Office's

---

[5] *Accord* Civil Complaint in *Bertuglia v. City of New York*, 11 CV 2141 (JGK) (S.D.N.Y.) (Doc. # 22) (7/1/2011) at ¶¶ 270-286, incorporated here by reference (detailing numerous additional instances of the DANY failing to discipline prosecutors for grand jury misconduct established by court findings, and establishing the DANY's policy of acquiescence, ratification, and failure to discipline); *Bertuglia v. City of New York*, 839 F. Supp. 2d 703, 738 (S.D.N.Y. 2012) (Koetl, J.). (denying City's motion to dismiss a DANY failure to discipline *Monell* claim based on these allegations).

constitutional obligations foreseeably encouraged such violations to continue and was a substantial cause of the violations of Mr. Velazquez's constitutional rights before and during his trial, his wrongful conviction, and the continuation thereafter of his wrongful imprisonment and prosecution.

321.    The foregoing violations of Mr. Velazquez's federal constitutional rights and resultant injuries were directly, foreseeably, proximately, and substantially caused by conduct, chargeable to Defendant City of New York, amounting to deliberate indifference to the constitutional rights of persons, including Mr. Velazquez, subject to prosecution by the New York County District Attorney's Office, namely: (a) the institution and implementation of plainly inadequate or unlawful policies, procedures, regulations, practices, and/or customs concerning the duty not to use false, misleading, or unreliable evidence, testimony, statements, or argument during grand jury, trial, and other criminal proceedings; the continuing obligation to correct false, inaccurate, incomplete, or misleading evidence, testimony, statements, and argument whenever discovered; the continuing duty to obtain, preserve, and make timely disclosure to the appropriate parties, including the court and the defense, during criminal investigations and prosecutions, of all material evidence or information favorable to a person suspected, accused, or convicted of criminal conduct, including exculpatory evidence and evidence impeaching the credibility or reliability of prosecution witnesses, and including verbal as well as recorded information; and the duty to refrain from coercing or manufacturing false or inherently unreliable statements and testimony from witnesses; and (b) the failure to adequately instruct, train, supervise, and discipline employees with respect to such matters.

322.    The aforesaid deliberate or de facto policies, procedures, regulations, practices, and/or customs (including the failure to properly instruct, train, supervise, and/or discipline

employees with regard thereto) were implemented or tolerated by policymaking officials for the Defendant CITY, including, but not limited to, the District Attorney of New York County and his delegates, who knew: (a) to a moral certainty that such policies, procedures, regulations, practices, and/or customs concern issues that regularly arise in the investigation and prosecution of criminal cases; (b) that such issues either present employees with difficult choices of the sort that instruction, training, and/or supervision will make less difficult, or that the need for further instruction, training, supervision, and/or discipline was demonstrated by a history of employees mishandling such situations as well as the incentives that employees have to make the wrong choice; and (c) that the wrong choice by municipal employees concerning such issues will frequently cause the deprivation of the constitutional rights of an accused and cause constitutional injury.

323.    The aforementioned policymaking officials had the knowledge alleged above, based upon, among other circumstances: (a) numerous credible allegations, many substantiated by judicial decisions, that police officers and ADAs had violated *Brady* and related disclosure obligations, had presented or failed to correct false or misleading testimony and argument, and/or had improperly coerced false or inherently unreliable statements or testimony from witnesses; (b) numerous decisions of the United States Supreme Court, the United States Court of Appeals for the Second Circuit, the New York Court of Appeals, and the New York Appellate Divisions, discussing the difficult issues that regularly arise under the *Brady* rule and the failures of prosecutors in New York State, including in New York County, to comply with that rule; (c) judicial decisions putting the New York County District Attorney on notice that the City could be held liable for its failure to adequately train, supervise, or discipline ADAs regarding their *Brady* and related due process obligations, *see*, *e.g.*, *Walker v. City of New York*, 974 F.2d 293 (2d Cir.

1992); *Ramos v. City of New York*, 285 A.D.2d 284, 729 N.Y.S.2d 678, 692–96 (1st Dep't 2001); and (d) the inherent obviousness of the need to train, supervise, and discipline ADAs in their aforementioned constitutional obligations to counteract the pressure on prosecutors to obtain convictions.

324.    Despite this knowledge, the supervisory and policymaking officers and officials of the Defendant City perpetuated, or failed to take preventative or remedial measures to terminate, said policies, procedures, regulations, practices, and/or customs, and did not effectively instruct, train, supervise, or discipline personnel with regard to the proper constitutional and statutory requirements in the exercise of their authority, but instead ratified, sanctioned, or tolerated the policies, procedures, regulations, practices, and/or customs described above, with deliberate indifference to the effect of such policies, procedures, regulations, practices, and/or customs upon the constitutional rights of residents and citizens of the City and the State of New York.

325.    The aforesaid policies, procedures, regulations, practices, and/or customs of Defendant City were collectively and individually a substantial factor in bringing about the violations of Mr. Velazquez's rights under the Constitution and laws of the United States and in causing his damages.

326.    Under the principles of municipal liability for federal civil rights violations, the District Attorney of New York County (or his authorized delegates) has final managerial responsibility for training, instructing, supervising, and disciplining attorneys and other employees in his office regarding their conduct in the prosecution of criminal matters, including, but not limited to, their obligations not to coerce witnesses or manufacture false or unreliable evidence, to make timely disclosure of exculpatory or impeachment evidence to the defense, including post-trial, and to refrain from offering, and to correct, false or misleading evidence, testimony, and

argument during trial proceedings.

327.    The New York County District Attorney, personally and/or through his authorized delegates, at all relevant times had final authority to promulgate and implement administrative and managerial policies and procedures, including policies and procedures as to personnel hiring, training, supervision, and discipline, with respect to his Office's performance of its duties.

328.    The District Attorney of New York County at all relevant times was and is an elected officer of New York County, one of the constituent counties of Defendant City; the Office was and is funded out of the City's budget; and the Office was and is a New York City agency.

329.    Furthermore, the District Attorney was and is designated a "local officer," rather than a "state officer," under the New York Public Officers Law (§ 2); and New York has provided by statute (N.Y. County Law §§ 53, 941) that the City's constituent counties (including New York County), and hence Defendant City itself, shall have liability for torts committed by County officers and employees, such as the District Attorney and his assistants.

330.    The District Attorney of New York County personally and/or through his authorized delegates, at all relevant times had final authority, and constituted a City policymaker for whom the City is liable, with respect to the above-mentioned areas.

331.    During all times material, the City, through its policymakers, owed a duty to the public at large and to Mr. Velazquez which such policymakers knowingly and intentionally breached, or to which they were deliberately indifferent, to implement policies, procedures, customs, and practices sufficient to prevent, deter, and avoid conduct by their subordinates violating the aforementioned constitutional rights of criminal suspects or defendants and of other members of the public.

332.    It was foreseeable to the City of New York that these policies and practices would

have a direct harmful impact on the falsely accused and the families of the falsely accused, such as Plaintiffs, and they did do so.

333. By virtue of the foregoing, under 42 U.S.C. § 1983, and *Monell v. Dept. of Social Services of the City of New York,* 436 U.S. 658 (1978), Defendant City of New York is liable for the misconduct of DANY employees, which misconduct caused Mr. Velazquez's wrongful prosecution and conviction and all his consequential damages, including the damages to the Plaintiffs herein, but not limited to his wrongful prosecution, conviction, and subsequent imprisonment and parole restrictions.

WHEREFORE, Plaintiffs demand judgment against defendants as follows:

    a. For compensatory damages of not less than $50,000,000;

    b. For punitive damages against the individual defendants as determined by the finders of fact;

    c. For reasonable attorneys' fees, together with costs;

    d. For pre-judgment interest as allowed by law; and

    e. For such other and further relief as this Court may deem just and proper.

Dated:    New York, New York
        December 24, 2025


__/s/ Karen A. Newirth_____

__/s/ Charles F. Linehan_____

Karen A. Newirth
Charles F. Linehan
NEWIRTH LINEHAN PLLC
43 West 43rd Street, Suite 160
New York, NY 10036
(917) 426-5551
karen@newirthlinehan.com

charlie@newirthlinehan.com


\_\_/s/ Oscar Michelen\_\_\_\_\_
Oscar Michelen
MICHELEN LAW P.C.
200 Old Country Road
Suite 2 South
Mineola NY 11501
(516) 788-0375
oscar@michelenlaw.com

*Attorneys for Plaintiffs Maria Velazquez, Jon-Adrian Velazquez, Jr., and Jacob Velazquez*