**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------- X

JON-ADRIAN VELAZQUEZ,

                           Plaintiff,

    -against-

THE CITY OF NEW YORK, NEW YORK, a municipal
entity; NYPD Detective JOSEPH LITRENTA; NYPD
Lieutenant "JOHN" FALZARANO; NYPD Detective
GLENN CARBONI; NYPD Detective JOEL POTTER;
NYPD Detective ROBERT MOONEY; JACK ROE as
Administrator of the Estate of Manhattan District
Attorney Investigator GENARRO GIORGIO, JOHN and
JANE DOEs #1-20, in their individual capacities.

                           Defendants.

                       **COMPLAINT**
                       **JURY TRIAL DEMANDED**

-------------------------------------------------------------------- X

Plaintiff Jon-Adrian Velazquez, by his attorneys Newirth Linehan PLLC and Michelen Law P.C., complaining of the defendants, respectfully alleges, upon information and belief, as follows:

## NATURE OF THE ACTION

1.     This civil rights action under 42 U.S.C. §§ 1983 and 1988 and New York law, seeks monetary damages for the Plaintiff, Jon-Adrian Velazquez, due to his unlawful arrest, prosecution, and conviction for murder and robbery in New York County; his pretrial detention and post-conviction imprisonment totaling 23 years, 7 months, and 7 days and an additional 2 years and 6 months under community supervision; and his additional consequential damages.

2.     Beginning in February 1998, Jon-Adrian Velazquez was wrongfully arrested, prosecuted for, and convicted of a murder that he had nothing to do with, all as a result of the misconduct, detailed below, by members of the New York City Police Department ("NYPD") and the New York County District Attorney's Office ("DANY" or "DA's Office").

## JURISDICTION, VENUE AND CONDITIONS PRECEDENT

3.　　This action arises under 42 U.S.C. §§ 1983 and 1988 and under the common law of the State of New York.

4.　　The acts and omissions giving rise to this complaint occurred in New York County.

5.　　Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1343, as this action seeks redress for the violation of Plaintiff's constitutional and civil rights.

6.　　Supplemental jurisdiction is conferred upon this Court by 28 U.S.C. § 1367(a) over any and all state law claims that are so related to the federal claims that they form part of the same case or controversy.

7.　　Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(2), as this is the judicial district in which the events giving rise to Plaintiff's claims took place.

8.　　This action has been commenced within the applicable period for each claim.

9.　　On or about December 24, 2024, Plaintiff served the City of New York timely notice of the present claims, in accordance with N.Y. Gen. Mun. Law. § 50-e.

10.　　On July 8, 2025, the City of New York conducted a hearing in accordance with N.Y. Gen. Mun. Law § 50-h.

11.　　More than 90 days have elapsed since Mr. Velazquez's submission of his notice of claim and 50-h hearing. Plaintiff has duly complied with all the conditions precedent to the commencement of this action and the City has not compromised the action.

## JURY DEMAND

12.　　Plaintiff demands a trial by jury in this action on each and every one of his claims for which a jury trial is legally available.

2

## PARTIES

13.     Plaintiff Jon-Adrian Velazquez is an American citizen of the United States and the State of New York. At all times relevant to this Complaint, Mr. Velazquez, who is of Puerto Rican descent, was a resident of the State of New York, City of New York, and County of New York. Mr. Velazquez is presently a resident of the State of New York, City of White Plains, and County of Westchester.

14.     Defendant City of New York was and is a municipal corporation that is a political subdivision of the State of New York, was the employer of the individual Detective and Investigator Defendants and is and was at all times relevant to this Complaint responsible for the policies, practices, and customs of the New York City Police Department ("NYPD") and the New York County  District Attorney's Office ("DANY" or the "District Attorney's Office").

15.     Defendant JOSEPH LITRENTA, at all relevant times, was a detective employed by the NYPD, and acted toward Velazquez under color of the statutes, ordinances, customs, and usage of the State of New York, and acted within the scope of his employment. He is sued in his individual and official capacities. Based on information and belief, he is entitled to indemnification under New York General Municipal Law Section 50-k and by contract.

16.     Defendant "JOHN" FALZARANO, whose first name is presently unknown to Plaintiff, at all relevant times, was a lieutenant employed by the NYPD, and acted toward Velazquez under color of the statutes, ordinances, customs, and usage of the State of New York, and acted within the scope of his employment. He is sued in his individual and official capacities. Based on information and belief, he is entitled to indemnification under New York General Municipal Law Section 50-k and by contract.

3

17.     Defendant GLENN CARBONI, at all relevant times, was a detective employed by the NYPD, and acted toward Velazquez under color of the statutes, ordinances, customs, and usage of the State of New York, and acted within the scope of his employment. He is sued in his individual and official capacities. Based on information and belief, he is entitled to indemnification under New York General Municipal Law Section 50-k and by contract.

18.     Defendant JOEL POTTER, at all relevant times, was a detective employed by the NYPD, and acted toward Velazquez under color of the statutes, ordinances, customs, and usage of the State of New York, and acted within the scope of his employment. He is sued in his individual and official capacities. Based on information and belief, he is entitled to indemnification under New York General Municipal Law Section 50-k and by contract.

19.     Defendant ROBERT MOONEY, at all relevant times, was a detective employed by the NYPD, and acted toward Velazquez under color of the statutes, ordinances, customs, and usage of the State of New York, and acted within the scope of his employment. He is sued in his individual and official capacities. Based on information and belief, he is entitled to indemnification under New York General Municipal Law Section 50-k and by contract.

20.     Defendant "JACK ROE," whose actual name Plaintiff has been unable to ascertain notwithstanding reasonable efforts to do so, but who is sued herein by the fictitious designation "JACK ROE," is the Administrator of the Estate of GENARRO GIORGIO, who is deceased. GENARRO GIORGIO, at all relevant times, was an investigator employed by DANY, and acted toward Velazquez under color of the statutes, ordinances, customs, and usage of the State of New York. JACK ROE, as Administrator of the Estate of GENARRO GIORGIO, is sued for the acts and omissions of GENARRO GIORGIO undertaken in his individual capacity. Based on information and belief, GIORGIO and/or Jack Roe, as Administrator of the Estate of GENARRO

4

GIORGIO, is entitled to indemnification under New York General Municipal Law Section 50-k and by contract.

21.      Defendant Does #1 through 20, whose actual names Plaintiff has been unable to ascertain notwithstanding reasonable efforts to do so, but who are sued herein by the fictitious designations "John Doe" and "Jane Doe," represent those officers, detectives, investigators, supervisors, and/or other agents and employees of the NYPD or DANY, acting under color of law and in their individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York, who participated in the misconduct described herein. Based on information and belief, they are entitled to indemnification under New York General Municipal Law Section 50-k and by contract. They are sued in their individual and official capacities.

<u>**ALLEGATIONS COMMON TO ALL CAUSES OF ACTION**</u>

**A. ALBERT WARD IS KILLED BY TWO AFRICAN AMERICAN MEN**

22.      At approximately 1:30 pm on the afternoon of January 27, 1998, two African American men entered Albert Ward's illegal gambling establishment, which was located at 2335 Eighth Avenue, just north of 125th Street in Harlem. One carried duct tape and the other brandished a handgun. The men announced a robbery, told patrons to get on the floor, and the man with the duct tape began taping patrons' hands together. Ward, a retired NYPD Police Detective, pulled out his handgun and was shot fatally by the man with the gun.

23.      The African American shooter had previously entered Ward's establishment approximately 45 minutes before the robbery, at around 12:15 pm, purportedly to place a bet.

24.      During this initial visit,  the shooter told one of Ward's workers that he was from the nearby St. Nicholas Projects and usually played numbers on the East Side.

5

25. The shooter placed a bet by handling and writing "Tee"—purportedly his name or nickname—on a betting slip.

26. The betting slip was later collected from the crime scene and preserved as evidence.

27. As is discussed in greater detail, DNA testing on this slip ultimately excluded Mr. Velazquez, finally proving that he was not the shooter—just as he had always claimed. The DNA testing also established that the biological material on the betting slip came from an African American man, consistent with every initial description provided to the police by eyewitnesses.

28. This incontrovertible proof of Mr. Velazquez's innocence caused DANY to finally join Mr. Velazquez's latest motion to vacate his conviction after years opposing Mr. Velazquez's efforts to prove his innocence. As a result, Mr. Velazquez was exonerated on September 30, 2024.

29. From the time of the shooter's first visit to Ward's establishment through the time of the crime, Mr. Velazquez was continuously at his home at 1344 University Avenue in the Bronx, between three and four miles from the Harlem crime scene.

**B. EYEWITNESSES DESCRIBE THE PERPETRATORS AS TWO AFRICAN AMERICAN MEN; MR. VELAZQUEZ IS NOT AFRICAN AMERICAN**

30. Because Mr. Ward was a retired NYPD detective who had served in the 28th Precinct—the very Precinct where he was murdered—the police response was immediate and intense.

31. Within hours of Ward's murder, the NYPD established a mobile command post staffed by four lieutenants, eight sergeants, and 37 police officers.

32. Defendant Detective Joseph LITRENTA was assigned to be the lead detective on the case.

33.     Defendant Lieutenant FALZARANO was assigned to supervise the investigation into Ward's murder, including the work of Defendants LITRENTA, CARBONI, POTTER, MOONEY, and others.

34.     Shortly after the shooting, police obtained descriptions of the culprits from eyewitnesses to the crime.

35.     All of the eyewitnesses were African American.

36.     Seven of the nine eyewitnesses were able to describe the culprits, and those seven described the shooter consistently:  an  African American male,  in his twenties with a lighter complexion than the other African American assailant.  Of the eyewitnesses who described the shooter's hair, all but one recalled that he was wearing his hair in braids. The other eyewitness described the shooter's hair as curly.

> (a) Joe Scott described the gunman as a very light-skinned Black man, approximately 23 to 25 years old with his hair in braids.

> (b) James "River Jack" Smith told police that the first man who entered was a light-skinned Black man, approximately 25 years old.

> (c) Dorothy Canady, who was 85 years old at the time of the crime, described the shooter as a Black man with a light complexion, 20 to 25 years old, and between 5'7" and 5'9" tall.

> (d)  Lorenzo Woodford described the shooter as a light-skinned Black man between 5'8" and 5'10" tall, weighing 180 to 190 pounds, and 20 to 25 years old. He stated the man had a light mustache and brown eyes and may have worn his hair in braids.

(e) Phillip Jones described the shooter as a light-skinned Black man with red hair, about 5'10" tall, and between 150 and 160 pounds. He stated the man was between 30 and 35 years old.

(f) Augustus Brown described the shooter as a light-skinned Black male, 5'8" tall, and 165 pounds. He stated the gunman had jet black curly hair, a light mustache, sideburns, and light brown eyes.

(g) Robert "Ricky" Jones described the shooter as a light-skinned Black man with a light beard, mustache, and braids, about 5'7" or 5'8" tall, and between 150 and 155 pounds.

(h) Richard "Ham" Jones described the robbery and murder to the police but did not provide any descriptions of the gunman or his accomplice.

(i) Matty Alex told police that when the robbery was announced, she got on the floor, closed her eyes, and turned her head away. She stated that she never looked up and could not identify any suspects.

37. Based on the eyewitnesses' descriptions, at 5:00 pm on the evening of the shooting, the NYPD broadcast a description of the shooter: "M/B [male Black], light complexion, 20-25 yrs., 5'7''–5'9'', 150–155 lbs., beard, mustache and goatee, braids, wearing yellow or orange bubble jacket."

38. Later that night, Robert Jones was taken to police headquarters where he assisted in creating a sketch of the shooter.

39. Members of the NYPD placed the sketch on a wanted poster, which described the shooter as "male, black, 20-25 yrs. old, 5'7''-5'9'', 150-160 lbs., braided hair, light complexion,

8

thin mustache/beard, wearing an orange/yellow ¾ length jacket." Below is the wanted poster with

the shooter's description:



40. Every eyewitness who was able to provide a description of the shooter described

him as Black, and the Defendants did not doubt that the shooter was, in fact, Black.

41. Plaintiff Jon-Adrian Velazquez is not African American. He is a light-skinned

person of Puerto Rican descent who would not be identified as African-American in appearance

by an objective observer.

9

42.     On the day of the murder, Mr. Velazquez wore his hair in a close cropped, Caesar style haircut. Mr. Velazquez never wore his hair in braids nor could his hair be objectively described as "curly."

43.     That Mr. Velazquez was not African-American and did not otherwise match the description given by seven eyewitnesses was evident to each of the Defendants, as the following photographs—one taken two weeks before the crime, and the other taken on the day of his arrest—make clear.



44.     These facts alone should have disqualified Mr. Velazquez as a suspect in this murder.

## C. EYEWITNESSES IDENTIFY DERRY DANIELS, AN AFRICAN AMERICAN MAN, AS THE ASSAILANT WITH THE DUCT TAPE

45.     On January 28, 1998, the day after Ward's murder, eyewitness Phillip Jones, the brother of eyewitness Robert Jones, was at the 28th Precinct to look through the precinct's binders of mugshot photos.

46.     After viewing approximately ten mugshot books, Phillip Jones identified a photograph of a man named Derry Daniels as the man carrying the duct tape during the robbery.

47.     Daniels, who is African American, had a significant criminal history for drugs, assault, and robbery.

48.     Daniels had been arrested on April 6, 1990, within the confines of the 28th Precinct, for an armed robbery with shots fired at a different illegal gambling establishment in Harlem.

49.     Daniels matched the eyewitnesses' description of the assailant with the duct tape.

50.     Once Phillip Jones identified Daniels from a photograph, Daniels was placed into a live lineup.

51.     Phillip Jones viewed the lineup and positively identified Daniels as the man carrying the duct tape.

### D. DANIELS, WHO HAS NO CONNECTION WHATSOEVER TO MR. VELAZQUEZ, IS ARRESTED AND CHARGED WITH WARD'S MURDER[1]

52.     After being identified as the man with the duct tape, Daniels was arrested.

53.     Mr. Velazquez had never met or heard of Derry Daniels.

54.     Mr. Velazquez had no connection whatsoever to Daniels.

55.     No connection between Daniels and Mr. Velazquez has ever been produced by police, prosecutors, or anyone else.

### E. THE NYPD DEFENDANTS OBTAIN CRITICAL *BRADY* MATERIAL POINTING TO A FRIEND OF DANIELS WHO MATCHES THE GUNMAN'S DESCRIPTION, AND SUPPRESS IT FROM MR. VELAZQUEZ

56.     On January 29, 1998, the day after Daniels' arrest, and two days after Ward's murder, NYPD Detective Joel POTTER spoke with Daniels' father about his son, Derry.

57.     Detective POTTER documented his phone call with Derry Daniels' father in a DD5 numbered 93 in the case file (hereinafter, "DD5 93").

---

[1] Daniels ultimately pleaded guilty to lesser charges and received a reduced sentence.

58.     According to DD5 93, Daniels' father reported to POTTER that at around 5 pm on the evening before the crime, Derry Daniels had come to his apartment with a friend.

59.     Derry Daniels asked his father for money, stating that he owed money to the friend who was with him.

60.     Daniels' father described his son's friend as: African American, male, in his 20s, with a lighter complexion than Derry, shorter than Derry, and braided hair. Daniels' father reported that he would be able to identify his son's friend if he saw him again.

61.     Daniels' father's description of Daniels' friend matched the descriptions of the gunman provided by the eyewitnesses to Ward's murder.

62.     This was a critical lead.  Derry Daniels matched the description provided by witnesses as the dark-skinned assailant with the duct tape, was identified as that person, arrested, and charged with the crime, and his friend—to whom he owed money on the evening before the crime—matched the description of the lighter-skinned shooter with braids.

63.     DD5 93 was known to Defendants POTTER, LITRENTA, FALZARANO, and CARBONI and others.

64.     Rather than investigate this lead, as any reasonable officer in 1998 to 2000 would have done, Defendants POTTER, LITRENTA, FALZARANO, and CARBONI instead focused the investigation on Jon-Adrian Velazquez—a man who did not match any eyewitness description in any respect, had no connection whatsoever to Derry Daniels, and was demonstrably in another borough at the time the murder occurred.

65.     Neither Defendants POTTER, LITRENTA, FALZARANO, or CARBONI, nor any other member of the NYPD took any steps to identify Derry Daniels' friend:

(a) Defendants POTTER, LITRENTA, FALZARANO, and/or CARBONI did not show Daniels' father any photographs of suspects or possible suspects; and

(b) Defendants POTTER, LITRENTA, FALZARANO, and/or CARBONI did not present Daniels' father with any identification procedure containing Mr. Velazquez or his photo at any time, to confirm or rule out Mr. Velazquez as Daniels' friend;

66.     DD5 93, and its *Brady* material pointing to an alternate suspect, was suppressed by Defendants POTTER, LITRENTA, FALZARANO, or CARBONI from DANY until sometime after the Grand Jury returned an indictment against Mr. Velazquez.

67.     After his indictment, DANY suppressed from Mr. Velazquez:

(a) DD5 93;

(b) DD5 93's *Brady* material pointing to an alternate suspect; and

(c) the fact that Defendants POTTER, LITRENTA, FALZARANO, and/or CARBONI suppressed it from DANY until after Mr. Velazquez was indicted.

68.     When DANY subsequently obtained DD93, DANY then suppressed this *Brady* material from Mr. Velazquez despite Mr. Velazquez's trial and post-conviction attorneys making multiple, specific discovery requests, pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), for both DD5 93 specifically and any evidence pointing to alternate suspects.

69.     Mr. Velazquez's attorneys, in addition to their general demand for *Brady/Rosario* in Mr. Velazquez's initial omnibus motion, made two separate, specific *Brady* demands to which DD5 93 was responsive.  In each case, DANY—by two different, consecutively assigned assistant district attorneys—suppressed DD5 93 and affirmatively, falsely represented that DD5 93 was not required to be disclosed. This was consistent with DANY's policies and practices in place at the time.

13

(a) The defense's first supplemental *Brady* request was filed on September 21, 1998 and was responded to by the then-assigned ADA, Kathryn Jones, on March 17, 1999. Jones suppressed DD5 93 and falsely represented to the court and counsel that the materials sought did not "suggest that someone other than the defendants committed the charged crimes."

(b) In July 1999, later-assigned ADA, Eugene Hurley, provided additional discovery to Mr. Velazquez. Hurley reviewed Jones's March 1999 decision and misrepresentation about DD5 93, and concurred with it, so did not produce or otherwise address DD5 93.

(c) Finally, on October 8, 1999, two weeks before trial, ADA Hurley responded to another *Brady* request by Mr. Velazquez's attorney. This request specifically demanded the production of DD5 93, among other DD5s that had not yet been produced. ADA Hurley suppressed DD5 93 and falsely claimed that he was not required to disclose DD5 93 because it related to individuals who "will not be called as witnesses at trial" and "provided no information about the crimes charged."

## F.  DEFENDANT-DETECTIVES MANUFACTURE EVIDENCE AGAINST VELAZQUEZ AND ARREST HIM FOR WARD'S MURDER

70.  To make the case against the innocent Mr. Velazquez, Defendants LITRENTA, FALZARANO, MOONEY, and CARBONI used a variety of improper means, including highly suggestive and improper identification procedures; coercive threats and promises to induce eyewitnesses to give false statements and evidence implicating Mr. Velazquez, even though there was no factual basis for them to do so; and by fabricating evidence against Mr. Velazquez.

1.  **Defendant-Detectives Use False Threats of Arrest and Unduly Suggestive Identification Procedures to Coerce and Fabricate a False Identification of**

**Velazquez from Vulnerable Witness Augustus Brown**

71.     On or about January 30, 1998, the day after Daniels' father spoke to Detective POTTER and the same day DD5 93 was created, police brought another eyewitness, Augustus Brown, to the 28th Precinct.

72.     Brown, who is African American, described the shooter to the police as "M/B [male Black]/light skinned, 5'8, 165, jet black curly hair, light mustache, sideburns, light brown eyes."

73.     At the time, Brown was approximately twenty-one years old, a frequent heroin user, on probation for an unrelated crime, with active warrant(s) pending.

74.     Brown was interrogated and subjected to identification procedures for many hours by Defendants LITRENTA, MOONEY, and CARBONI. At all relevant times, Defendant FALZARANO supervised LITRENTA, MOONEY, and CARBONI.

75.     Defendants LITRENTA, MOONEY, and CARBONI told Brown that they believed he was involved in the robbery/murder of Ward, and threatened that, if he did not cooperate with them, he would be criminally charged in connection with the Ward murder.

76.     Defendants LITRENTA, MOONEY, and CARBONI also threatened to charge Brown with drug possession for drugs he had on his person at the time if he did not cooperate with their investigation into the Ward murder. And, of course, Brown would have faced arrest for the pending warrant(s) against him.

77.     No written record was made of the threats made by Defendants LITRENTA, MOONEY, and CARBONI, nor were the threats disclosed by Defendants LITRENTA, MOONEY, and CARBONI to the District Attorney or to Mr. Velazquez.

15

78.     Brown told Defendants LITRENTA, MOONEY, and CARBONI that he was not involved in the crimes against Ward and that he did not have a good opportunity to view the perpetrators.

79.     Brown nevertheless agreed to look at photographs of people to comply with Defendants LITRENTA, MOONEY, and CARBONI's demand that he cooperate with them or be charged with Ward's murder.

80.     Brown believed Defendants LITRENTA, MOONEY, and CARBONI's threats and was terrified that he would be charged and convicted of a crime he did not commit if he did not cooperate.

81.     Defendant Detectives LITRENTA and CARBONI, and others, used the NYPD's electronic mugshot database system to present Mr. Brown with mugshot photographs maintained in the NYPD's system.

82.     The electronic mugshot database system requires that an administrator enter search parameters, including race, age, height, etc.

83.     The search parameters should match the eyewitness's description of the culprit to avoid generating photographs of individuals who cannot be guilty of the subject crime because they do not match the person seen by the eyewitness.

84.     Defendant MOONEY's contemporaneous report of Mr. Brown's description of the gunman reflects that Mr. Brown described him as "male [B]lack." All other initial descriptions by eyewitnesses were also that the shooter was Black.

85.     Defendants LITRENTA and CARBONI knew, or should have known, that Brown's description of the shooter was a "male Black", and that every other initial eyewitness description was also that both perpetrators were African American.

16

86.     Despite this, Defendant-Detective LITRENTA and/or CARBONI or others unilaterally entered the search parameters "Hispanic" and "Black Hispanic" to generate photographs for Mr. Brown to view.

87.     Defendant LITRENTA used the search term "Hispanic" even though Mr. Brown had only ever described the shooter as Black.

88.     On information and belief, Defendant LITRENTA, frustrated that no witness had identified the shooter despite being shown many photographs, unilaterally decided to expand the search to include "Hispanic" to increase his chance of solving this high profile case, without regard to:

    (a) the witness's ability to actually identify the shooter;

    (b) the likelihood that the unilaterally expanded search would necessarily produce photographs of innocent people; and

    (c) the actual guilt of the individual selected.

89.     One of the innocent, non-Black people whose mugshot was produced in response to Defendant LITRENTA's improper search parameter, "Hispanic", was Jon-Adrian Velazquez.

90.     The mugshot of Mr. Velazquez that was produced in response to Defendant LITRENTA's improper search parameters—the only mugshot of Mr. Velazquez in the NYPD's database—had been illegally retained by the Defendant City, in contravention of New York State law.

    (a) New York's Criminal Procedure Law section 160.50 mandates that, where an arrest does not result in a conviction, the mugshot (and any other associated records) be sealed and expunged.

17

(b) Here, the mugshot of Mr. Velazquez that was shown to Brown was the product of an arrest that was dismissed.

(c) Thus, under New York law, the mugshot of Mr. Velazquez should have been sealed and expunged from the files of the NYPD.

91.     The NYPD's failure to seal and expunge Mr. Velazquez's mugshot when his arrest was dismissed, and instead to unlawfully retain it and maintain it in a database of mugshots routinely showed to crime victims and witnesses, created a likelihood—realized in this case—that he would be mistakenly identified as a perpetrator of a crime that he did not commit.

92.     On January 31, 1998, the day after Mr. Velazquez's illegally retained photograph was shown to Brown, the then-assigned ADA, Kathryn Jones, submitted a sworn affirmation seeking to unseal Mr. Velazquez's dismissed criminal case, in which she acknowledged that the photographs shown to Brown had been sealed.

93.     This violation was not an isolated incident; for years, the NYPD has routinely violated C.P.L. § 160.50. This systemic misconduct is evidenced by a 2023 Order in a class action lawsuit where the court found the NYPD in violation of the Sealing Statutes and ordered a comprehensive "Implementation Plan" to cease the illegal use, access, and disclosure of sealed records. As part of this plan, the court specifically directed the NYPD to develop a "permanent delete function" for arrest photographs to ensure they are "irretrievable" and "unavailable to anyone". See *R.C. v. City of New York*, No. 153739/2018 (Sup. Ct. N.Y. Cnty. Mar. 29, 2023).

94.     This illegal practice creates a grave risk of wrongful conviction. By maintaining access to records that should be sealed, the NYPD bypasses statutory protections designed to prevent innocent people from being erroneously identified and incarcerated for crimes they did not commit.

95.     But for the NYPD's systemic and illegal retention of Mr. Velazquez's sealed mugshot—a practice the court in *R.C. v. City of New York* has since ordered dismantled—his image would never have been available to Brown, he would never have been the target of LITRENTA and others' misconduct, and the chain of events leading to his wrongful arrest and decades-long incarceration would never have been set in motion.

96.     Brown viewed hundreds of mugshot photographs without making a positive identification.

97.     After about 800 photographs, Brown saw the illegally retained mugshot of Jon-Adrian Velazquez, which was returned in response to LITRENTA's improper search term "Hispanic."

98.     Defendants LITRENTA and CARBONI continued to show Brown mugshots.

99.     After viewing more than 800 additional photographs without a positive identification, LITRENTA and/or CARBONI decided to falsely claim that when Brown viewed Mr. Velazquez's photograph, he positively identified him.

100.     In fact, when Brown viewed Mr. Velazquez's photograph, he noted that the shooter's eyes were lighter than Mr. Velazquez's.

101.     Defendants LITRENTA, CARBONI, AND MOONEY did not document that Brown continued to view approximately 800 photographs after viewing Mr. Velazquez's photograph.

102.     In documenting Mr. Brown's purported "identification" of Mr. Velazquez, Defendant LITRENTA also falsely attributed to Brown the statement that Brown recognized Mr. Velazquez from "w95-w96 st on Amsterdam ave and sold drugs there."

103. Defendant LITRENTA included these additional details in the DD5 in order to falsely strengthen Mr. Brown's objectively weak identification.

104. Defendant LITRENTA also fed this detail to Brown.

105. Defendant LITRENTA'S fabrication of evidence—specifically including false information in the DD5 and feeding it to Mr. Brown—demonstrates that he and his colleagues knew Brown's identification was unreliable. Despite this knowledge, they remained determined to arrest Mr. Velazquez and secure a conviction for their former colleague's murder at any cost.

106. Defendants LITRENTA, CARBONI, AND MOONEY's conduct not only departed from established protocols for minimizing suggestiveness in identification procedures but also elevated the risk of a mistaken identification well beyond the already precarious baseline associated with eyewitness identifications.

107. In doing so, and in suppressing their own and each other's misconduct from DANY, Defendants FALZARANO, LITRENTA, CARBONI, and MOONEY created a foreseeable and unjustifiable likelihood that Mr. Velazquez would be wrongfully convicted.

## 2. Defendant-Detectives Fabricate Additional False Identifications of Mr. Velazquez Using Similar Improper Tactics

108. Defendants FALZARANO, LITRENTA, CARBONI, and MOONEY, knowing that (a) Mr. Brown's identification of Mr. Velazquez was unreliable, false, and the product of police coercion and suggestion, (b) Mr. Velazquez did not match the eyewitnesses' description; (c) no physical or forensic evidence connected Mr. Velazquez to the crime; (d) Mr. Velazquez had no connection whatsoever to the location, Albert Ward, or Derry Daniels; and (e) Mr. Velazquez had no motive to commit this crime, caused Mr. Velazquez to be arrested for the murder of Albert Ward, a crime he did not commit.

20

109.    Defendants FALZARANO, LITRENTA, CARBONI and others searched for Mr. Velazquez, including by visiting and contacting Mr. Velazquez's father's domestic partner and other family members and telling them that Mr. Velazquez was wanted for a serious crime.

110.    Defendants FALZARANO, LITRENTA, CARBONI and others knew, or should have known, that Mr. Velazquez's family—whose patriarch had been a law enforcement officer with a deep-seated respect for the law—would compel Mr. Velazquez to surrender.

111.    Defendants FALZARANO, LITRENTA, CARBONI and others relied on and exploited the background and values of the Velazquez family to effectuate the arrest of Mr. Velazquez. They knew the family's commitment to the rule of law would lead them to encourage Mr. Velazquez's surrender, weaponizing their trust in and belief that the legal system would recognize and respect his innocence.

112.    As a result, Mr. Velazquez learned from his family that he was being sought by police.

113.    On February 2, 1998, knowing he was being sought in connection with a crime he did not commit, and after conferring with his mother, Plaintiff Maria Velazquez, Mr. Velazquez presented himself at the 28th Precinct.

114.    Mr. Velazquez voluntarily agreed to participate in a lineup, believing that his cooperation would confirm his innocence.

115.    While at the precinct for the lineup, member(s) of the NYPD took a polaroid photograph of Mr. Velazquez.  On information and belief, this photograph was improperly shown to one or more witnesses to prime them to identify Mr. Velazquez in the lineup.

    **a.**    **<u>Defendants Litrenta and Others Use Threats, Coercion and Unduly Suggestive Identification Procedures to Obtain False Identifications of Mr.</u>**

**Velazquez from Phillip and Robert Jones**

116.     On or about February 2, 1998, Defendant LITRENTA, MOONEY, CARBONI, POTTER, or another member of the NYPD contacted eyewitnesses Phillip and Robert Jones, two brothers, by telephone.

117.     Even though LITRENTA and others knew that Mr. Velazquez could not be the shooter, Defendant LITRENTA and/or others told Phillip and Robert Jones, in substance, that they had caught the shooter of Albert Ward.

118.     Defendant LITRENTA and/or others said that they had caught the shooter to pressure Phillip and Robert Jones to make a positive identification of Velazquez when they had no independent basis to do so.

119.     Defendant LITRENTA and others then told Phillip and Robert Jones to come to the 28th Precinct to participate in a lineup procedure.

120.     Once at the 28th Precinct, Defendant LITRENTA and others told Phillip and Robert Jones, in substance, that LITRENTA and others believed the Jones brothers had stolen thousands of dollars that Albert Ward dropped on the floor when he was killed.

121.     Defendant-Detective LITRENTA and others threatened to arrest Phillip and Robert Jones in connection with this alleged theft.

122.     Defendant-Detective LITRENTA and others made it clear to Phillip and Robert Jones that if they cooperated with the police investigation into Ward's murder they would not be arrested or charged in connection with the alleged theft or any other illegal activity.

123.     Neither Phillip nor Robert Jones stole the money that Ward supposedly dropped when he was shot.

124.     Defendant LITRENTA and/or others also falsely told Robert Jones, in substance, that the police had the right man because Augustus Brown knew him and told the police where he lived. Defendant LITRENTA also provided Robert Jones with other false information, including that Mr. Velazquez killed Ward with his father's law enforcement service weapon and that Velazquez's appearance was different than it was at the time of the crime.

125.     This information was false and was designed to coerce Robert Jones to make a positive identification of Velazquez even though there was no basis for him to do so.

126.     After being subjected to the foregoing instances of improper pressure, suggestion, and threats of prosecution, Phillip and Robert Jones were each shown a live lineup in which Mr. Velazquez appeared.

127.     Defendants FALZARANO, LITRENTA, and POTTER—all of whom knew that Mr. Velazquez had never been truly identified by Augustus Brown and could not have committed the crime—were in the lineup viewing room during the lineup showings.

128.     Phillip and Robert Jones then "identified" Mr. Velazquez from the lineup.

129.     Phillip and Robert Jones' "identification" of Mr. Velazquez was the result of improper police pressure, suggestion, and threats made by Defendants FALZARANO, LITRENTA, MOONEY, CARBONI, and/or POTTER—not because they actually recognized Mr. Velazquez as the shooter. None of the pressure, suggestion, or threats were recorded in the police reports created by Defendants FALZARANO, LITRENTA, MOONEY, CARBONI, and/or POTTER.

130.     After Phillip and Robert Jones selected Mr. Velazquez from the lineup, they were not threatened again with arrest for stealing Ward's money; nor were they arrested or charged with that crime.

### b. __Police Use Coercion and Suggestion to Compel Augustus Brown To Identify Mr. Velazquez In The Lineup__

131.    On or about February 2, 1998, Defendant LITRENTA, MOONEY, CARBONI, POTTER, or another member of the NYPD called Augustus Brown and told him to come to the 28th Precinct to view a live lineup.

132.    Just two days earlier, Augustus Brown had been threatened by Defendant LITRENTA and others with arrest in connection with Ward's murder unless he cooperated with the police.

133.    As discussed above, following Brown's inability to identify the perpetrator, detectives created several false reports alleging that Brown had positively identified Mr. Velazquez as the shooter.  *See* ¶¶ 99-105, *supra*.

134.    On February 2, 1998, Brown was presented with a lineup in which Mr. Velazquez appeared.

135.    On information and belief, Mr. Velazquez was the only person in the lineup whom Brown had previously seen.

136.    Defendants FALZARANO, LITRENTA, and POTTER—all of whom knew that Augustus Brown had previously failed to identify Mr. Velazquez and that Velazquez could not have committed the crime—were in the room when the lineup was presented to Augustus Brown.

137.    Mr. Brown, having been subjected to improper pressure, suggestion, and threats of prosecution, and in the presence of at least three members of the NYPD, "chose" Mr. Velazquez from the lineup.

138.    Mr. Brown's "identification" of Mr. Velazquez was the result of improper police pressure, suggestion, and threats made by Defendants FALZARANO, LITRENTA, MOONEY,

CARBONI and/or POTTER—not because he actually recognized Mr. Velazquez as the shooter. None of the pressure, suggestion, or threats were recorded in the police reports created by Defendants FALZARANO, LITRENTA, MOONEY, CARBONI, and/or POTTER.

139.    After Mr. Brown selected Mr. Velazquez from the lineup, Brown was allowed to leave the precinct without being charged in connection with the Ward murder or for drug possession, as he had been previously threatened, and without being arrested on his pending warrant(s).

### c.    <u>Three Eyewitnesses Fail To Identify Mr. Velazquez as the Perpetrator</u>

140.    Eyewitness Lorenzo Woodford, shown the same lineup as Phillip Jones, Robert Jones, and Augustus Brown, did not positively identify Mr. Velazquez.  According to the contemporaneously made lineup report, Woodford identified number 3, then said maybe 2 and stated "no not sure."

141.    Joe Scott, shown the same lineup, selected a different lineup member, stating "That's him."

142.    Dorothy Canady, also shown the lineup, likewise failed to identify Mr. Velazquez.  Prior to viewing the lineup, Canady was shown a photo array featuring a photograph of Mr. Velazquez and did not identify him.

### d.    <u>Outside of the Lineup Room, Litrenta Coerces, Pressures, and/or Threatens Woodford to Falsely Identify Mr. Velazquez as the Shooter</u>

143.    After Woodford left the lineup viewing room—where Mr. Velazquez's attorney was also present—Defendant LITRENTA made Woodford speak to him privately.

144.    During this private conversation, LITRENTA coerced, pressured, or threatened Woodford to positively identify Velazquez as the shooter, despite Woodford's prior

identification of a different lineup member and his report that he was not sure about his identification.

145.     Neither LITRENTA's private conversation with Woodford, nor Woodford's purported positive identification of Velazquez, were memorialized in writing, nor was it reported by LITRENTA to Velazquez's attorney, who was still present.  Nor did LITRENTA share this information with DANY prior to the DANY charging Mr. Velazquez with murder.

146.     LITRENTA's actions after Woodford's failure to positively identify Velazquez in the lineup viewing room were consistent with practices used by members of the NYPD during the 1990s whereby witnesses who did not make positive identifications while viewing lineups were privately confronted by members of the NYPD and pressured, coerced, or threatened to make them change their report to positively identify the police suspect. *See, e.g., infra* ¶¶ 398, 408, 410, 411-412, 414, 415, 416, 417, 418, 419, 420, 421.

### 3. Detectives Mislead The District Attorney Into Charging Mr. Velazquez With Murder

147.     On February 2, 1998, based on the foregoing fabricated evidence and suppressed exculpatory evidence, and despite there being no probable cause to arrest Mr. Velazquez, and despite all the evidence supporting Mr. Velazquez's claim of innocence—which he immediately asserted—Mr. Velazquez was arrested and charged with Murder in the First Degree, Murder in the Second Degree, Attempted Murder in the Second Degree, Robbery in the First Degree, and Criminal Use of a Firearm in connection with the Ward robbery and murder.

148.     In accordance with customary practice, prior to and following Mr. Velazquez's arrest, Detective LITRENTA and other detectives spoke with prosecutors from the District Attorney's Office regarding the case against Mr. Velazquez and whether probable cause existed for his arrest.

149.     During those conversations and/or meetings, Detective LITRENTA falsely represented to the prosecutors that (a) five witnesses had positively identified Mr. Velazquez in the lineup, (b) August Brown had provided corroborating details about his prior familiarity with Mr. Velazquez, (c) all of the identifications were reliable, (d) the information in the reports created by other detectives was reliable, and (e) there was probable cause to believe Mr. Velazquez committed the crime.

150.     Detective LITRENTA also forwarded or caused to be forwarded, to DANY, the police reports memorializing the fabricated evidence.  *See* ¶¶ 99-105, 129, 138, *supra*.

151.     Additionally, while urging the District Attorney's office to charge Mr. Velazquez with murder, Defendants FALZARANO, LITRENTA, MOONEY, CARBONI, and POTTER concealed from DANY numerous items of exculpatory and/or impeaching information, including:

(a) Their own and each other's misconduct discussed above;

(b) DD5 93 and the information it contained;

(c) LITRENTA's misconduct when Brown was viewing the photographs, and LITRENTA's fabrication of a Brown's purported "identification" of Mr. Velazquez;

(d) LITRENTA, FALZARANO, MOONEY, and/or CARBONI threatening to arrest and prosecute each of the identifying witnesses—Brown, Phillip Jones, and Robert Jones—with arrest for serious crimes if they did not cooperate with the police investigation;

(e) LITRENTA, CARBONI, and MOONEY knew that Brown did not positively identify Velazquez when viewing mugshots;

(f) LITRENTA, CARBONI, and MOONEY knew that they had Brown continue to view 800 additional mugshots after he viewed Velazquez's photograph;

(g) LITRENTA and CARBONI fed nonpublic information about Velazquez to Brown and included a fabricated detail in a DD5—that Brown recognized Mr. Velazquez from West 95th/96th Street—and falsely represented that information came from Brown and not LITRENTA and CARBONI in order to bolster Brown's credibility;

(h) LITRENTA and/or others falsely told Phillip and Robert Jones that the police had arrested the shooter, in order to encourage their positive identification of Velazquez;

(i) LITRENTA and/or others falsely told Robert Jones that the police knew they had the right person because Augustus Brown knew him and knew where he lived, in order to encourage Robert Jones's positive identification of Velazquez.

(j) LITRENTA coerced Woodford, following the lineup, to adopt LITRENTA's false narrative that Woodford actually recognized Mr. Velazquez during the lineup, but was afraid to say so until LITRENTA spoke with Woodford after the lineup was completed.

152. FALZARANO, LITRENTA, MOONEY, CARBONI, POTTER acted jointly in creating this false narrative implicating Mr. Velazquez, concealing their own and each other's deception and misconduct, and deceiving the District Attorney's Office through these affirmative misrepresentations and material omissions into charging Mr. Velazquez with murder.

153.     Based on FALZARANO, LITRENTA, MOONEY, CARBONI, POTTER and/or others' "evidence" and presentation, DANY approved Mr. Velazquez's prosecution, and filed a felony complaint charging Mr. Velazquez with capital murder.

### 4.  DANY Secures an Indictment of Mr. Velazquez Through a False, Misleading, and Incomplete Grand Jury Presentation

154.     On February 5 and 6, 1998, DANY presented Velazquez's case to a grand jury through a false, misleading, and incomplete grand jury presentation.

155.     The prosecutors presenting the case to the grand jury did not inform the grand jury of the exculpatory and impeaching information identified in ¶¶ 138-144, above.

156.     Because no physical evidence, DNA, fingerprints, or weapons connected Mr. Velazquez to the crime, the only evidence allegedly incriminating Mr. Velazquez presented to the Grand Jury was fabricated eyewitness identification testimony.

157.     The prosecution called eyewitnesses Robert Jones, Phillip Jones, Augustus Brown, and Lorenzo Woodford to testify.

158.     During the Grand Jury proceeding, none of the eyewitnesses described the shooter as "Black" or "African American" despite previously referring to him as such.

159.     Instead, they referred to the shooter as the "light skinned guy" or "Spanish kid."

  (a) Witness Augustus Brown testified to the Grand Jury using the terms "Spanish kid" or the "light skin one" to refer to the shooter.

  (b) Witness Phillip Jones testified to the Grand Jury using the term "light skin guy" for the shooter, contrasting him with the accomplice whom he called the "black guy."

  (c) Witness Robert Jones testified to the Grand Jury using the term "light skin guy" for the shooter.

(d) Witness Lorenzo Woodford testified to the Grand Jury using the term "light skin kid" for the shooter.

160.    In their initial descriptions to police made immediately after the shooting, all of the eyewitnesses described the shooter as "Black."

161.    The prosecution did not present evidence to or elicit testimony before the Grand Jury that Augustus Brown, Phillip Jones, Robert Jones, or Lorenzo Woodford had initially described the shooter to police as "Black." This was exculpatory evidence that should have been presented to the Grand Jury.

162.    The prosecution did not present evidence to the Grand Jury that the initial police reports from all of the eyewitnesses who provided statements, including those who did not testify in the Grand Jury, documented the shooter as a "Male Black." This was exculpatory evidence that should have been presented to the Grand Jury.

163.    The omission of the initial "Male Black" description created a materially false impression that Mr. Velazquez matched the witnesses' initial descriptions.

164.    The prosecution did not present to the Grand Jury the composite sketch created by Robert Jones, which did not look anything like Mr. Velazquez. This was exculpatory evidence that should have been presented to the Grand Jury.

165.    The omission of the composite sketch from the evidence presented to the Grand Jury created a materially false impression that Mr. Velazquez matched the witnesses' initial descriptions.

166.    Augustus Brown did not testify that the shooter's eye color was lighter than Mr. Velazquez's.

30

167.     The prosecution did not present evidence or elicit testimony before the Grand Jury that Augustus Brown stated to police that the shooter had light brown eyes and stated, when looking at the photograph of Plaintiff, that the shooter had lighter eyes than Plaintiff. This was exculpatory evidence that should have been presented to the Grand Jury.

168.     The omission of Brown's statement that the shooter had "light brown" eyes that were different from the color of Mr. Velazquez's eyes further concealed from the Grand Jury that Plaintiff's appearance did not match that of the shooter. This was exculpatory evidence that should have been presented to the Grand Jury.

169.     The prosecution did not present evidence or elicit testimony before the Grand Jury about any aspect of Augustus Brown's photographic identification of Mr. Velazquez—including that he continued to view another 800 photographs after purportedly identifying Mr. Velazquez's photograph.

170.     Augustus Brown testified falsely in the Grand Jury that he recognized Mr. Velazquez from 1995, when they "used to hustle together on the same block."

171.     This testimony was the result of Defendant LITRENTA and others feeding false information to Mr. Brown in order to bolster his testimony, and coercing and/or pressuring him to incorporate that information into his testimony.

172.     The prosecution did not present evidence or elicit testimony before the Grand Jury that Augustus Brown never told police before making an identification that he recognized the shooter.

173.     The prosecution did not present evidence or elicit testimony before the Grand Jury that Augustus Brown never told police that he "used to hustle together on the same block" with the shooter.

174. The omission of these facts concealed that Brown's after-the-identification claim that he recognized the shooter was false, and that the detail he included about seeing him previously originated with the police, not with Brown himself.

175. Lorenzo Woodford testified in the Grand Jury that the "light skin kid" was the gunman.

176. Woodford testified in the Grand Jury that during the lineup he recognized Mr. Velazquez as the shooter but that he didn't say he did while in the room.

177. Woodford testified in the Grand Jury that he said "I don't know" when looking at the lineup.

178. Woodford testified in the Grand Jury that when he left the room, he told LITRENTA that number two, Mr. Velazquez, was the shooter.

179. The prosecution did not present evidence or elicit testimony before the Grand Jury that Woodford's purported identification of Mr. Velazquez was never recorded.

180. The omission of these facts deprived the Grand Jury of exculpatory evidence that would have undermined the credibility of Woodford, LITRENTA, and the identification of Plaintiff.

181. Nor did the prosecution present any of the Defendant-detectives' misconduct, or their acts and omissions discussed above in ¶¶ 56-69, 70, 74-87, 97-105; 117-130; 132-139, 143-146, 151.

182. Nor did the prosecution inform the grand jury of the information LITRENTA and others concealed from DANY in convincing them to authorize Velazquez's prosecution.

183. On February 11, 1998, the Grand Jury, unaware of the above exculpatory and/or impeaching evidence and relying on the foregoing incomplete and misleading presentation,

32

returned an indictment charging Velazquez with Ward's murder and the robbery of his gambling establishment.

184. Mr. Velazquez was remanded to Rikers Island and held without bail.

185. At the time Mr. Velazquez was charged, the State of New York still maintained a capital punishment statute.

186. For more than four months following his arrest, the Manhattan District Attorney's Office actively contemplated seeking the death penalty against him.

187. As a result, Mr. Velazquez lived under the acute threat of execution, compounding the trauma of being wrongfully accused of crimes he did not commit.

188. Because Mr. Velazquez was charged with killing a police officer, corrections officers harassed, threatened, and used excessive force against him during his processing into Central Booking and Riker's Island. Mr. Velazquez was categorized as a Central Monitored Case ("CMC") and placed in protective custody ("PC")—essentially solitary confinement.

189. Mr. Velazquez was thus made to live in segregated housing, given only limited access to recreation, required to wear leg shackles and handcuffs during transit with a Captain escort (whether to a visit, recreation, or the law library), limiting his movement and increasing his vulnerability to violent attacks by others.

190. Whenever Mr. Velazquez was escorted through the jail, other incarcerated people were made to face the wall, further increasing Mr. Velazquez's isolation and dehumanization.

191. Although the District Attorney determined not to seek the death penalty after approximately five months, Mr. Velazquez remained designated CMC and in PC, and the foregoing conditions remained imposed on him until he was transferred to state custody after his conviction and sentencing.

## G. DEFENDANT-DETECTIVE LITRENTA AND DEFENDANT DANY INVESTIGATOR GIORGIO FABRICATE EVIDENCE TO DISCREDIT MR. VELAZQUEZ'S ALIBI

192.    At the time of Ward's murder, Mr. Velazquez was nowhere near 2335 Eighth Avenue in Manhattan, where the crime occurred.

193.    Rather, Mr. Velazquez was at his family apartment at 1344 University Avenue, Bronx, New York with his domestic partner, Iris "Vanessa" Cepero, and their two small children.

194.    At the precise time of Ward's murder, Mr. Velazquez was speaking to his mother, Maria Velazquez, by telephone. The call, which took place on both Mr. Velazquez and Maria's respective land lines, lasted 74 minutes.

195.    Telephone records for the landlines connected to Mr. Velazquez's home and to Maria's home, produced by Mr. Velazquez to the prosecution prior to trial, documented this call.

196.    Mr. Velazquez, Maria Velazquez, and Ms. Cepero all had firsthand knowledge of the telephone call: Jon-Adrian and Maria Velazquez as participants, and Ms. Cepero because she was present in the apartment when Mr. Velazquez was speaking to his mother.

197.    Each of these individuals recalled the telephone call, as well as the date of the call, because the call and the date on which it took place were significant.

198.    The date—January 27, 1998—was the day before the first birthday of Mr. Velazquez's father since his passing in 1997.

199.    The call was also significant because Mr. Velazquez and his mother were discussing the family's plans to honor his father's birthday at his grave.

200.    Rather than investigate Mr. Velazquez's truthful alibi in good faith, the NYPD focused on discrediting it by any means necessary.

34

201.     Three months after Mr. Velazquez's arrest, and one month after Mr. Velazquez's attorneys provided his alibi notice, Defendant LITRENTA decided to visit Vanessa Cepero at her home.

202.     Defendant LITRENTA asked Defendant GIORGIO to accompany him, because he and GIORGIO were "friends," having previously worked together as detectives with the NYPD. GIORGIO also had a reputation within the NYPD for getting witnesses to say what he wanted them to say—whether it was truthful or not. LITRENTA, as a friend of GIORGIO, knew of this reputation.

203.     GIORGIO agreed to go with LITRENTA out of loyalty to his friend and out of his interest to help secure a conviction on his friend's case. GIORGIO was not asked or directed to conduct this interview by anyone at DANY, and accompanied LITRENTA based on their personal relationship.

204.     Ms. Cepero, however, refused to speak with Defendants LITRENTA and GIORGIO.

205.     Yet rather than truthfully document that Ms. Cepero refused to speak with them, Defendant LITRENTA, with GIORGIO's full knowledge and approval, fabricated a false report of a conversation with Ms. Cepero that never happened.

206.     Defendant GIORGIO made no record, apart from the fact, date, and location of the meeting, of any statement by Cepero.

207.     According to the fabricated statement, Ms. Cepero claimed she had been sleeping between 8:00 am and 1:30 pm on the day of the murder. Thus, she allegedly could not vouch for Mr. Velazquez's presence in their home at the time of the crime.

208. The fabricated statement was inconsistent with Mr. Velazquez's alibi insofar as it created the possibility that Mr. Velazquez was not home at the time of the crime.

209. DANY and NYPD hid this fabricated report from Mr. Velazquez and his attorneys, and did not provide notice of an alibi rebuttal case, waiting instead until after Plaintiff, Ms. Cepero, and Maria Velazquez testified to ambush them with the fabricated report at trial. Nor did either LITRENTA or GIORGIO ever disclose to DANY that they fabricated this evidence and that, in truth, Ms. Cepero refused to speak with them.

210. LITRENTA or GIORGIO's fabrication of the report, their false testimony about the fabricated statement, and DANY's ambushing the defense with it at trial, undermined Mr. Velazquez's truthful alibi, created a false basis to impeach Mr. Velazquez's alibi witnesses, and prevented his attorneys from establishing his innocence.

## H. THE TRIAL AND MR. VELAZQUEZ's WRONGFUL CONVICTION

211. Mr. Velazquez's trial began on October 14, 1999, in New York County Supreme Court, and lasted approximately two weeks.

### 1. <u>Immediately Prior to Trial, the Assigned ADA Falsely Represents DD5 93's Contents and His Duty to Disclose It</u>

212. On October 8, 1999, just a week before the start of trial, the trial prosecutor, ADA Eugene Hurley, responded by letter to a specific request for enumerated DD5s, including DD5 93, by Mr. Velazquez's trial counsel.

213. In that letter, ADA Hurley identified various DD5s, including DD5 93, and stated that they "are not discoverable," noting that "most concern area canvases and perfunctory prisoner debriefings, or interviews of members of the deceased family. . . [and] other individuals who some

of these DD5s report were 'interviewed' will not be called as witnesses at the trial and provided

no information about the crimes charged."

214.     Following this general explanation, Hurley purported to provide the topic of each

DD5. Hurley described DD5 93 as "Phone Interview of Danny Daniels."

215.     Contrary to Hurley's representation, he was obligated to disclose DD5 93 pursuant

to *Brady*.  *See* ¶¶ 56-69, *supra*.

216.     DD5 93 was then continuously suppressed from Mr. Velazquez by Defendants

throughout decades of appellate, post-conviction, and Freedom of Information Law actions in

which Mr. Velazquez asserted his innocence, claimed he had been wrongfully convicted, and

sought any favorable evidence that might produce leads to help him establish his innocence.

217.     Members of both the NYPD and DANY continued to suppress DD5 93 throughout

Mr. Velazquez's wrongful conviction and incarceration.

## 2.   The Prosecution's Case Consists of Fabricated Eyewitness Identification Testimony

218.     The prosecution's case against Mr. Velazquez was based entirely on fabricated

eyewitness identifications.

219.     The prosecution called seven eyewitnesses: Augustus Brown, Dorothy Canady,

Matty Alex, Joe Scott, Robert Jones, Phillip Jones, and Lorenzo Woodford.

220.     Of these seven, three did not identify Mr. Velazquez as the shooter in court:

(a)  When asked if she saw the shooter in the courtroom, Dorothy Canady identified a

juror.

(b)  Matty Alex testified that her back was turned when the robbers entered, and she

did not see either of them.

(c) Joe Scott described the person believed to be the shooter but could not identify him.

221.    Augustus Brown, acting in accordance with Defendant-Detectives' previously described threats and suggestions, which was not disclosed to the defense, identified Mr. Velazquez in court as the perpetrator.

222.    Robert Jones testified that he initially described the shooter as a light-skinned Black male, assisted in producing a police sketch of the shooter as a Black man with braided hair, and picked out a mugshot photograph of a different person who was a Black male who resembled the shooter.

223.    When asked if he saw  "the light-skinned man in court today" by the prosecutor, Jones indicated Mr. Velazquez. Then, when asked if he recognized the person he picked out of the lineup on February 2, 1998, Mr. Jones asked Mr. Velazquez to stand up, paused, and said, "Looks like him, okay."

224.    Robert Jones's identification of Mr. Velazquez in court was the result of the Defendants' previously described threats and suggestion, which were not disclosed to the defense.

225.    Phillip Jones, Robert Jones's brother,  testified pursuant to a cooperation agreement, which was disclosed to the defense. In exchange for his testimony, DANY agreed that, within 30 days of the completion of the trial, it would inform the Parole Board that Mr. Jones had testified as a witness for the prosecution.

226.    Phillip Jones testified that he also initially described the shooter as a light-skinned Black male, with long braided hair. He nevertheless identified Mr. Velazquez in court.

227. Phillip Jones' positive identification of Mr. Velazquez in court was the result of the Defendant-Detectives' previously described threats and suggestions, which were not disclosed to the defense.

228. Phillip Jones' positive, in-court identification of Mr. Velazquez was also the product of improper police suggestion and cuing, not disclosed to the defense, which were designed to ensure that Mr. Jones would positively identify Mr. Velazquez, even though he had no basis to do so:

> (a) Prior to Phillip Jones testifying, Defendant LITRENTA and/or others told Mr. Jones that they had the "right guy;"
>
> (b) Prior to Phillip Jones testifying, Defendant LITRENTA and/or others promised, explicitly or implicitly, to help reduce his current prison sentence in exchange for his testimony.

229. Lorenzo Woodford could not recall the description of the gunman he initially gave police. However, when his recollection was refreshed, he confirmed his initial description was of a light-skinned Black male with two to two-and-a-half inch braids. Woodford testified that Mr. Velazquez looked a lot different at trial than the shooter did on January 27, 1998. Nevertheless, Mr. Woodford identified Mr. Velazquez in court.

230. Lorenzo Woodford's positive identification of Mr. Velazquez in court was the result of the Defendant-Detectives' previously described coercion and suggestions, which was not disclosed to the defense.

231. Woodford also testified that although he did not identify Mr. Velazquez during the lineup, he told LITRENTA outside of the lineup viewing room that Mr. Velazquez was the shooter.

39

232. Although Canady did not identify Mr. Velazquez in court, and there is no record of her ever positively identifying him, Canady testified that after the February 2, 1998, lineup where she did not identify anyone, she was at the precinct and told police that she recognized number 2, Mr. Velazquez. There is no contemporaneous record of this.

### 3. Detective Litrenta Testifies Falsely About the Police Investigation

233. At trial, Defendant-Detective LITRENTA testified falsely, including by stating that:

(a) He was not aware that Brown initially described the gunman as African American;

(b) Brown described the shooter as Hispanic;

(c) Brown recognized the gunman as someone he had previously seen selling drugs on Amsterdam Avenue between 95th and 96th Street.

(d) Woodford spoke to him after the lineup.

### 4. The Prosecution Defeats the Defense Case with a Fabricated Rebuttal Case

234. The defense called Mr. Velazquez, his mother Maria Velazquez, and Vanessa Cepero to testify to the telephone call between Mr. Velazquez and his mother on January 27, 1998, beginning at 11:44 am and ending at 12:58 pm.

235. The defense offered as an exhibit the telephone records reflecting the call between Mr. Velazquez and his mother.

236. The telephone records showed that the call was made from Mr. Velazquez's home address, 1344 University Avenue, Bronx, New York—approximately four miles from where the shooting occurred in a completely different borough of New York.

237.    The defense also offered in evidence a photograph of Mr. Velazquez taken two weeks prior to the murder, showing Mr. Velazquez's hair in a short Caesar style haircut, as well as an arrest photograph of Mr. Velazquez, taken six days after the crime, showing the same hairstyle. *See supra* ¶ 43.

238.    Mr. Velazquez and Ms. Cepero also testified to Mr. Velazquez's presence in their home in the Bronx at the time of the crime.

239.    The prosecution then called as rebuttal witnesses Defendants LITRENTA and GIORGIO.

240.    LITRENTA and GIORGIO falsely testified about the false statement they fabricated and attributed to Ms. Cepero, i.e., that she was asleep during the time of the crime.

241.    Because Cepero had denied, on her direct testimony, giving police any such statement, and testified to being awake and being with Mr. Velazquez during the relevant period, this false testimony caused Cepero's credibility to be impeached and undermined the alibi defense in general.

242.    LITRENTA and GIORGIO falsely testified that Cepero purportedly said that she was sleeping between 8:00 am and 1:30 pm, creating the possibility that Mr. Velazquez was not at home at the time of Ward's murder and that the alibi had been fabricated by the three defense witnesses who attested to the alibi.

243.    The sworn police documents purporting to record Ms. Cepero's statement to Defendants LITRENTA and GIORGIO were fabricated by Defendants LITRENTA and GIORGIO.

244.    Defendants' LITRENTA and GIORGIO's trial testimony concerning Ms. Cepero's alleged statements to them was false.

5. **The Trial Prosecutor's Summation Misconduct Ensured Mr. Velazquez's Wrongful Conviction**

245.    In summation, the trial prosecutor capitalized on the false alibi rebuttal evidence LITRENTA and GIORGIO fabricated that impugned the credibility of Mr. Velazquez's alibi defense. ADA Hurley argued:

> The claim here is that a twenty-two-year-old man had a seventy-four-minute conversation with his mother. Now, this is not his girlfriend or his boyfriend. This is his mother... I think that you'll admit, if you think about that, that that is a highly unlikely event... I obviously don't want to do any gender stereotyping here, but two women who know each other well... it stands to reason that they could have that conversation whereas the twenty-two-year-old son is unlikely to have had.

246.    ADA Hurley knew or was recklessly indifferent to the truth, as there was no evidence that Mr. Velazquez, or any other twenty-two-year-old man would not have a seventy-four minute conversation with his mother, particularly on the eve of his father's first absent birthday. By arguing this on summation, the trial prosecutor made false, sexist, and misleading summation arguments.

247.    Additionally, ADA Hurley:

(a) acted as an unsworn witness, testifying to facts not in evidence regarding the social habits of adult males, and introduced no expert or statistical evidence to support this gender-based generalization; and

(b) invited the jury to nullify objective documentary evidence—the phone bill—based on prejudice rather than proof;

248.    Hurley also leveraged the false testimony of Brown and Woodford to urge a guilty verdict by:

(a) Arguing that Brown recognized Velazquez from "hustling with him" years earlier in the area around 95th or 96th Street and Amsterdam Avenue, making his

identification more reliable, even though Brown did not, in fact, recognize

Velazquez or have prior interactions with him;

(b) arguing that Woodford positively identified Velazquez outside of the lineup room,

even though he did not.

249. ADA Hurley knew or was recklessly indifferent to the truth, as the official police

files and DD5s contained no record of these purported material identifications and statements.

250. Additionally, under federal law, information known to the police and others

acting on DANY's behalf was attributable to ADA Hurley and the rest of the DANY as a matter

of law.

251. By arguing these facts on summation, the trial prosecutor made false and

misleading summation arguments.

252. ADA Hurley also vouched for witnesses Brown, Woodford, and the Jones

Brothers by praising their courage in testifying and interjecting his own belief that it is

"ridiculous" that they would lie and suggesting that they had no motive not to be truthful.

253. ADA Hurley knew or was recklessly indifferent to the truth—that each of these

witnesses only identified Mr. Velazquez under threat of being prosecuted for crimes themselves.

By making these arguments, the trial prosecutor made false and misleading summation

arguments.

254. Finally, ADA Hurley improperly commented on the credibility of Mrs. Velazquez

and Ms. Cepero, arguing that they were "willing to stretch the truth" because of their familial

bias towards Mr. Velazquez.

6.  **Mr. Velazquez Is Convicted And Sentenced to Life Imprisonment With a Minimum of 25 Years**

255.    ADA Hurley did not inform the jury of the information FALZARANO, LITRENTA, CARBONI, POTTER, MOONEY and others concealed from DANY in convincing them to prosecute Mr. Velazquez.  He did not inform them of the evidence he himself concealed, including DD5 93 and its contents.

256.    The prosecutor presenting Velazquez's case did not inform the jury of the false and/or misleading testimony of witnesses.

257.    The prosecutor presenting Velazquez's case amplified the false and misleading testimony of witnesses.

258.    Relying on the foregoing incomplete, false, and misleading presentation, the jury voted to convict Plaintiff.

259.    On October 29, 1999, the jury, unaware of the above exculpatory, false, misleading, and fabricated evidence, found Velazquez guilty for Ward's murder and the robbery of his gambling establishment.[2]

260.    On March 7, 2000, Mr. Velazquez was sentenced to life imprisonment with a minimum of 25 years for the murder of Mr. Ward, to run concurrent with sentences imposed on the other counts of the indictment.

261.    Prior to being sentenced, Mr. Velazquez passionately asserted his innocence and stated that he had never been to Ward's establishment or seen any of the witnesses against him, all of whom, he said, testified falsely.

7.  **Mr. Velazquez and His Family Suffer Decades of Forced Separation, Psychological Trauma, and Stolen Milestones**

---

[2] The jury acquitted Mr. Velazquez of First-Degree Murder and convicted him of Second-Degree Murder, Robbery, and Attempted Robbery.

262. The moment of Mr. Velazquez's wrongful arrest triggered an immediate and violent separation from his children, Ms. Cepero, and his mother, Maria Velazquez, severing the foundational bond of their family.

263. In the sudden absence of their primary breadwinner and protector, the family's stability collapsed, rendering Ms. Cepero and Mr. Velazquez's children homeless and forcing them to seek refuge in a municipal shelter.

264. As the legal proceedings transitioned from an arrest to a wrongful conviction, the romantic relationship between Mr. Velazquez and Ms. Cepero, the mother of his children, succumbed to the insurmountable strain of a life sentence, ending their union and leaving the children in a broken home and without the love, companionship, and guidance of their father.

265. Maria Velazquez was forced to abandon her own life and aspirations to step into the void, assuming the exhausting dual responsibility of supporting her incarcerated son while raising his children in his stead.

266. This state of forced separation was not a temporary hardship but a permanent reality that spanned decades, defining the entirety of his children's youth and Maria Velazquez's middle and senior years.

267. Under the relentless pressure of this decades-long injustice, and forced separation from her son, Mr. Velazquez's mother suffered a catastrophic decline in both mental and physical health, culminating in a stress-induced heart attack and a debilitating stroke.

268. Deprived of their father's presence during their most vulnerable years, Mr. Velazquez's sons developed severe mental health issues and deep-seated depression, which eventually led to one son acting out his grief and anger in a manner that resulted in his own incarceration.

269.    From the onset of his detention at Rikers Island through the decades he spent in upstate maximum-security facilities, every moment of familial connection was strictly mediated and monitored by the state.

270.    The family was never permitted to speak freely; every phone call was recorded, and every letter sent between a mother and her son and a father and his children was opened and read by state agents.

271.    The family was forced to discuss highly personal, private, and confidential details of their lives–including medical, health, and financial details—through means monitored by the state. They had no privacy whatsoever.

272.    To simply sit in the same room as their son and father, family members were forced to endure demeaning security protocols, including physical pat downs and invasive searches, while Mr. Velazquez was subjected to invasive strip searches and physical inspections before and after every encounter.

273.    These state-imposed barriers ensured the family could never socialize, embrace, or be together in the manner they desired, forcing their most personal relationships to exist only within the cold, clinical, and demeaning parameters of the carceral system.

274.    The damage to Mr. Velazquez's most important, intimate relationships, and the suffering experienced by Mr. Velazquez, his sons, his mother, and Ms. Cepero, were foreseeable consequences of Defendants' conduct and wrongdoing.

## I.    DANY AND THE NYPD CONTINUE MR. VELAZQUEZ'S MALICIOUS PROSECUTION IN THE FACE OF HIS EFFORTS TO VACATE HIS CONVICTION

### 1.    Direct Appeal and Habeas Corpus

275.    Mr. Velazquez appealed his conviction and sentence.

276. DANY assigned an Assistant District Attorney to oppose Mr. Velazquez's direct appeal of his conviction.

277. Prosecutors had an ongoing duty to disclose the *Brady* material that had been suppressed from Velazquez at trial.

278. Yet, during Velazquez's appeal to the Appellate Division, DANY continued to suppress all of the *Brady* material in Velazquez's case, ¶¶ 56-69, 70, 74-87, 97-105; 117-130; 132-139, 143-146, and 151, above, and made affirmative misrepresentations of fact to the court.

279. DANY represented in its submission to the court that the eyewitnesses were reliable and did not disclose the threats, coercion, and suggestion used to obtain their positive identifications of Velazquez.

280. DANY continued to argue that Brown had previously sold drugs with Velazquez and that Woodford positively identified Velazquez outside of the lineup room.

281. The Appellate Division, crediting DANY's arguments, affirmed Mr. Velazquez's conviction. *People v. Velazquez,* 13 A.D.3d 184 (1st Dep't 2004).

282. Mr. Velazquez sought leave to appeal the Appellate Division's affirmance of his conviction and sentence. DANY opposed Mr. Velazquez's motion for leave to appeal to the Court of Appeals with the same false or misleading submissions they used to defeat Mr. Velazquez's appeal in the Appellate Division. Leave was denied. *People v. Velazquez*, 4 N.Y.3d 857 (2004).

283. Mr. Velazquez, proceeding pro se, then sought habeas corpus relief.

284. In response to Mr. Velazquez's petition, DANY presented the same false arguments to the federal district court that they had made to the Appellate Division and Court of Appeals.

285.    On November 29, 2007, the district court denied Mr. Velazquez's habeas petition. *Velazquez v. Fischer*, 524 F.Supp.2d 443 (S.D.N.Y. 2007).  A certificate of appealability was denied.

### 2. Former DA Cyrus Vance, Jr.'s Conviction Integrity Unit Continues to Suppress Exculpatory Evidence and Oppose Mr. Velazquez's Efforts to Vacate His Conviction

286.    In October 2011, Mr. Velazquez sought review of his conviction by DANY's Conviction Integrity Unit ("CIU").

287.    In seeking review, Mr. Velazquez's attorneys presented new evidence discovered through their investigation, including witness recantations and claims that eyewitness identifications were the product of police coercion, threats, and pressure–rather than the eyewitnesses' own memories.

288.    Mr. Velazquez also presented the CIU with evidence relating to the frequency of eyewitness misidentifications and the unreliability of eyewitness identifications; the mismatch between eyewitness descriptions of the shooter and Mr. Velazquez's appearance; the failure of police to investigate credible leads pointing away from Mr. Velazquez; and the fact that Mr. Velazquez had no connection whatsoever to Derry Daniels.

289.    The CIU agreed to reinvestigate Mr. Velazquez's conviction.

290.    On April 2, 2013, the CIU advised Mr. Velazquez that it had concluded its reinvestigation and it would not support vacatur of Mr. Velazquez's conviction.

291.    The CIU did not disclose DD5 93 or any of the other information concerning the misconduct of Defendants FALZARANO, LITRENTA, CARBONI, POTTER, and MOONEY, including that  Brown's testimony that he sold drugs with Velazquez, and Woodford's purported positive identification of Velazquez, were fabrications.

48

292.     Instead, the District Attorney's Office continued to hide this favorable information from Mr. Velazquez and his attorneys.

### 3.  Mr. Velazquez's First CPL § 440.10 Motion to Vacate His Conviction

293.     On May 1, 2013, Mr. Velazquez filed a motion to vacate his conviction, pursuant to CPL §§ 440.10, based on newly discovered evidence, ineffective assistance of counsel, and actual innocence.

294.     DANY vigorously opposed the motion, and continued to suppress DD5 93 and all of the *Brady* material identified in ¶¶ 56-69, 70, 74-87, 97-105; 117-130; 132-139, 143-146, 151, *supra*.

295.     New York Supreme Court (Clott, J.), denied the motion on November 13, 2014, without a hearing.  Mr. Velazquez appealed that denial on February 12, 2016. DANY opposed the appeal, and on September 8, 2016, the Appellate Division, First Department affirmed the denial. *People v. Velazquez*, 143 A.D.3d 126 (1st Dep't 2016). Leave to appeal was sought by Mr. Velazquez, opposed by DANY, and denied on February 16, 2017. *People v. Velazquez,* 28 N.Y.3d 1189 (2017).

### 4.  Mr. Velazquez's Second CPL § 440.10 Motion

296.     By March 2017, Mr. Velazquez's post-conviction investigation had finally uncovered DD5 93.

297.     Soon thereafter, Mr. Velazquez's post-conviction attorney asked former DA Cyrus Vance, Jr. to confirm whether DD5 93 was disclosed to the defense during trial. Through his Chief Assistant District Attorney, the DA refused to answer counsel's question, directing counsel instead to raise the issue in court.

298.    On June 26, 2017, Mr. Velazquez brought a second CPL 440.10 motion to vacate his conviction.

299.    Mr. Velazquez's motion was supported by a letter dated October 8, 1999, shortly before trial commenced, in which the trial prosecutor denied Mr. Velazquez's trial attorney's specific request for DD5 #93 (and other specified DD5s).

300.    The criminal case file also shows numerous other specific requests for *Brady* material to which the Suppressed DD5 was responsive. At every turn, the District Attorney's Office affirmed that it was complying with its *Brady* obligations while it withheld DD5 93.

301.    The District Attorney again opposed Mr. Velazquez's motion.  At the same time, DANY continued to withhold all of the other *Brady* material in the case, which the court reviewing Mr. Velazquez's motion was required to consider cumulatively with DD5 # 93. *See, e.g.,* ¶¶ 70, 74-87, 97-105; 117-130; 132-139, 143-146, 151, *supra*.

302.    On April 16, 2018, without considering the additional items of *Brady* material being suppressed by DANY, the court denied Mr. Velazquez's motion without a hearing. The denial was affirmed by the First Department on June 14, 2018. *See People v. Velazquez*, 2018 N.Y. Slip Op. 75011(U).

**5.   DANY Continues to Suppress *Brady* Material in the Face of Mr. Velazquez's Public Records Requests**

303.    Throughout the period of his wrongful incarceration, Mr. Velazquez, acting pro se or through his agents, including his attorneys, filed multiple FOIL requests with DANY seeking, among other things, all police reports, *Brady* material, and witness statements concerning the investigation into the murder of Albert Ward.

### a. **The Law Regarding the FOIL**

304.    The Freedom of Information Law ("FOIL") requires New York City and State agencies, including a District Attorney's Office, to permit the public to inspect and copy every record it holds, excepting only those records that fall within one or more narrowly defined exemptions to disclosure.

305.    The FOIL imposes identical duties on all CITY agencies to handle such requests and to disclose such records.

306.    The FOIL also requires all CITY agencies to designate Records Access and Appeals Officers. The Records Access Officer receives and responds to FOIL requests. He or she may grant access to the records or, if the records are exempt from disclosure, withhold the records and explain the reasons for doing so in writing.

307.    The person making the request may then administratively appeal to the agency's Appeals Officer, who is required to overturn the denial and grant access if the records do not properly fall within the grounds for denying access.

308.    Under the FOIL and as a matter of DANY practice, DANY's Appeals Officer functions as the final policymaker regarding the agency's compliance with disclosure obligations. The FOIL Appeals Officer's decision is not subject to any internal review and for legal purposes constitutes the final, binding, decision of the DANY that may then be challenged in an Article 78 proceeding.  The policies and practices established by the Appeals Officer govern how Records Access Officers respond to requests.

309.    Both the Records Access Officer and the Appeals Officer are prohibited by law from denying a request by falsely claiming that a requested record does not exist. It is a crime to

intentionally prevent the public from inspecting records requested under the FOIL. See Penal Law § 240.65.

**b. Velazquez's FOIL Requests and Documents Wrongfully Withheld**

310.     In response to Mr. Velazquez's public records requests, DANY, through its designated Records Access Officers and FOIL Appeals Officers, acting pursuant to the policies and customs of the FOIL Appeals Officer, continued to suppress critical *Brady* material that was suppressed during trial, ¶¶ 56-69, 70, 74-87, 97-105; 117-130; 132-139, 143-146, 151, above, including DD5 93, by withholding them on false grounds or falsely stating the records could not be located or were not in their possession.

311.     By making these affirmative, false representations and knowing omissions, DANY fraudulently concealed this evidence from Mr. Velazquez, rendering any further administrative challenge futile at that time, and continued Mr. Velazquez's malicious prosecution and the due process violations resulting from the suppression of *Brady* material during his trial.

312.     DANY's suppression of DD5 No. 93 was part of DANY's then long-standing policy and custom of continuing the suppression of *Brady* material concealed at trial, in order to preserve wrongful convictions.

313.     Had DANY complied with its constitutional obligations and truthfully disclosed the records Mr. Velazquez requested, he would have been able to demonstrate his innocence and secure his release years earlier. Instead, DANY's fraudulent concealment of these documents prolonged Velazquez's wrongful imprisonment, continued the violation of his constitutional rights, and continued his malicious prosecution.

## J.  MR. VELAZQUEZ IS GRANTED EXECUTIVE CLEMENCY

314.    On August 17, 2021, Governor Andrew Cuomo granted Mr. Velazquez executive

clemency.

315.    On September 9, 2021, after 23 years, 7 months, and 8 days of wrongful

incarceration, Mr. Velazquez was released from Sing Sing Correctional Facility.  He was,

however, released subject to the supervision of New York State's Board of Parole, a division of

New York State's Department of Corrections and Community Supervision.

316.    In the fall of 2022, while still wrongly convicted, in recognition of his unique

contributions to criminal justice reform, Mr. Velazquez was invited to the White House to

discuss criminal justice legal reform in a small group directly with President Joseph Biden. To

attend this event, Mr. Velazquez was required to obtain permission from his parole officer to

leave New York State.

317.    During that meeting on October 18, 2022, President Biden apologized to him on

"behalf of all society" for Mr. Velazquez's wrongful conviction and incarceration. [3]

## K.  DNA ESTABLISHES MR. VELAZQUEZ'S INNOCENCE AND THE NEW DA'S CIU EXONERATES HIM

318.    Mr. Velazquez used his freedom to continue to reinvestigate his case and

advocate for his exoneration.

319.    In this phase of the reinvestigation, due to the now increased sensitivity and scope

of forensic DNA testing, Mr. Velazquez focused on getting forensic DNA testing on the physical

evidence from the crime scene, including a piece of duct tape and the betting slip handled by the

shooter just prior to the Ward shooting.

---

[3] See Justice-in-Education Initiative at Columbia University, "Biden Discusses Criminal Legal Reform with Jon-Adrian "JJ" Velasquez [sic]" at https://justiceineducation.columbia.edu/biden-discusses-criminal-legal-reform-with-jj-velasquez/

320.     At the time of the crime and trial, the betting slip had been preserved as evidence, but had not been tested for DNA because testing of the slip required DNA-sensitivity not then available.

321.     By 2020, however, new forensic DNA analysis was available. Mr. Velazquez retained an outside laboratory, Cybergenetics, to review the results of 2014 testing conducted by the New York City Office of the Chief Medical Examiner ("OCME"), which had found DNA on the betting slip and the duct tape but had not compared that DNA to Mr. Velazquez or anyone else.

322.     Cybergenetics' testing conclusively excluded Mr. Velazquez as a contributor to the biological material from the betting slip and duct tape.

323.     Specifically, on July 2, 2020, Cybergenetics' testing concluded that a match between the DNA found on the betting slip and Mr. Velazquez is 19.4 billion times less probable than a match to an unrelated African American person and 53.1 billion times less probable than a match to an unrelated Hispanic person.

324.     Not only did this testing exclude Mr. Velazquez, it also affirmed what the eyewitnesses had all reported at the time of the crime: The shooter was African American and was not Hispanic.

1.  **DANY's Newly Formed Post-Conviction Justice Bureau Opens a Second Reinvestigation of Mr. Velazquez's Conviction**

325.     On April 19, 2021, DANY's Post Conviction Justice Unit (PCJU) opened a second reinvestigation into Mr. Velazquez's case.

326.     During this second reinvestigation, the PCJU, Mr. Velazquez, his advocates, and his attorneys, uncovered additional favorable and exculpatory material that had been suppressed

54

by DANY for decades in violation of *Brady*, *Rosario* and their progeny, as well as the United States and New York State Constitutions.

327. This additional suppressed material included police notes and records, including a statement from Lorenzo Woodford stating that he was told that Ward's murder had been the result of a murder-for-hire hit.

328. On April 10, 2023, Cybergenetics' exculpatory results were independently confirmed by the Office of the Chief Medical Examiner (OCME), which found "Jon-Adrian Velazquez is excluded as a contributor to all samples where comparisons could be made."

329. On August 7, 2024, PCJU concluded that the new DNA evidence and the other newly discovered exculpatory material created a reasonable probability that the verdict would have been more favorable to Mr. Velazquez, and agreed to join Mr. Velazquez's third motion to vacate his conviction pursuant to CPL § 440.10.

**2. Mr. Velazquez's Third Motion to Vacate His Conviction Pursuant to CPL § 440.10(g-1) and (g) is Finally Successful**

330. On September 23, 2024, counsel for Mr. Velazquez filed the third motion to vacate his conviction pursuant to CPL § 440.10(1)(g-1) and (g).

331. The motion was joined by DANY.

332. On September 30, 2024, after 26 years, 7 months, and 28 days fighting for his innocence, Jon-Adrian Velazquez was finally exonerated when his motion to vacate his conviction and sentence was granted by Justice Clott.

333. DANY then moved to dismiss the indictment, which was also granted.

**MR. VELAZQUEZ'S DAMAGES AND INJURIES**

334. Mr. Velazquez's damages and injuries include, but are not limited to:

(a) His false and malicious arrest, prosecution, and conviction for murder and robbery, and sentence to life in prison;

(b) The wrongful denial or delay of his challenges to his conviction filed in State and Federal Court;

(c) His 23 year, 7 month, and 7 day incarceration, and the additional two years and six months he spent subject to DOCCS' supervision;

(d) Loss of enjoyment of life;

(e) Violation of his Federal and State civil rights;

(f) Living in prison under the spectre of a death penalty case for five months;

(g) Physical injuries he suffered during assaults by other inmates, and the mental and emotional effects of such assaults;

(h) Past and future physical illnesses and injuries as a result of his wrongful conviction and experiences in prison;

(i) Past, present, and future mental and emotional injuries and suffering;

(j) The loss of the services, society, companionship, and consortium of his children, mother, grandchildren, brother, and other family members and friends;

(k) Legal fees and expenses.

## **FIRST CAUSE OF ACTION**

### **42 U.S.C. § 1983**
### **Malicious Prosecution and Deprivation of Liberty Under the Fourth, Fifth, Sixth, and Fourteenth Amendments**
*Against Defendants Falzarano, Litrenta, Carboni, Mooney, and John and Jane Doe Defendants #1–20*

335.     Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

56

336.    Defendants FALZARANO, LITRENTA, CARBONI, MOONEY, individually, collectively, acting in concert and aiding and abetting one another, intentionally, knowingly, and willfully manufactured, or caused the manufacturing of, false statements and identifications by Augustus Brown, Phillip Jones, Robert Jones, and Lorenzo Woodford which they improperly compelled or induced Brown, Phillip Jones, and Robert Jones to adopt, accusing Mr. Velazquez of the robbery and murder of Albert Ward.

337.    Defendants FALZARANO, LITRENTA, CARBONI, MOONEY knew that the statements and identifications would be relied on by DANY and the court as a basis to authorize Velazquez's arrest, actually arrest him, and formally initiate his prosecution, and that the statements and identifications would be introduced into evidence at Velazquez's trial. Defendants then caused that false evidence to be forwarded to DANY, and DANY relied on that evidence in deciding to commence charges against Mr. Velazquez.  The false statements and identifications of Augustus Brown, Phillip Jones, Robert Jones, and Lorenzo Woodford were in fact introduced during Velazquez's pretrial *Wade* hearing and trial.

338.    By virtue of the foregoing, Defendants FALZARANO, LITRENTA, CARBONI, MOONEY, with actual malice, initiated, continued, or caused the initiation and continuation of, criminal proceedings against Mr. Velazquez that they knew, or should have known, there was no probable cause for, and for which in fact there was no probable cause, and thereby caused Velazquez to be deprived of his liberty.

339.    Mr. Velazquez is completely innocent of the robbery and murder of Albert Ward. The prosecution finally terminated in Mr. Velazquez's favor on September 30, 2024, when the conviction was vacated and the indictment dismissed. *See* Exhibit A.

340.    Defendants FALZARANO, LITRENTA, CARBONI, and MOONEY knew, but

withheld from DANY, either permanently or for a substantial period of time, and therefore from the court and the defense, exculpatory or impeaching evidence that tended to negate Mr. Velazquez's guilt and which they knew or should have known the law required them to timely disclose. This evidence included, but was not limited to, the items detailed in ¶¶ 56-69, 70, 74-87, 97-105; 117-130; 132-139, 143-146, 151,above.

341. The aforesaid conduct, which Defendants FALZARANO, LITRENTA, CARBONI, MOONEY committed individually, collectively, in concert with, and in aid of each other, and/or in concert or conspiracy with other named and unnamed individuals, operated to deprive Velazquez of his rights under the Constitution and Laws of the United States:

     (a) Not to be arrested, indicted, prosecuted, detained, convicted, or imprisoned based on false, fabricated, manufactured, misleading, or inherently unreliable "evidence," including the statements and testimony of witnesses who have been improperly influenced, coerced, or manipulated to provide such statements and testimony, in violation of the Due Process and Fair Trial Clauses of the Fifth, Sixth and Fourteenth Amendments to the United States Constitution;

     (b) Not to be deprived of his liberty absent probable cause to believe he has committed a crime, in violation of his rights under the Fourth and Fourteenth Amendments to the United States Constitution; and

     (c) To timely disclosure of all material evidence favorable to the defense pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and their progeny, and the Due Process and Fair Trial Clauses of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitutions.

342. The foregoing violations of Velazquez's federal constitutional rights by Defendants FALZARANO, LITRENTA, CARBONI, MOONEY directly, substantially, proximately, and foreseeably caused the initiation and continuation of Velazquez's criminal prosecution, his loss of liberty, his wrongful conviction, his subsequent imprisonment, and his other injuries and damages.

343. The foregoing violations of Velazquez's rights amounted to Constitutional torts and were affected by actions taken under color of State law, and within the scope of the individual Defendants' employment and authority.

344. Defendants FALZARANO, LITRENTA, CARBONI, MOONEY committed the foregoing violations of Velazquez's rights knowingly, intentionally, willfully, recklessly, and/or with deliberate indifference to his constitutional rights or to the effect of such misconduct on his constitutional rights. No reasonable officer during the time periods these wrongs were committed and continued would have believed this conduct was lawful.

345. Mr. Velazquez is completely innocent of the robbery and murder of Albert Ward. The prosecution finally terminated in Mr. Velazquez's favor on September 30, 2024, when the conviction was vacated and the indictment dismissed.

346. By reason of the foregoing, Defendants FALZARANO, LITRENTA, CARBONI, MOONEY are liable to Velazquez for compensatory and punitive damages.

347. The CITY is liable for these wrongs by virtue of (a) DANY's and the NYPD's policies, customs, and deliberate indifference to, and failure to train, supervise, and discipline their employees regarding such conduct, despite the likelihood that the failure to do so would result in the injuries pled here, and (b) a CITY policymaker's direct participation in the cover-up

59

of Velazquez's wrongful and malicious arrest prosecution and conviction. *See* ¶¶ 388-512, *infra*

(*Monell* claims against the CITY)

348. As a direct and proximate result of these Defendants' actions, Mr. Velazquez spent more 26 years, 7 months, and 28 days wrongfully convicted (of which he spent 23 years, 7 months, and 7 days wrongfully incarcerated, and two and a half years wrongfully subject to DOCCS supervision) and suffered the other grievous, permanent, and continuing damages and injuries set forth above.

## SECOND CAUSE OF ACTION

### 42 U.S.C. § 1983
### Evidence Manufacturing; Denial of a Fair Trial Under the Fifth, Sixth, and Fourteenth Amendments
*Against Defendants Falzarano, Litrenta, Carboni, Mooney, Potter, Jack Roe (as Administrator of the Estate of Gennaro Giorgio), and John and Jane Doe Defendants #1–20*

349. Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

350. Defendants FALZARANO, LITRENTA, CARBONI, MOONEY, POTTER, and GIORGIO, individually, collectively, and acting in concert and aiding and abetting the other, intentionally, recklessly, and with deliberate indifference to Mr. Velazquez's constitutional rights manufactured false evidence against Velazquez.

351. Specifically:

(a) On January 31, 1998, Defendant POTTER created DD5 93 and, together with Defendants FALZARANO, LITRENTA, CARBONI, and MOONEY, suppressed it from DANY until sometime after Mr. Velazquez's indictment, despite the fact that its contents were exculpatory and impeaching;

(b) On February 2, 1998, Defendant LITRENTA manufactured Augustus Brown's

false statements that he knew Mr. Velazquez from the area of 95th and 96th Street and Amsterdam Avenue and created the false February 2, 1998 report purporting to contain genuine statements freely given by Brown;

(c) On May 26, 1998, Defendants LITRENTA and GIORGIO manufactured Vanessa Cepero's false statement that she was asleep at the time of the crime so that she could not definitively say whether Mr. Velazquez was at home, and they created the false May 26, 1998 report purporting to contain genuine statements freely given by Cepero;

(d) At some point prior to the empaneling of the Grand Jury, Defendant LITRENTA manufactured Lorenzo Woodford's false statement that he positively identified Mr. Velazquez when he left the lineup room;

(e) At some point prior to the empaneling of the Grand Jury, Defendant LITRENTA and/or a member of DANY caused the eyewitnesses not to use "African American" or "Black" to describe the shooter, and in some cases, caused them to falsely describe the shooter as Hispanic or Spanish.

352. With the exception of GIORGIO, the Defendants presented this fabricated evidence to DANY which, relying on that evidence, decided to and did charge Mr. Velazquez with murder.

353. These Defendants deprived Mr. Velazquez of his right to a fair trial by fabricating inculpatory evidence and intentionally using unduly suggestive identification procedures and/or direct suggestion and/or coercion to fabricate and obtain false witness statements inculpating Mr. Velazquez.

354. These Defendants deprived Mr. Velazquez of his right to a fair trial by withholding material exculpatory and impeachment evidence from Mr. Velazquez's defense counsel and the

61

Court, and knowingly omitting material facts from their presentation to DANY when DANY was deciding whether to charge Mr. Velazquez.

355.    LITRENTA and GIORGIO fabricated a false narrative after learning of Mr. Velazquez's alibi defense, and gave that false narrative to the trial prosecutor who then called LITRENTA and GIORGIO as witnesses to testify to the false narrative.

356.    These Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Mr. Velazquez's clearly established constitutional rights. No reasonable officer during the time periods these wrongs were committed and continued would have believed this conduct was lawful.

357.    Mr. Velazquez is completely innocent of the robbery and murder of Albert Ward. The prosecution finally terminated in Mr. Velazquez's favor on December 30, 2024, when the conviction was vacated and the indictment dismissed.

358.    As a direct and proximate result of these Defendants' actions, Mr. Velazquez spent more than 26 years, 7 months, and 28 days wrongfully convicted (of which he spent 23 years, 7 months, and 7 days wrongfully incarcerated, and two and a half years wrongfully subject to DOCCS supervision)and suffered the other grievous and continuing damages and injuries set forth above.

### THIRD CAUSE OF ACTION

**42 U.S.C. § 1983**
**Unreasonable Seizure under the Fourth Amendment, Denial of Due Process and a Fair Trial under the Fifth, Sixth, and Fourteenth Amendments, and Denial of Reasonable Bail under the Eighth Amendment, Due to the Pretrial Withholding of Favorable Evidence Likely to Result in Plaintiff's Release from Custody ("*Russo* Claim")**
*Against Defendants Falzarano, Litrenta, Carboni, Mooney, Potter, and John and Jane Doe Defendants #1–20*

359.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and

further alleges as follows:

360. Following the initiation of Mr. Velazquez's prosecution with the filing of a Criminal Court complaint and a proceeding before a grand jury, which would decide whether the evidence supported formally charging Mr. Velazquez by indictment he was bound over for trial.

361. Under New York law, as well as the Eighth and Fourteenth Amendments to the United States Constitution, the court, following the filing of charges, was required, upon application of the defendant, to consider whether to fix a reasonable bail so that the defendant could obtain his release.

362. Under New York law, the strength of the prosecution's case was a significant factor for a court in determining whether to fix a reasonable bail and the amount of such bail.

363. Despite knowing this, Defendants FALZARANO, LITRENTA, CARBONI, MOONEY and POTTER withheld, or caused to be withheld, from Mr. Velazquez and his lawyer, the grand jury, and the court exculpatory and impeachment evidence and other evidence favorable to the defense that completely undermined the prosecution's case.

364. Had such evidence been timely disclosed, the charges against Mr. Velazquez likely would not have survived a preliminary hearing or the determination by the grand jury, and/or the court would have released Mr. Velazquez on his own recognizance or on reasonable bail.

365. The failure to make timely disclosure of such obviously significant evidence undermining the entire case caused Mr. Velazquez to be unnecessarily and unreasonably deprived of his liberty.

366. In addition, Defendants FALZARANO, LITRENTA, CARBONI and MOONEY falsely represented to DANY that five eyewitnesses had positively identified Mr. Velazquez.

367. In fact, only three eyewitnesses positively identified Mr. Velazquez, and those

identifications were the product of Defendants FALZARANO, LITRENTA, CARBONI and MOONEY's coercion, pressure, and threats, including false threats of arrest for serious crimes.

368. This conduct was shocking to the conscience.

369. It violated Mr. Velazquez's constitutional rights to be free of unlawful or unreasonable seizure under the Fourth and Fourteenth Amendments, to reasonable bail under the Eighth and Fourteenth Amendments, to a fair trial under the Sixth and Fourteenth Amendments, and to due process of law under the Fifth and Fourteenth Amendments.

370. By virtue of the foregoing, the Individual Defendants are liable, pursuant to 42 U.S.C. § 1983, for the violation of Mr. Velazquez's constitutional rights and his resultant injuries.

**FOURTH CAUSE OF ACTION**

**42 U.S.C. § 1983**
**Denial of Due Process and a Fair Trial**
**under the Fifth, Sixth, and Fourteenth Amendments by Withholding Evidence Favorable to the Defense ("*Brady* Claim")**
*Against Defendants Falzarano, Litrenta, Carboni, Mooney, and John and Jane Doe Defendants #1–20*

371. Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

372. At all relevant times, Mr. Velazquez had a right—under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, and *Brady v. Maryland*, 363 U.S. 83 (1963) and its progeny—to timely disclosure to him, by the prosecution, of all evidence in its possession, custody, or control that was favorable to his defense, either because it tended to show his innocence, tended to impeach the credibility of the prosecution's witnesses against him, or both ("*Brady* material").

373. In furtherance of this right, police officers, including Defendants FALZARANO, LITRENTA, CARBONI and MOONEY had a duty to timely disclose, or to ensure the timely

64

disclosure of, all potential *Brady* material to DANY so that it could disclose that information to the defense.

374.    Defendants FALZARANO, LITRENTA, CARBONI and MOONEY individually, collectively, acting in concert with each other, knowingly, willfully, intentionally, recklessly, and/or with deliberate indifference to Velazquez's constitutional rights, suppressed from DANY and Velazquez (a) the exculpatory and impeaching information detailed in ¶¶ 56-69, 70, 74-87, 97-105; 117-130; 132-139, 143-146, 151, above; (b) their creation of false police reports; (c) their false representations to DANY to convince that office to criminally charge Mr. Velazquez; and (d) their own and each other's misconduct.

375.    As a result of those defendants' suppression, DANY was unable to disclose to Mr. Velazquez the exculpatory and impeaching information detailed in the preceding paragraphs, and to correct the false testimony and argument that flowed from the suppression of that evidence.

376.    The suppressed evidence was material, likely to influence a jury's decision, and there is a reasonable probability that had the evidence been disclosed to the defense, the result of Mr. Velazquez's trial would have been different.

377.    Defendants FALZARANO, LITRENTA, CARBONI and MOONEY's actions deprived Mr. Velazquez of his right:

> (a) Not to be arrested, indicted, prosecuted, detained, convicted, or imprisoned based on false, fabricated, manufactured, misleading, or inherently unreliable "evidence," including the statements and testimony of witnesses who have been improperly influenced, coerced, or manipulated to provide such statements and testimony, in violation of the Due Process and Fair Trial Clauses of the Fifth, Sixth and Fourteenth Amendments to the United States Constitution;

(b) Not to be deprived of his liberty absent probable cause to believe he has committed a crime, in violation of his rights under the Fourth and Fourteenth Amendments to the United States Constitution; and

(c) To timely disclosure of all material evidence favorable to the defense pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and their progeny, and the Due Process and Fair Trial Clauses of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

378. The foregoing violations of Mr. Velazquez's rights amount to constitutional torts and were affected by actions taken under color of State law, and within the scope of Defendants Falzarano, Litrenta, Carboni, Mooney and John and Jane Doe's employment and authority.

379. Defendants FALZARANO, LITRENTA, CARBONI and MOONEY and others committed the foregoing violations of Mr. Velazquez's rights knowingly, intentionally, willfully, recklessly, and/or with deliberate indifference to Mr. Velazquez's constitutional rights or to the effect of such misconduct on those rights.

380. By reason of the foregoing, Defendants FALZARANO, LITRENTA, CARBONI and MOONEY and others are liable to Mr. Velazquez for the damages detailed in ¶¶ 328(a)-(k), above.

381. The CITY is liable for these wrongs by virtue of (a) DANY's and the NYPD's policies, customs, and deliberate indifference to, and failure to train, supervise, and discipline their employees regarding such conduct, despite the likelihood that the failure to do so would result in the injuries pled here, and (b) a CITY policymaker's (the DANY FOIL Appeals Officer and District Attorney Vance) direct participation, following Mr. Velazquez's conviction, in the ongoing concealment and coverup of the suppression of this *Brady* material. *See* ¶¶ 388-512, *infra*

(*Monell* claims against the CITY).

## FIFTH CAUSE OF ACTION

### 42 U.S.C. § 1983
### Failure to Intervene
*Against Defendants Falzarano, Carboni, Mooney, Potter, Jack Roe (as Administrator of the Estate of Gennaro Giorgio), and John or Jane Doe*

382.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

383.    By their conduct and under color of state law, Defendants FALZARANO, CARBONI, MOONEY, AND JOHN OR JANE DOE had opportunities to intervene on behalf of Mr. Velazquez to prevent his malicious prosecution, false imprisonment, and his deprivation of liberty without due process of law, but, due to their intentional conduct and/or reckless or deliberate indifference, declined or refused to do so.

384.    These Defendants' failures to intercede violated Jon-Adrian Velazquez's clearly established constitutional right to be free from unreasonable search and seizure and not to be deprived of liberty without due process of law as guaranteed by the Fourth and Fourteenth Amendments.

385.    No reasonable officer during the time periods these wrongs were committed and continued would have believed that failing to intervene to prevent Defendant LITRENTA and others from fabricating inculpatory evidence, intentionally using unduly unreliable identification procedures and/or direct suggestion and/or coercion to obtain inculpatory identifications and statements, withholding material, exculpatory and/or impeachment evidence, deliberately failing to conduct a constitutionally adequate investigation, and causing Mr. Velazquez to be arrested and prosecuted without probable cause, were lawful.

386.    Mr. Velazquez is completely innocent of the robbery and murder of Albert Ward.

67

The prosecution finally terminated in Mr. Velazquez's favor on December 30, 2024, when the conviction was vacated and the indictment dismissed.

387.     As a direct and proximate result of these Defendants' actions, Mr. Velazquez spent more than 26 years, 7 months, and 28 days wrongfully convicted (of which he spent 23 years, 7 months, and 7 days wrongfully incarcerated, and two and a half years wrongfully subject to DOCCS supervision) and suffered the other grievous and continuing damages and injuries set forth above.

**SIXTH CAUSE OF ACTION**

**42 U.S.C. § 1983**
**_Monell_ Liability Based on the Conduct of the NYPD**
*Against Defendant City of New York*

388.     Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

389.     The foregoing violations of Mr. Velazquez's federal constitutional rights and injuries were directly, foreseeably, proximately, and substantially caused by conduct chargeable to the CITY, amounting to unconstitutional policies, practices, and/or customs with respect to the rights of persons, including Mr. Velazquez, who are investigated by NYPD officers and subsequently prosecuted for alleged criminal offenses.

390.     Under the principles of municipal liability for federal civil rights violations, the CITY's Police Commissioner and/or his authorized delegates, during all times relevant to this action, had final responsibility as municipal policymakers for training, instructing, supervising, and disciplining police officers and other employees of the NYPD with respect to the investigation and prosecution of criminal matters, including but not limited to constitutional obligations prohibiting the use of psychological coercion during the questioning or interrogation of suspects

and witnesses; requiring officers to refrain from manufacturing, or causing the manufacturing of, false or unreliable identification evidence, false or unreliable witness statements, and false or materially misleading or incomplete reports for use against criminal suspects and defendants in criminal prosecutions and trials; prohibiting officers from giving false testimony against a criminal suspect; and prohibiting the initiation of prosecutions without probable cause.

391. In his role as policymaker, the New York City Police Commissioner and/or his authorized delegates maintained a policy, custom, or practice of violations by NYPD employees of the foregoing constitutional obligations, or were deliberately indifferent to such violations by NYPD employees, and to the obvious need to train, supervise, and discipline NYPD employees with respect to these obligations.

392. Before Mr. Velazquez's arrest, policymaking officials at the NYPD knowingly failed to implement adequate policies, procedures, regulations, practices, customs, training, supervision, or discipline concerning the foregoing constitutional obligations.

393. During all periods relevant to this lawsuit, the New York County District Attorney was the chief law enforcement officer for New York County and, personally and/or through authorized delegates, had final authority and constituted a City policymaker with respect to the use of evidence gathered by NYPD officers and detectives during criminal proceedings.

394. The New York County District Attorney, and/or authorized delegates, had final managerial responsibility for training, instructing, supervising, and disciplining assistant district attorneys and other employees in that office regarding their conduct in connection with the initiation and prosecution of criminal matters.

395. The New York County District Attorney, personally and/or through authorized delegates, at all relevant times had final authority to promulgate and implement administrative and

managerial policies and procedures, including policies and procedures concerning personnel hiring, training, supervision, and discipline, with respect to the Office's performance of its duties.

396.    In the role as policymaker for the City, the New York County District Attorney and/or authorized delegates maintained a policy, custom, or practice of deliberate indifference to violations by NYPD officers and detectives of their constitutional obligations; to the risk that such violations would and did produce false or unreliable evidence, testimony, and convictions; and to the risk of future such violations by NYPD employees.

397.    The aforesaid deliberate or de facto policies, procedures, regulations, practices, and/or customs, including the failure to properly instruct, train, supervise, and/or discipline employees with respect thereto, were implemented or tolerated by policymaking officials for the CITY, including but not limited to the NYPD Commissioner and the New York County District Attorney, who knew or should have known to a moral certainty that such policies, procedures, regulations, practices, and/or customs concern issues that regularly arise in the investigation and prosecution of criminal cases; that such issues either present police employees with difficult choices of the sort that instruction, training, and/or supervision will make less difficult, or that the need for further instruction, training, supervision, and/or discipline was demonstrated by a history of police employees mishandling such situations, as well as the incentives police employees have to make the wrong choice; and that the wrong choice by such employees concerning such issues will frequently cause the deprivation of the constitutional rights of criminal suspects or defendants and cause them constitutional injury.

398.    The aforementioned policymaking officials had the knowledge and notice described above based upon, among other circumstances, credible allegations—many substantiated by judicial decisions—finding that NYPD detectives had manufactured false or

unreliable identification and other evidence through improper suggestion, promises, or coercion, and/or knowingly given false or misleading testimony; civil lawsuits, some of which resulted in substantial civil settlements, credibly alleging that police officers had falsified or exaggerated evidence and/or conducted searches or made arrests without probable cause; numerous decisions of the United States Supreme Court, the United States Court of Appeals for the Second Circuit, federal district courts, the New York Court of Appeals, and the New York Appellate Division addressing the difficult issues that regularly arise under the probable cause requirement of the Fourth Amendment; judicial decisions placing the NYPD on notice that the City could be held liable for failure to adequately train police officers and investigators regarding their obligation to provide truthful testimony; formal reports of the New York City Comptroller's Office and the Association of the Bar of the City of New York criticizing the NYPD and the New York City Law Department for failing to follow up substantial civil settlements for police misconduct with disciplinary or other remedial action; the Mollen Commission Report, dated July 7, 1994, following a two-year investigation and a year of hearings, which found a culture of corruption within the NYPD, pervasive misconduct by officers and detectives including fabrication of evidence and testimony, and tolerance of that misconduct by Department leadership; and the inherent and obvious need to train, supervise, and discipline police officers in such obligations to counteract the pressures and powerful incentives officers face to close cases and obtain arrests and convictions.

399.    Many of the foregoing illegal practices, their toleration by NYPD and DANY policymakers, and the culture of corruption created by such indifference were documented prior to Mr. Velazquez's 1998 arrest and subsequent prosecution and conviction in the Mollen Commission Report, formally known as the Report of the Commission to Investigate Allegations

of Police Corruption and the Anti-Corruption Procedures of the New York City Police Department.

400. The Mollen Commission was formed in 1992 following widespread reports of police corruption, including the fabrication of evidence in criminal investigations.

401. The Commission conducted an extensive investigation and held highly publicized hearings over a two-year period, culminating in the issuance of its final report on July 7, 1994, less than two years before Mr. Velazquez's arrest.

402. The Commission found that the NYPD's unwillingness to address corruption "manifested itself in every component of the Department's corruption controls from command accountability and supervision, to investigations, police culture, training and recruitment."

403. The Commission found that officers commit falsification to serve what they perceive to be legitimate law enforcement ends, often based on the belief that the defendant is guilty regardless of the legality of the arrest, leading to the manufacture of false narratives. Frustrated by what they perceive to be unrealistic legal constraints and by their inability to control crime through lawful means, officers take the law into their own hands, resulting in police falsification.

404. The Commission further observed that the practice of police falsification was so common in certain precincts that it had spawned its own term: "testilying."

405. In at least one NYPD unit, the Commission found that the commanding officer not only tolerated but affirmatively encouraged the unlawful practices of falsifying documents and committing testimonial perjury.

406. The Commission concluded that there existed a deep-rooted perception among officers of all ranks within the Department that compromising facts to fight crime was necessary and justified, even if unlawful, and that this belief was so entrenched—particularly in high-crime

precincts—that officers expressed disbelief when confronted with evidence of perjury, asserting that defendants were guilty regardless.

407. The Commission also concluded that the Department's top commanders bore responsibility for this culture, noting the absence of sanctions against supervisors or commanders for permitting perjury or falsification, the lack of self-initiated Internal Affairs investigations into patterns of perjury and falsification, and the failure of Police Commissioners and Internal Affairs leadership to focus on eliminating these practices.

408. Consistent with the Mollen Commission's findings, NYPD and DANY policymakers were aware, prior to Mr. Velazquez's prosecution, that many detectives routinely violated proper police protocols in homicide and felony investigations, including through the use of unduly suggestive identification procedures, coercive or suggestive interview and interrogation techniques, and the preparation of false or misleading documentation.

409. Despite this knowledge, NYPD and DANY policymakers did little or nothing to prevent such misconduct, resulting in numerous wrongful arrests, prosecutions, and convictions directly attributable to their deliberate indifference.

410. NYPD detectives also used improperly suggestive identification procedures, as they did in this case, to manufacture false or unreliable identification evidence in numerous homicide and other serious felony cases, including a number that resulted in the wrongful conviction of innocent people.

411. In 1991, NYPD detectives employed coercive and suggestive investigative tactics that resulted in the wrongful conviction of Fernando Bermudez for a homicide, despite the fact that Bermudez did not match eyewitness descriptions of the shooter in any material respect. Multiple witnesses described the perpetrator as significantly shorter, slimmer, and lacking the

distinctive physical characteristics Bermudez possessed, and several witnesses who were present at close range failed to identify Bermudez or affirmatively stated that he could not have been the shooter. Rather than crediting these non-identifications and description mismatches, detectives conducted improperly suggestive photo identification procedures, directing witnesses' attention to Bermudez's photograph, and repeatedly exposing witnesses to Bermudez as the suspect police believed to be responsible.

412. Witnesses were also pressured to conform their accounts to the prosecution's theory, and alternative suspects who more closely matched the descriptions were not meaningfully pursued. At pretrial hearings and at trial, detectives falsely testified that the identifications were the product of independent witness recollection and that identification procedures had been conducted properly, while concealing the suggestive nature of those procedures and the witnesses' prior failures to identify Bermudez. At the same time, detectives and prosecutors suppressed exculpatory evidence, including non-identifications, inconsistencies in witness accounts, and evidence pointing to other suspects, depriving the defense of the ability to meaningfully challenge the reliability of the identification evidence. This manufactured identification evidence, and the suppression of favorable evidence, led to Mr. Bermudez's wrongful conviction. He spent 18 years in prison before courts determined that the identification procedures were constitutionally tainted and that the testimony used to secure his conviction was unreliable, leading to the vacatur of his conviction.

413. In 1992, Luis Kevin Rojas was wrongfully convicted of murder in connection with a shooting in Manhattan based on eyewitness identifications manufactured by the NYPD. As in Mr. Velazquez's case, although Mr. Rojas bore no resemblance to the descriptions of the shooter provided by 911 callers, police officers arrested him. They then directed him to change his jacket

to match the shooter's reported clothing, and then brought him to the crime scene for show-up identifications. The following morning, officers conducted a lineup in which none of the fillers resembled Mr. Rojas. As a result of these unduly suggestive procedures, Mr. Rojas was wrongly identified. In 1995, Mr. Rojas's conviction was overturned, and a jury subsequently acquitted him at retrial.

414.    After the arrest of Kareem Bellamy in 1994 for a stabbing death, an NYPD detective conducted a lineup that included Bellamy. The only known eyewitness could not positively identify Bellamy. The detective took the witness into a private room for an improper private meeting, after which the witness suddenly claimed to be certain that Bellamy was the perpetrator. The witness's identification of Bellamy was a significant cause of Bellamy's conviction at trial. Bellamy was imprisoned for 14 years before his conviction was overturned and the charges against him dismissed.

415.    In 1994, NYPD detectives investigating a murder in Queens put Jaythan Kendrick in a lineup and showed the lineup to 10-year-old witness Brandon Rogers. Rogers selected a filler, number six. Detectives had Rogers review and sign a Line-Up Report that identified number three, Kendrick, as the police "Subject." Detectives then took Rogers and Rogers's mother into a private room, where Rogers heard a detective say that Rogers had selected the wrong person. Rogers, having learned that number three, Kendrick, was the police suspect, now told the detectives that number three was his "second choice." Rogers testified to this manufactured identification of Kendrick at trial, and Kendrick was convicted and spent almost 25 years in prison before forensic evidence that exculpated Kendrick came to light and his conviction was vacated and the indictment dismissed.

416.    In 1996, an NYPD detective conducted a lineup in the investigation of Emmett

Wheaton for a robbery. At the lineup, Wheaton heard Gillen saying to the witness, "Is it number four? Is it number four? Is it number four?" The witness picked out number four, Wheaton, and Wheaton was arrested and charged. Wheaton was acquitted at trial, but only after spending almost a year in jail.

417. In 1996, NYPD detectives investigating a homicide employed coercive interview tactics and improperly suggestive identification procedures to manufacture evidence against Pablo Fernandez. Witnesses initially failed to identify Fernandez, provided descriptions of the shooter that did not match Fernandez in any material respect, or affirmatively stated that Fernandez was not the person they had seen. Rather than crediting those non-identifications and description mismatches, detectives repeatedly re-interviewed witnesses, pressured them to change their accounts, and conveyed—explicitly and implicitly—that Fernandez was the person the police believed to be responsible for the crime. Fernandez was arrested in 1997, despite the fact that the identifications obtained against him contradicted the witnesses' original descriptions and observations. The fabricated and/or coerced eyewitness identifications became central to the prosecution's case and Fernandez was wrongly convicted and spent approximately 24 years in prison before a federal district court granted his habeas petition and vacated his conviction, finding that the evidence used to convict him—including the eyewitness identifications—was unreliable and the product of improper police conduct.[4]

---

[4] *Accord* Civil Complaint in *Negron v. City of New York*, 18 CV 6645 (DG) (RLM) (E.D.N.Y.) (Doc. # 1) (11/20/2018) at ¶¶ 212-373, incorporated here by reference (detailing numerous additional instances of police misconduct which provided the NYPD with notice of its officers misconduct, and establish the NYPD's policy of acquiescence, ratification, and the failure to train, supervise, and discipline); First Amended Civil Complaint in *Buari v. City of New York*, 18 CV 12299 (MKV)(BCM) (S.D.N.Y.)(Doc. # 58) (11/11/2019) at ¶¶ 304, 308-312, incorporated here by reference (same); *Buari v. City of New York*, 530 F. Supp. 3d 356, 402 (S.D.N.Y. 2021) (Vyskocil, J.) (denying City' motion to dismiss and holding such allegations "plausibly alleged a failure by the NYPD to train, supervise, and discipline.")

76

418.    In 1997, NYPD detectives employed coercive and suggestive investigative tactics that resulted in the wrongful conviction of Jabar Walker for a double homicide. Although eyewitnesses who knew Walker personally failed to identify him as the shooter, detectives persisted in pursuing Walker as a suspect. These non-identifications were suppressed from the defense, and detectives used suggestive and coercive identification procedures, including presenting witnesses with Walker's photograph and steering their accounts to conform to the prosecution's theory to obtain positive identifications of Walker. Detectives also relied on coerced and incentivized testimony from a jailhouse informant who later recanted and admitted that his testimony was fabricated under pressure from law enforcement. This manufactured evidence was central to the prosecution's case. Walker was convicted and spent more than twenty-five years in prison before his conviction was vacated and the indictment dismissed, after prosecutors determined that the evidence used against him was unreliable and the product of improper police conduct.

419.    In 1999, NYPD detectives brought Jason Chambers, who had witnessed a murder, to view a lineup containing suspect Pierre Jenkins. Chambers picked Jenkins. The next year at a pretrial hearing, Chambers testified that he had picked Jenkins only after the detectives had told him: "you got to pick somebody. It was like, you got to get him. Pick somebody." Chambers then recanted his identification of Jenkins. Asked why he had picked Jenkins originally, Chambers said: "Because the detectives were, like, you had to pick somebody. I just wanted to go home and they were just, like, forcing me to pick somebody." After Chambers's recantation, prosecutors dropped the murder charges against Jenkins.

420.    In 1999, NYPD detectives investigating a deadly shooting conducted a lineup containing suspect Ronald Ambrose. Witness Edgar Rivera had, within an hour of the shooting,

identified another man as the perpetrator. Rivera viewed the lineup containing Ambrose and did not identify Ambrose. Detective Jose Rosario then took Rivera into an office at the police precinct. Approximately 20 minutes later, Rosario and Rivera returned, and Rivera identified Ambrose as one of the shooters. After this identification, Ambrose was indicted for murder. Based on independent exculpatory evidence, Ambrose was acquitted at trial, but only after having served over two years in pretrial detention.

421.    In 2005, Detective Robert Moscoso presented a lineup containing Julio Negron to an eyewitness to a Queens shooting. The eyewitness made an equivocal statement about whether he recognized Negron as the shooter. Moscoso then manufactured the witness's positive identification of Negron by showing the witness a Line-Up Report that identified Negron, in capital letters, as the police "SUSPECT," and taking the witness into a private room and speaking to him for at least 15 minutes. Negron spent nearly 10 years in prison before the New York Court of Appeals reversed his conviction.

422.    Other examples of such misconduct by the NYPD can be found in a report issued by the Conviction Review Unit ("CRU") of the Brooklyn DA's office in July 2020. Titled 426 Years: An Examination of 25 Wrongful Convictions in Brooklyn, New York, the report examined the first 25 convictions identified by CRU since its inception in 2014.[5] Of the wrongful convictions examined in the CRU report, most occurred in the 1980s and 1990s and involved homicides. In 25 percent of the cases examined, the CRU concluded that the wrongful convictions involved unreliable identifications by eyewitnesses—including obvious limitations on the witness's ability

---

[5] Post-incident evidence is relevant to a claim of municipal liability as it may "shed some light on what policies existed in the city on the date of an alleged deprivation of constitutional right." *Bordanaro v. McLeod*, 871 F.2d 1151, 1167 (1st Cir. 1989); *see also Henry v. County of Shasta*, 132 F.3d 512, 519 (9th Cir. 1997) ("[W]e reiterate our rule that post-event evidence is not only admissible for purposes of proving the existence of a municipal defendant's policy or custom, but is highly probative with respect to that inquiry.")

to view the suspect, inconsistencies in the identification over time, and the use of in-court show ups, as well as likely police coaching as to whom the witness should select.

423.     There are numerous other examples of homicide investigations in the late 1980s and 1990s in which NYPD officers used similar unlawful tactics to manufacture false testimony by witnesses. In many of those cases, police officers also failed to disclose exculpatory evidence or follow obvious leads that would lead to another suspect. Such wrongful convictions include those of Clifford Jones in 1981, Scott Fappiano in 1985, Rafael Ruiz in 1985, Anthony Faison in 1988, Barry Gibbs in 1988, Charles Shepherd in 1988, Derrick Deacon in 1989, William Lopez in 1989, Bernie Pollard in 1989, Mark Denny in 1989, Shabaka Shakur in 1989, Jonathan Fleming in 1990, Jeffrey Blake in 1991, Huwe Burton in 1991, Carlos Davis in 1991, Ruben Ortega in 1991, John Dwayne Bunn in 1992, Derrick Hamilton in 1992, Rosean Hargrave in 1992, Sharrif Wilson and Antonio Yarbough in 1992, Reginald Connor and Everton Wagstaffe in 1993, Jose Garcia and Carlos Morillo in 1993, Ruddy Quezada in 1993, Jabbar Collins in 1994, Carlos Weeks in 1995, Hector Gonzalez in 1996, and Richard Rosario in 1998. In all of these cases, these individuals had their convictions reversed or vacated after police misconduct came to light, and only after serving many years in prison.

424.     Until 2010, the NYPD had no policy, practice, or procedure to learn about and investigate allegations in lawsuits, settlements in lawsuits, or judicial findings of improper or illegal behavior by police officers concerning investigations, arrests, and prosecutions. This was even though, since 1992, the NYPD had been admonished by two different New York City Comptrollers, as well as the Bar Association of the City of New York, to impose discipline on officers involved in settled civil cases in which constitutional violations were alleged, and to institute new training in response to such claims and/or other remedial action.

425.    In a 1992 report, then-Comptroller Elizabeth Holtzman recommended that the NYPD "monitor claims and lawsuits involving charges of police misconduct in addition to complaints filed with the Civilian Complaint Review Board and correlate the data from all three sources," and to "use the data from claims and lawsuits, as well as civilian complaints, to identify and correct problems in training or other procedures and policies; and identify individual police officers and take appropriate follow-up action, including additional training or other assistance" in order to "improve the functioning of the NYPD."

426.    In a 1999 report, then-Comptroller Alan Hevesi recommended that the City "[r]eview settled claims data," and re-train and discipline officers accordingly.

427.    In a 2000 report, The Association of the Bar of the City of New York concluded that the City's "policy" of failing to re-train or discipline officers involved in settled civil rights lawsuits "has resulted in a situation in which the City consistently misses opportunities to increase the protection of the rights of persons in the City."

428.    The NYPD took no official action in response to any of these reports and recommendations.

429.    In a report issued in 2010, then-Comptroller John Liu reported that, for the first time, the City paid out more money in the 2009-10 fiscal year for lawsuits against the NYPD than against any other City agency. He again recommended that the NYPD monitor incidents and practices that would give rise to claims.

430.    The NYPD failed to act despite its being put on notice, in the 1990's and early 2000's, to officers' misconduct by numerous civil lawsuits credibly alleging officers' violations of individuals' constitutional rights.

431.    In the following civil rights lawsuits, the City paid substantial monetary settlements

to plaintiffs for their claims that NYPD officers manufactured evidence, gave false testimony or statements, initiated prosecutions without probable cause, or otherwise violated the constitutional rights of the accused:

> (a) *Almonte v. City of New York*, et al., 99-cv-519 (E.D.N.Y.) (settled 7/12/00, $30,000): plaintiff arrested on drug sale charges without probable cause; indictment dismissed by the court one year, eight months after arrest.

> (b) *Boland v. City of New York*, et al., 93-cv-5058 (E.D.N.Y.) (settled 8/6/96, $30,000): plaintiff arrested without probable cause; held in custody for two nights.

> (c) *Bradley v. City of New York*, et al., 97-cv-4076 (E.D.N.Y.) (settled 10/14/98, $20,000): plaintiff ordered to pull car over without probable cause; falsely arrested based on outstanding Illinois warrant issued for a different person; and held in custody for three days despite evidence that she was not the person being sought by the warrant.

> (d) *Carthens v. City of New York*, et al., 94-cv-8764 (S.D.N.Y.) (settled 3/18/97, $200,000): plaintiff arrested without probable cause; police fabricated that plaintiff had dropped a bag that contained cocaine and a weapon; police swore to a Criminal Court complaint with false allegations.

> (e) *Castro v. City of New York*, et al., 94-cv-5114 (S.D.N.Y.) (settled 1/14/97, $72,500): plaintiff arrested on weapons possession charges without probable cause; charges dropped after plaintiff was held in custody for several hours. Complaint alleged that an NYPD officer responded to plaintiff's complaints about wrongful arrest by saying that he would not release her, but if the arrest were in error she could "always sue the City, [because] they got a lot of money."

(f) *Coleman*, et al. v. *City of New York*, et al., 00-cv-2019 (E.D.N.Y.) (settled 1/2/01, $60,000): two plaintiffs arrested without probable cause; charges pending for 2 ½ months before dismissal. Complaint alleged that the NYPD had a policy, custom, and/or practice of arresting individuals without probable cause in lower income areas and areas with high reports of crime, which resulted in plaintiffs' false arrest and malicious prosecution.

(g) *Cotto v. City of New York*, et al., 00-cv-1341 (E.D.N.Y.) (settled 12/01/00, $30,000): plaintiff arrested without probable cause; charges pending for one month before dismissal by the court.

(h) *Crespo v. City of New York*, et al., 93-cv-8847 (S.D.N.Y.) (settled 8/29/06, $25,000): plaintiff arrested without probable cause on weapons possession charges. Complaint alleged a Monell claim based on the NYPD's "fostering [of] a policy to which perjury and the falsification of documents were methods of securing indictments and convictions of innocent individuals."

(i) *Dabbah v. City of New York*, et al., 95-cv-2952 (S.D.N.Y.) (settled 3/12/96, $35,000): plaintiff arrested without probable cause; charges dismissed on the People's motion eight months after arrest.

(j) *Daniels v. City of New York*, et al., 00-cv-1981 (S.D.N.Y.) (settled 3/15/00, $28,500): plaintiff arrested without probable cause on weapons charges; charges dismissed by the court eight months after arrest.

(k) *Davis v. City of New York*, et al., 00-cv-387 (S.D.N.Y.) (settled 1/19/00, $175,000): plaintiff arrested without probable cause; spent four months in jail before jury acquittal; during criminal trial, the trial court found that plaintiff's arrest was

"illegal and outrageous," that he was arrested solely because of his race, and that police took plaintiff's photo and showed it to the complainant unlawfully and without probable cause.

(l) *Deluise v. City of New York*, et al., 98-cv-4535 (S.D.N.Y.) (settled 3/18/99, $28,000): plaintiff arrested without probable cause.

(m) *Denizard v. City of New York*, et al., 98-cv-423 (E.D.N.Y.) (settled 6/4/99, $64,000): plaintiff arrested without probable cause for disorderly conduct and resisting arrest; charges dismissed on the People's motion eight months after arrest.

(n) *Dennis v. City of New York*, et al., 98-cv-5355 (E.D.N.Y.) (settled 5/26/99, $15,000): plaintiff threatened, assaulted, and arrested without probable cause; false charges filed against plaintiff.

(o) *Espinal v. City of New York*, et al., 95-cv-9759 (S.D.N.Y.) (settled 6/7/96, $800,000): plaintiff arrested without probable cause; police falsely testified before the grand jury; after plaintiff's guilty plea, the conviction was vacated and the indictment was dismissed as procured by false and/or perjured testimony.

(p) *Fields v. City of New York*, et al., 99-cv-8130 (E.D.N.Y.) (settled 7/28/00, $15,000): plaintiff arrested without probable cause; prosecution continued for four months before dismissal by the court.

(q) *Frantino v. City of New York*, et al., 96-cv-3725 (S.D.N.Y.) (settled 4/15/97, $50,000): two plaintiffs arrested without probable cause and issued Desk Appearance Tickets; district attorney declined prosecution; parking summons issued by police dismissed for facial insufficiency.

(r) *Gager v. City of New York*, et al., 97-cv-4718 (S.D.N.Y.) (settled 6/1/98, $105,000):

plaintiff issued false summonses for criminal trespass and disorderly conduct; charges dismissed on the People's motion.

(s) *Gallion v. City of New York*, et al., 93-cv-5180 (S.D.N.Y.) (settled 7/18/94, $25,000): plaintiff arrested without probable cause; charges were dismissed.

(t) *Gallo v. City of New York*, et al., 95-cv-2105 (E.D.N.Y.) (settled 7/5/94, $13,334): plaintiff arrested for robbery without probable cause; charges subsequently dismissed.

(u) *Gaylock*, et al. v. *City of New York*, et al., 96-cv-6183 (E.D.N.Y.) (settled 3/6/98, $90,000): plaintiffs arrested without probable cause on weapons charges, which were pending for 10 months before dismissal by the court.

(v) *Golston v. City of New York*, et al., 98-cv-4206 (E.D.N.Y.) (settled 10/26/00, $25,000): plaintiff arrested on false charges of criminal harassment, which were dismissed after four months.

(w) *Gordon v. City of New York*, et al., 97-cv-8035 (S.D.N.Y.) (settled 11/12/98, $40,000): plaintiff arrested without probable cause based on false allegations in felony complaint made by NYPD officers; charges dismissed by the prosecutor three months after arrest.

(x) *Gurley v. City of New York*, et al., 95-cv-2422 (E.D.N.Y.) (settled 8/21/97, $1,750,000): conviction obtained in 1972 was vacated more than 20 years later based on prosecutor's withholding of exculpatory evidence, including an NYPD ballistics report; complaint contained a malicious prosecution claim.

(y) *Howlen v. City of New York*, et al., 97-cv-6544 (S.D.N.Y.) (settled 12/22/97, $200,000): plaintiff arrested without probable cause; police swore to a false

complaint; police testified falsely during preliminary hearing and in the grand jury; police admitted to committing perjury in connection with plaintiff's case.

(z) *Jefferson v. City of New York*, et al., 98-cv-1097 (E.D.N.Y.) (settled 4/14/99, $175,000): plaintiff, a corrections officer, arrested on drug charges without probable cause; charges pending for five months before grand jury returned no true bill; complaint alleged that NYPD officers failed to inform prosecutors of their knowledge of plaintiff's innocence during the prosecution.

(aa) *Kadlub v. City of New York*, et al., 95-cv-1080 (E.D.N.Y.) (settled 12/11/96, $34,000): plaintiff arrested without probable cause on drug possession and sale charges.

(bb) *Lindo v. City of New York*, et al., 98-cv-9066 (S.D.N.Y.) (settled 11/21/00, $85,000): plaintiff arrested without probable cause; police swore to a false felony complaint; district attorney agreed to dismissal of charges.

(cc) *Lopez*, et al. v. *City of New York*, et al., 93-cv-6516 (S.D.N.Y.) (settled 1/2/96, $80,000): two plaintiffs were arrested without probable cause and unlawfully strip searched; district attorney declined to prosecute.

(dd) *Lovell v. City of New York*, et al., 00-cv-0002 (S.D.N.Y.) (settled 10/20/00, $40,000): plaintiff arrested without probable cause for turnstile jumping based on false statements made by an NYPD officer in a criminal complaint.

(ee) *Mahase v. City of New York*, et al., 96-cv-6105 (E.D.N.Y.) (settled 6/16/00, $75,000): plaintiff arrested and detained without probable cause; charges dismissed on the district attorney's motion due to lack of probable cause.

(ff) *Marino v. City of New York*, et al., 97-cv-9003 (S.D.N.Y.) (settled 6/4/98, $90,000):

plaintiff arrested and strip-searched without probable cause; released when the district attorney declined to prosecute the case.

(gg)     *Martinez v. City of New York*, et al., 96-cv-289 (E.D.N.Y.) (settled 4/12/99, $50,000): plaintiff assaulted and arrested without probable cause when police entered her apartment with a battering ram looking for her son.

(hh)     *McCaskill v. City of New York*, et al., 96-cv-3687 (E.D.N.Y.) (settled 7/10/97, $100,000): plaintiff arrested for disorderly conduct without probable cause.

(ii) *Nakajima*, et al. v. *City of New York*, et al., 94-cv-857 (E.D.N.Y.) (settled 3/8/95, $51,000): two plaintiffs arrested without probable cause while driving in a rental car, despite providing a valid rental agreement.

(jj) *Napoli v. City of New York*, et al., 97-cv-1255 (E.D.N.Y.) (settled 4/9/99, $60,000): plaintiff arrested and indicted on weapons possession and assault charges based on false testimony by NYPD officers in the grand jury; plaintiff acquitted approximately one year after arrest.

(kk)     *Nieves v. City of New York*, et al., 94-cv-1491 (E.D.N.Y.) (settled 4/25/96, $50,000): plaintiff, a security officer with the City's Department of Business Services with a Special Patrolman's license, was arrested without probable cause in a baseless drug sweep, but never arraigned; due to the incident, plaintiff's employer revoked his license; an officer concocted a false story preventing plaintiff from defending himself at a hearing pertaining to the revocation of his license.

(ll) *Paster v. City of New York*, et al., 95-cv-10316 (S.D.N.Y.) (settled 3/23/98, $115,000): plaintiff arrested without probable cause; charges against him were

dismissed.

(mm)     *Perez v. City of New York*, et al., 98-cv-2331 (S.D.N.Y.) (settled 1/16/99, $15,000): plaintiff arrested without probable cause; charges dismissed by the court approximately one month after arrest.

(nn)     *Rojas v. City of New York*, et al., 96-cv-8728 (S.D.N.Y.) (settled 3/31/97, $800,000): plaintiff arrested without probable cause; police falsely charged plaintiff and testified falsely in the grand jury; plaintiff's conviction was vacated and indictment dismissed.

(oo)     *Sharp v. City of New York*, et al., 97-cv-4236 (S.D.N.Y.) (settled 3/17/98, $55,000): plaintiff arrested and strip-searched without probable cause; falsely charged; charges were subsequently dismissed.

(pp)     *Sierzputowski*, et al. v. *City of New York*, et al. (E.D.N.Y.) (settled 12/1/97, $55,000): two plaintiffs arrested without probable cause while driving a rental car, despite producing proof of valid rental; plaintiffs held in custody for 41 hours until arrests voided.

(qq)     *Silver v. City of New York*, et al., 97-cv-5384 (E.D.N.Y.) (settled 3/2/99, $40,000): plaintiff arrested without probable cause; charges were dropped approximately four months later.

(rr) *Sweazie v. City of New York*, et al., 99-cv-419 (E.D.N.Y.) (settled 10/20/99, $20,000): plaintiff arrested on weapons possession charges; prosecution continued based on NYPD officers' false statements in felony complaint; charges dismissed when grand jury voted no true bill.

(ss) *Taousse v. City of New York*, et al., 95-cv-7965 (S.D.N.Y.) (settled 12/4/96,

$16,000): plaintiff arrested without probable cause and falsely charged with violating traffic laws; charges were dismissed.

(tt) *Tomback v. City of New York*, et al., 96-cv-3972 (E.D.N.Y.) (settled 2/9/98, $20,000): plaintiff arrested without probable cause; charges dismissed due to lack of evidence.

(uu)     *Tong v. City of New York*, et al., 95-cv-7965 (S.D.N.Y.) (settled 10/4/95, $35,000): plaintiff arrested and strip searched for a traffic violation, which was later dismissed.

(vv)     *Udofia v. City of New York*, et al., 00-cv-4872 (E.D.N.Y.) (settled 1/4/01, $30,000): plaintiff arrested and detained without probable cause; was not prosecuted.

(ww)     *Victor v. City of New York*, et al., 96-cv-243 (S.D.N.Y.) (settled 6/17/96, $725,000): plaintiff arrested without probable cause; police falsely charged plaintiff and committed perjury in the grand jury; plaintiff's conviction was vacated and indictment dismissed.

(xx)     *Williams v. City of New York*, et al., 98-cv-5917 (S.D.N.Y.) (settled 2/1/99, $300,000): plaintiff arrested without probable cause for possessing a controlled substance; police falsified evidence to effect an unlawful arrest.

(yy)     *Ziehenni v. City of New York*, et al., 98-cv-3763 (S.D.N.Y.) (settled 3/5/99, $55,000): plaintiff arrested without probable cause; charges pending for 2 ½ months before they were dismissed by the court; complaint alleged the arrest was made in retaliation for plaintiff's prior CCRB complaint.

432.    The NYPD did not discipline any of the officers involved for their conduct, despite

paying out the above settlements.

433.     The aforementioned policies, customs, and/or practices of the NYPD and/or DANY regarding, and policymakers' deliberate indifference to, coercion of false statements, fabrication of evidence including manufacturing eyewitness identifications through suggestion, and initiation of arrests and prosecutions without probable cause directly, foreseeably, proximately, and substantially caused the violations of Mr. Velazquez's federal constitutional rights in this case and his resulting injuries.

434.     By virtue of the foregoing, under 42 U.S.C. § 1983, and *Monell v. Dept. of Social Services of the City of New York,* 436 U.S. 658 )(1978), Defendant City of New York is liable for the misconduct of NYPD officers which caused Mr. Velazquez's wrongful prosecution and conviction and all his consequential damages, including but not limited to his wrongful prosecution, conviction, and subsequent imprisonment and parole restrictions.

<u>**SEVENTH CAUSE OF ACTION**</u>

**42 U.S.C. § 1983**
***Monell* Liability for Actions of the New York County District Attorney's Office**
*Against Defendant City of New York*

435.     Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

436.     Prior to, at the time of, and subsequent to Plaintiff's criminal prosecution, including during the period that the New York County District Attorney's Office was opposing Plaintiff's efforts to overturn his unconstitutionally-obtained conviction and causing the continuation of his constitutional injuries, the New York County District Attorney, as the manager and chief administrator of the New York County District Attorney's Office, a New York City agency, maintained a policy, custom or practice of deliberate indifference to violations by his employees

of the constitutional right to due process and a fair trial guaranteed to all criminal suspects and defendants under the Constitution and laws of the United States and the State of New York.

437.    Such violations included the knowing, reckless, or negligent use of false or misleading evidence and argument in the grand jury and at trial and the failure to correct such false or misleading evidence and argument, as well as the deliberate, reckless, or negligent withholding of exculpatory and impeachment evidence favorable to the defense and required to be disclosed as "*Brady* material" by the Due Process and Fair Trial Clauses of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. *See Brady v. Maryland*, 373 U.S. 83 (1963).

438.    Prosecutors in New York County (and NYPD detectives working with them on criminal investigations and prosecutions) were permitted and in fact instructed by their Offices to refrain from making any record of false or inconsistent out-of-court statements of prospective prosecution witnesses, or information bearing upon their potential motives to lie, in order to avoid creating "*Rosario* material" that would have to be disclosed to the defense under State law, even though this policy also predictably resulted in prosecutors ultimately not disclosing the same information as *Brady* material.

439.    New York County prosecutors were permitted to make informal promises, or to provide informal inducements, to "cooperating" witnesses, without recording them or disclosing them to the defense.

440.    DANY permitted ADAs to present false or misleading testimony and argument denying their witnesses' motives to lie, to fail to correct such false or misleading testimony and argument, and to improperly vouch for the credibility of such witnesses through the prosecutors' own arguments and unsworn "testimony" during their summations.

441.    DANY permitted ADAs to maintain the "deniability" of impeachment information

90

that they were required to disclose by deliberately avoiding acquiring direct or actual knowledge of it, and then presenting false or misleading testimony and argument that was contradicted by the undisclosed information. In the unlikely event that the defense was able to uncover and expose the information, the prosecutors would then argue that they were not guilty of personal misconduct because they lacked actual knowledge of the information, and the Office would not discipline them.

442.    DANY further allowed prosecutors, in violation of their *Brady* disclosure obligations, to refrain from disclosing statements of uncalled witnesses which tended to favor the defense, including statements suggesting the defendant's innocence.

443.    DANY would deny or defend the aforementioned types of misconduct in order to defeat or delay defendants' efforts to expose it and to overturn their wrongful convictions. Policymaking officials at DANY would almost always defend such behavior when it was challenged, including on direct appeal and on collateral attack, thereby teaching all employees of the Office that such conduct would be tolerated or was even approved by the District Attorney and was consistent with the policies of the Office, and thereby causing additional such violations to occur.

444.    Pursuant to the aforementioned policies, customs, and/or practices of the New York County District Attorney's Office, the assigned ADAs in Plaintiff's case consciously avoided gaining actual knowledge of information that would have impeached or contradicted the testimony of the prosecution's witnesses at trial and that DANY was obligated to disclose under *Brady*, *Rosario*, and other rules and requirements; deliberately avoided recording the statements of witnesses that the ADAs knew would impeach their credibility for the purpose of preventing the defense from obtaining such information; deliberately, recklessly, or negligently failed to disclose

information the ADA did know about that the ADA was required under *Brady* to disclose; knowingly, recklessly, or negligently presented witness testimony and their own arguments in the grand jury and at trial that they knew or should have known were false or misleading; knowingly, recklessly, or negligently failed to correct such false testimony and arguments; and improperly vouched, including as an unsworn "witness," for the credibility of witnesses they knew or should have known had given false or misleading testimony and the lack of credibility of defense witnesses and claims, and engaged in other summation misconduct as detailed *supra* in, e.g., ¶¶ 212-254.

445.    Furthermore, pursuant to the aforementioned policies, customs, and/or practices of the New York County District Attorney's Office, when the assigned ADAs' misconduct was revealed, the District Attorney's Office ratified and defended the ADAs' behavior and argued that it was consistent with the Office's due process and fair trial obligations. The Office denied at every level—the State Supreme Court, the Appellate Division, the Court of Appeals, and the federal District Court—that any misconduct had occurred at all.

446.    But this is not the only proof that the assigned ADAs' misconduct was consistent with, and resulted from, the unlawful policies, customs or practices of the Office to encourage, tolerate, and/or acquiesce in such behavior. There were numerous other instances of similar misconduct, before Plaintiff's trial and during the period that the Office fought to save his wrongful conviction. In virtually all such instances, some of which are described below, others of which are known only to the District Attorney's Office and may be ascertained in discovery, the Office defended the misconduct when it was exposed, thereby revealing that the conduct was consistent with and caused by the policies of the Office.

447.    In *People v. Wallert*, 98 A.D.2d 47 (1st Dep't 1983), the Appellate Division found

the prosecutor guilty of a "clear *Brady* violation," and of denying the defendant "a fair trial in violation of due process," based upon the prosecutor's argument in summation that the complainant in a sex crime case had no motive to lie when the prosecutor knew, but had concealed, that the complainant had consulted with a civil attorney and was waiting for the outcome of the trial before suing for monetary damages. The court reversed the conviction.

448.     In *People v. Novoa*, 70 N.Y.2d 490 (1987), the Court of Appeals unanimously reversed the defendant's New York County murder conviction because "the prosecutor here breached a duty to disclose . . . promises, to correct the witness's testimony that she was promised nothing, and to refrain from misstatements in summation." The prosecutor had elicited the witness's flat denial that "anyone had promised anything with respect to your pending case," and had then argued that she was a "forthright woman" who had no reason to lie because "she wasn't promised anything, ladies and gentlemen." In fact, the witness's Special Narcotics prosecutor had promised to consider the totality of her cooperation, including in the homicide case.

449.     In *People v. Conlan*, 146 A.D.2d 319 (1st Dep't 1989), the Appellate Division reversed another New York County murder conviction because of the prosecutor's "particularly disingenuous" denials that she had made any promise of consideration to a crucial prosecution witness, when the witness expected assistance with his own case based upon assurances of another assistant district attorney. The prosecutor "was certainly not warranted in disclaiming a deal simply because she had not personally made it," the court reasoned, continuing: "Not only did she neglect to correct [the witness's] misleading statements relating to the existence of any promises, but she reaffirmed those statements by means of her own rebuttal, as well as by her . . . summation . . . . However, the law is established that the failure of the prosecutor to correct a witness' erroneous impression that he had no reason to expect lenient treatment 'constitutes error so fundamental, so

93

substantial, that a verdict of guilt will not be permitted to stand.'"

450.    In *People v. Grice*, 188 A.D.2d 397 (1st Dep't 1992), the trial court vacated the defendant's conviction because the prosecutor "did not ascertain and disclose the full details of a cooperation agreement entered into by a material witness" in which his cooperation in Manhattan would likely benefit him in his own case in the Bronx. The People, denying any fault and blaming the defense, appealed, but the Appellate Division affirmed the lower court's ruling. The court reasoned that it had been "incumbent upon the prosecutor herein to investigate and disclose [the] substantially beneficial plea promise" that had been made to the witness and that the defense was entitled to rely upon the prosecutor's misleading summation falsely minimizing the promise made to the witness.

451.    In *People v. Jones*, 70 N.Y.2d 547 (1987), the Court of Appeals reversed a first-degree narcotics conviction due to the trial prosecutor's "total failure" to deliver interview notes with a key informant which would have revealed significant "discrepancies" in his trial testimony affecting his apparent honesty and overall credibility.

452.    In *People v. Curry*, 164 Misc.2d 969 (Sup. Ct., New York Co. 1995), a Supreme Court justice overturned another drug conviction, even though the defendant had pleaded guilty, because, on May 13, 1993, the People misrepresented to the defense that it had no *Brady* material regarding the case, induced the defendant to plead guilty to a reduced charge, and after its failure to disclose the *Brady* material, defended the conviction.

453.    Notwithstanding the foregoing decisions, DANY's policy to withhold impeachment information continued. In *People v. Williams*, 7 N.Y.3d 15 (2006), a *Brady* violation occurred at a pretrial suppression hearing, conducted in 2002, when the assigned prosecutor was kept in the dark by others in the office about a perjury investigation of the only witness, a police

94

officer, in a contemporaneous, similar, but unrelated case. When the assigned prosecutor learned the information, he still wrongfully withheld it. Disclosure was made only when the defense subpoenaed the witness to testify for the defendant at trial. Although the Court of Appeals upheld the hearing judge's decision to allow the People to reopen the suppression hearing and rely on a different witness, it condemned the prosecution's behavior: "There was no excuse for the People's failure to make the hearing judge aware of the perjury investigation of [the witness]—at the same time that the People were asking the hearing judge to rely on [the witness's] testimony to deny suppression. At best, the People now concede, they were guilty of a significant misjudgment."

454.    In *People v. Jackson*, 131 A.D.2d 179 (1st Dep't 1997), the Appellate Division, citing *Brady*, vacated a 1992 attempted murder conviction because of the prosecution's failure to turn over police reports that the defense had "specifically requested" which were "significantly at variance with the prosecution's evidence at trial and were clearly evidence that was favorable to the accused." The purported difficulties that the District Attorney's office had with obtaining the reports from the Internal Affairs Division of the Police Department were no excuse.

455.    In *People v. Gantt*, 13 A.D.3d 204 (1st Dep't 2004), the Appellate Division affirmed a lower court decision vacating the defendant's 2001 murder conviction due to the prosecution's failure to disclose the prior inconsistent statement of its main witness, a career criminal who had waited six years to come forward, which called into question his claim that he witnessed the shooting.

456.    In *People v. Sinha*, 84 A.D.3d 35 (1st Dep't 2011), aff'd on other grounds, 19 N.Y.3d 932 (2012), the Appellate Division reversed a 2007 bribery conviction in the interest of justice "because the prosecution failed to fulfill basic disclosure obligations that are essential to a fair trial," including withholding emails to a witness's mother containing extravagant promises of

consideration if her son would cooperate and revealing benefits he already had received, as well as other information bearing upon the witness's motive to lie and criminal history. The court wrote: "The trial court correctly characterized the tardy disclosure of the e-mails as 'inexcusable.' We add that for the prosecution to fail in three distinct respects to fulfill its disclosure obligation is intolerable."

457. Significantly, in the *Sinha* case, one of the ADAs who withheld the email evidence was a bureau chief.

458. In *People v. Ortiz*, 85 A.D.3d 588 (1st Dep't 2011), the Appellate Division, for the second time, reversed the defendant's conviction for criminal facilitation of murder. The first conviction, after a full trial in 2002, had been reversed for pervasive misconduct by the prosecutor. *People v. Ortiz*, 33 A.D.3d 432 (1st Dep't 2006). The second conviction was reversed because the prosecution had convinced the trial judge to deny the defense permission to use reports of the District Attorney's Office to contradict the crucial testimony of an assistant district attorney because it was unclear whether the same ADA had been the author of the reports. However, two justices, in a concurring opinion, found that the conviction also should have been reversed for a *Brady* violation: the failure to disclose another document which proved that the reports in question in fact had been authored by the same ADA-witness.

459. During the periods preceding and following Plaintiff's conviction, there were additional unpublished findings by lower courts of *Brady* and related discovery violations, as well as credible allegations of such violations, known to DANY, which did not result in reversals of convictions on that specific basis.

460. In many instances during the relevant time period, courts reversed convictions for what amounted to *Brady* violations, but addressed the issue only as whether the documents should

have been disclosed under State law as *Rosario* material. *See*, *e.g.*: *People v. Watkins*, 189 A.D.2d 623 (1st Dep't 1993) (drug conviction reversed for prosecutor's failure to disclose officer's notes containing "important impeachment material"); *People v. Jackson*, 114 A.D.2d 552 (1st Dep't 1991) (conviction reversed in the interest of justice where prosecutor falsely represented at a conditional hearing that all *Rosario* material had been disclosed while not disclosing until after the witness had been deported his initial, three-page statement to police); *People v. Green*, 140 A.D.2d 213 (1st Dep't 1988) (prosecutor failed to disclose handwritten police report and then misrepresented in summation that it confirmed the officer's testimony when in fact it contradicted it); *People v. Quinones*, 139 A.D.2d 404 (1st Dep't 1988) ("incomprehensible" failure by prosecutor to disclose various police documents, including one that undercut possession of stolen property charge); *People v. Thompson*, 71 N.Y.2d 918 (1988) (burglary and sodomy conviction reversed where prosecution sandbagged defense by holding back key document that undermined defense strategy); *People v. Dixon*, 209 A.D.2d 274 (1st Dep't 1994) (1990 murder conviction reversed for prosecutor's inexcusable failure, despite "repeated defense requests," to disclose police notes); *People v. Kest*, 185 A.D.2d 160 (1992) (failure to disclose police report plainly required to be disclosed under Court of Appeals precedent); *People v. Dennis*, 265 A.D.2d 271 (1st Dep't 1999) (reversing 1988 murder conviction because of prosecutor's failure to disclose and to preserve detective's handwritten notes which he used to refresh his recollection during his pretrial hearing testimony); *People v. Jordan*, 207 A.D.2d 700 (1st Dep't 1994) (reversing 1991 drug conviction because prosecution "prejudiced" the defense by failing to disclose police notes relating "directly to the primary issues contested at trial"); and *People v. Jennings*, 248 A.D.2d 265 (1st Dep't 1998) (reversing 1994 narcotics conviction where prosecutor inexcusably failed to disclose a significant police report).

461.   In numerous other cases, convictions were reversed for misconduct by the prosecutor in improperly vouching for the credibility of the People's witnesses and thereby denying the defendant his constitutional right to a fair trial, for providing "testimony" in an unsworn manner during the prosecutor's summation, or for overall pervasive misconduct, including: *People v. Rivera*, 75 A.D.2d 544 (1st Dep't 1980); *People v. Bolden*, 82 A.D.2d 151 (1st Dep't 1981); *People v. Dowdell*, 88 A.D.2d 239 (1st Dep't 1982); *People v. Bendell*, 111 A.D.2d 878 (1st Dep't 1985), *rev'd on other grounds*, *People v. Bendell*, 67 N.Y.2d 119 (1986); *People v. Coates*, 137 A.D.2d 192 (1st Dep't 1988); *People v. Hansen*, 141 A.D.2d 411 (1st Dep't 1988); *People v. Blake*, 139 A.D.2d 110 (1st Dep't 1988); *People v. Clemons*, 166 A.D.2d 363 (1st Dep't 1990); *People v. Norton*, 164 A.D.2d 343 (1st Dep't 1990); *People v. D'Alessandro*, 184 A.D.2d 114 (1st Dep't 1992); *People v. Tolbert*, 198 A.D.2d 132 (1st Dep't 1993); *People v. Bell*, 191 A.D.2d 361 (1st Dep't 1993); *People v. Nevedo*, 202 A.D.2d 183 (1st Dep't 1994); *People v. Collins*, 12 A.D.3d 33 (1st Dep't 2004); *People v. Ortiz*, 33 A.D.3d 432 (1st Dep't 2006); and *People v. Moye*, 52 A.D.3d 1 (1st Dep't 2008), aff'd, 12 N.Y.3d 743 (2009).

462.   Prior to Plaintiff's trial, DANY also had a history of withholding exculpatory information tending to demonstrate defendants' innocence. In *People v. Lee Earl Johnson*, Ind. No. 6571/74 (Sup. Ct., New York Co.), reported at 173 N.Y.L.J. 15 (5/22/75), Justice McQuillan decried as "misconduct . . . [that] shocks the conscience" the prosecutor's one-month failure to disclose his interviews with two witnesses who completely exculpated the defendant, and then off-handedly disclosing the witnesses when it was too late for the defense to fully investigate their information. Acquitting the defendant at a non-jury trial, Justice McQuillan called the prosecutor's "explanation to the court for his nonfeasance . . . sheer hogwash," and admonished the District Attorney's Office regarding training and supervision.

98

463.     In *People v. Hunter*, 126 Misc.2d 13 (Sup. Ct., New York Co. 1984) (Atlas, J.S.C.), the court dismissed an indictment for grand larceny because the prosecutor, in violation of the defendant's Federal due process rights, had withheld from the defendant, during grand jury proceedings, the statement of a witness that proved the defendant's absolute innocence.

464.     Similarly, in *People v. Isla*, 96 A.D.2d 789 (1st Dep't 1983), the Appellate Division admonished the District Attorney for misleading the grand jury by reporting the first half of the defendant's statement—that he had shot the alleged victim—without presenting the second half—that he had acted in self-defense—thereby depriving the defendant of his right to have the Grand Jury hear the full story so that it could make an independent probable cause determination.

465.     In *People v. Porter*, 128 A.D.2d 248 (1st Dep't 1987), a narcotics case, the Appellate Division directed a hearing into the materiality of a police report that supported the defense that the drugs were found in a third person's, not the defendant's, possession. The court concluded that the disclosure violation was, at a minimum, "regrettable," but if committed knowingly, represented a "disturbing error in judgment."

466.     In *People v. Davis*, 81 N.Y.2d 281 (1993), the Court of Appeals reversed a 1988 assault and robbery conviction where the prosecutor had knowingly misled the defense and the jury about information which, if accurately disclosed, would have supported the defense that the People's identification witness had misidentified another alleged perpetrator. The Court found "especially troublesome" the prosecutor's misleading summation discounting that any such misidentification had occurred.

467.     In *People v. Bermudez*, 25 Misc.3d 1226(A), 2009 WL 3823210 (Sup. Ct., New York Co. Nov. 9, 2009), the court overturned a false murder conviction obtained by the New York County D.A.'s Office in 1992 having close similarities to Plaintiff's case, as detailed *supra* ¶¶ 411-

412. The court found that the trial prosecutor had known, but had failed to reveal, that the key accomplice witness had indicated that an individual other than the defendant was the shooter, had failed to correct the witness's false testimony, and had made false summation arguments advocating the witness's credibility. Additionally, the prosecutor had "testified" in summation as an unsworn "witness" to explain why the witness had not been charged as an accessory to the crime. Condemning the District Attorney's continued opposition to vacating the conviction after a wrongfully convicted man had spent nearly 18 years in prison, the court concluded: "The People's position that this court should uphold a conviction based [o]n materially false testimony is untenable in our system of justice . . . ."

468. In *People v. Ennis*, 41 A.D.3d 271 (1st Dep't 2007), the Appellate Division held under *Brady* that the prosecutor at the 2001 trial should have disclosed an uncalled witness's statement that someone other than the defendant was the perpetrator of the shooting. While the Court of Appeals upheld the denial of a new trial, it also concluded that the prosecutor's failure to disclose the statement, made directly to him, "cannot be condoned," 11 N.Y.3d 403, 414 (2008).

469. In *People v. Colon*, 13 N.Y.3d 343 (2009), the Court of Appeals vacated the murder convictions of Danny Colon and Anthony Ortiz, finding that the DANY trial prosecutor at their 1993 trial withheld *Brady* material, including benefits provided to a key witness and notes of conversations with two uncalled witnesses providing leads to alleged alternate suspects, failed to correct the witness's false and misleading testimony concerning the benefits received, and "compounded" the *Brady* violations by "repeating and emphasizing the misinformation during summation." DANY vigorously opposed every effort made by Colon and/or Ortiz to vacate their convictions, denying for sixteen years that the trial ADA had done anything wrong, thereby ratifying her conduct.

100

470.    In *Fernandez v. Capra*, 916 F.3d 215 (2019), the Second Circuit found that, at Pablo Fernandez's 1996 trial, DANY prosecutors withheld favorable and impeaching evidence relating to the lead investigator's prior criminal conduct, although this was not the basis for the vacatur of the conviction. Instead, the Second Circuit vacated the conviction on the basis of "prosecutorial misconduct" through the presentation of perjured eyewitness testimony. Throughout Fernandez's twenty-three year effort to vacate his conviction, DANY denied any wrongdoing by the trial ADAs, thereby ratifying their conduct.

471.    Upon information and belief, none of the prosecutors who were responsible for the misconduct described above were investigated or disciplined by DANY, or referred for discipline by any outside body. There is no record of any Manhattan prosecutor being publicly sanctioned for the misconduct described above.  To the contrary, such prosecutors continued to receive regular pay raises and performance bonuses despite the adverse court decisions.  The absence in New York prosecutors' offices of any disciplinary rules or procedures, or history of sanctioning prosecutors for misconduct during the time period at issue, has been documented. *See generally* Joel B. Rudin, The Supreme Court Assumes Errant Prosecutors Will Be Disciplined by Their Offices or the Bar: Three Case Studies that Prove that Assumption Wrong, 80 Fordham L. Rev. 537 (2011).[6] *See also* Final Report of the N.Y. State Assn's Task Force on Wrongful Convictions 19, 29–31 (2009). The City of New York has settled lawsuits containing allegations of unlawful D.A. policies and practices regarding *Brady* disclosure and related constitutional violations, including the failure to discipline or supervise prosecutors responsible for such violations.

---

[6] *Accord* Civil Complaint in *Bertuglia v. City of New York*, 11 CV 2141 (JGK) (S.D.N.Y.) (Doc. # 22) (7/1/2011) at ¶¶ 270-286, incorporated here by reference (detailing numerous additional instances of the DANY failing to discipline prosecutors for grand jury misconduct established by court findings, and establishing the DANY's policy of acquiescence, ratification, and failure to discipline); *Bertuglia v. City of New York*, 839 F. Supp. 2d 703, 738 (S.D.N.Y. 2012) (Koetl, J.). (denying City's motion to dismiss a DANY failure to discipline *Monell* claim based on these allegations).

472.    Indeed, the New York County District Attorney, during all relevant times, had no employee handbook, manual, or other document setting forth any disciplinary process for such misconduct, or potential sanctions for it, nor was any such process made known to employees as a deterrent. The knowledge that there would be no personal consequence for violations of the due process and fair trial rights of criminal defendants encouraged prosecutors, including Plaintiff's prosecutor, to commit such violations.

473.    The District Attorney's policy, custom, and/or practice of approval or ratification of, toleration or acquiescence in, or deliberate indifference to, violations of his Office's constitutional obligations foreseeably encouraged such violations to continue and was a substantial cause of the violations of Plaintiff's constitutional rights before and during his trial, his wrongful conviction, and the continuation thereafter of his wrongful imprisonment and prosecution.

474.    The foregoing violations of Plaintiff's federal constitutional rights and resultant injuries were directly, foreseeably, proximately, and substantially caused by conduct, chargeable to Defendant City of New York, amounting to deliberate indifference to the constitutional rights of persons, including Plaintiff, subject to prosecution by the New York County District Attorney's Office, namely: (a) the institution and implementation of plainly inadequate or unlawful policies, procedures, regulations, practices, and/or customs concerning the duty not to use false, misleading, or unreliable evidence, testimony, statements, or argument during grand jury, trial, and other criminal proceedings; the continuing obligation to correct false, inaccurate, incomplete, or misleading evidence, testimony, statements, and argument whenever discovered; the continuing duty to obtain, preserve, and make timely disclosure to the appropriate parties, including the court and the defense, during criminal investigations and prosecutions, of all material evidence or information favorable to a person suspected, accused, or convicted of criminal conduct, including

exculpatory evidence and evidence impeaching the credibility or reliability of prosecution witnesses, and including verbal as well as recorded information; and the duty to refrain from coercing or manufacturing false or inherently unreliable statements and testimony from witnesses; and (b) the failure to adequately instruct, train, supervise, and discipline employees with respect to such matters.

475.    The aforesaid deliberate or de facto policies, procedures, regulations, practices, and/or customs (including the failure to properly instruct, train, supervise, and/or discipline employees with regard thereto) were implemented or tolerated by policymaking officials for the Defendant CITY, including, but not limited to, the District Attorney of New York County and his delegates, who knew: (a) to a moral certainty that such policies, procedures, regulations, practices, and/or customs concern issues that regularly arise in the investigation and prosecution of criminal cases; (b) that such issues either present employees with difficult choices of the sort that instruction, training, and/or supervision will make less difficult, or that the need for further instruction, training, supervision, and/or discipline was demonstrated by a history of employees mishandling such situations as well as the incentives that employees have to make the wrong choice; and (c) that the wrong choice by municipal employees concerning such issues will frequently cause the deprivation of the constitutional rights of an accused and cause constitutional injury.

476.    The aforementioned policymaking officials had the knowledge alleged above, based upon, among other circumstances: (a) numerous credible allegations, many substantiated by judicial decisions, that police officers and ADAs had violated *Brady* and related disclosure obligations, had presented or failed to correct false or misleading testimony and argument, and/or had improperly coerced false or inherently unreliable statements or testimony from witnesses; (b)

numerous decisions of the United States Supreme Court, the United States Court of Appeals for the Second Circuit, the New York Court of Appeals, and the New York Appellate Divisions, discussing the difficult issues that regularly arise under the *Brady* rule and the failures of prosecutors in New York State, including in New York County, to comply with that rule; (c) judicial decisions putting the New York County District Attorney on notice that the City could be held liable for its failure to adequately train, supervise, or discipline ADAs regarding their *Brady* and related due process obligations, see, e.g., *Walker v. City of New York*, 974 F.2d 293 (2d Cir. 1992); *Ramos v. City of New York*, 285 A.D.2d 284, 729 N.Y.S.2d 678, 692–96 (1st Dep't 2001); and (d) the inherent obviousness of the need to train, supervise, and discipline ADAs in their aforementioned constitutional obligations to counteract the pressure on prosecutors to obtain convictions.

477.    Despite this knowledge, the supervisory and policymaking officers and officials of the Defendant City perpetuated, or failed to take preventative or remedial measures to terminate, said policies, procedures, regulations, practices, and/or customs, and did not effectively instruct, train, supervise, or discipline personnel with regard to the proper constitutional and statutory requirements in the exercise of their authority, but instead ratified, sanctioned, or tolerated the policies, procedures, regulations, practices, and/or customs described above, with deliberate indifference to the effect of such policies, procedures, regulations, practices, and/or customs upon the constitutional rights of residents and citizens of the City and the State of New York.

478.    The aforesaid policies, procedures, regulations, practices, and/or customs of Defendant City were collectively and individually a substantial factor in bringing about the violations of Plaintiff's rights under the Constitution and laws of the United States and in causing his damages.

479.    Under the principles of municipal liability for federal civil rights violations, the District Attorney of New York County (or his authorized delegates) has final managerial responsibility for training, instructing, supervising, and disciplining attorneys and other employees in his office regarding their conduct in the prosecution of criminal matters, including, but not limited to, their obligations not to coerce witnesses or manufacture false or unreliable evidence, to make timely disclosure of exculpatory or impeachment evidence to the defense, including post-trial, and to refrain from offering, and to correct, false or misleading evidence, testimony, and argument during trial proceedings.

480.    The New York County District Attorney, personally and/or through his authorized delegates, at all relevant times had final authority to promulgate and implement administrative and managerial policies and procedures, including policies and procedures as to personnel hiring, training, supervision, and discipline, with respect to his Office's performance of its duties.

481.    The District Attorney of New York County at all relevant times was and is an elected officer of New York County, one of the constituent counties of Defendant City; the Office was and is funded out of the City's budget; and the Office was and is a New York City agency.

482.    Furthermore, the District Attorney was and is designated a "local officer," rather than a "state officer," under the New York Public Officers Law (§ 2); and New York has provided by statute (N.Y. County Law §§ 53, 941) that the City's constituent counties (including New York County), and hence Defendant City itself, shall have liability for torts committed by County officers and employees, such as the District Attorney and his assistants.

483.    The District Attorney of New York County personally and/or through his authorized delegates, at all relevant times had final authority, and constituted a City policymaker for whom the City is liable, with respect to the above-mentioned areas.

484. During all times material, the City, through its policymakers, owed a duty to the public at large and to Plaintiff which such policymakers knowingly and intentionally breached, or to which they were deliberately indifferent, to implement policies, procedures, customs, and practices sufficient to prevent, deter, and avoid conduct by their subordinates violating the aforementioned constitutional rights of criminal suspects or defendants and of other members of the public.

485. By virtue of the foregoing, and pursuant to *Monell v. Dept. of Social Services of the City of New York,* 436 U.S. 658 (1978), Defendant City is liable for having substantially caused the foregoing violations of Plaintiff's constitutional rights and his resultant injuries.

### EIGHTH CAUSE OF ACTION

**42 U.S.C. § 1983**
***Monell* Liability for Actions of the Manhattan District Attorney's FOIL Appeals Officers and District Attorney Cyrus Vance, Jr. In Continuing Mr. Velazquez's Malicious Prosecution And The Due Process Violations That Took Place During Trial**
*Against Defendant City of New York*

486. Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

487. Following Plaintiff's conviction, DANY policymakers implemented and maintained a policy, custom, or practice intentionally designed to cover up *Brady* violations committed by trial prosecutors and to deprive convicted defendants of their constitutional right to ongoing disclosure of *Brady* material suppressed during their trial. This policy prioritized the "finality" of convictions over the rectification of injustice, even when presented with incontrovertible proof of innocence or misconduct.

488. At all relevant times, Robert Morgenthau, and later Cyrus Vance, Jr. upon his appointment or election, was the chief executive of DANY.

106

489.    As a matter of New York Law, Morgenthau and Vance, as the head of DANY, was the FOIL Appeals Officer for DANY, or the individual they designated for that purpose. *See* Public Officers Law § 89(4)(a).

490.    The FOIL explicitly authorized Morgenthau and Vance to designate a subordinate as the Appeals Officer. *Id.*; 43 Rules of the City of New York § 1-02 ("The head or governing body of each agency . . . shall designate one or more persons as records access officer or officers to coordinate the agency's response to public requests for inspection and copying of records.")

491.    Pursuant to the foregoing, during the relevant period, each elected Manhattan District Attorney designated a FOIL Appeals Officer ("AO") for DANY, who served in that role during their respective tenures.

492.    During that time period, the AO established all FOIL policies, procedures, and practices for DANY.

493.    No CITY official had veto power over the AO's FOIL decisions and policies, those decisions and policies were not reviewed internally, and they were completely insulated from further municipal review.

494.    The AO's policies, acts, and/or omissions, at the time they were made, for practical and legal reasons were the CITY's final decisions on the matters to which they pertained. 43 Rules of the City of New York § 1-06(d) (deeming Appeals Officer's decision final and requiring him or her to inform requesters of their right to seek judicial review of that decision); Public Officers Law § 89(b) (same)

495.    The AO, as the CITY official in charge of DANY's administration and compliance with the FOIL, and the municipal official who had the last word and ultimate say on the handling of FOIL requests made to DANY, had final policymaking authority concerning:

(a) Which DANY files would be searched in response to convicted defendants' FOIL requests seeking access to *Brady* material, *Rosario* material, and other records regarding their cases.

(b) The procedure for reviewing and responding to convicted defendants' FOIL requests seeking such materials.

(c) Responding to, granting, and/or denying convicted defendants' FOIL requests seeking such materials.

496. The AO, exercising that policymaking authority, promulgated, established, enforced, and instructed all DANY Records Access Officers to follow the policies discussed above, and DANY's Records Access Officers followed those policies, or pre-existing policies that Records Access Officer ("RAO") executed in denying each of Velazquez's FOIL requests, and which the AO then personally sustained and ratified, along with the basis for the RAO's decision.

497. The AO, in their role as final policymaker for the CITY in the aforementioned areas, directly participated in, aided and abetted, and conspired with other defendants and unnamed individuals, to refuse to produce and/or falsely deny the existence of DD5 93 and other *Brady* material, including the Mustapha and Woodford's murder-for-hire leads, to continue Plaintiff's malicious prosecution and the deprivation of his constitutional rights including his 14th Amendment right to Due Process and his 4th Amendment rights to be free from unreasonable seizure and arrest and prosecution without probable cause, and to access *Brady* material suppressed during his trial.

498. In addition, Vance, as a final policymaker for the CITY, ratified the cover-up policy and directly participated in the continuation of Mr. Velazquez's malicious prosecution and the deprivation of the above constitutional rights of Mr. Velazquez.

499.    On April 4, 2017, Plaintiff's counsel sent a letter via First Class Mail directly to District Attorney Cyrus Vance, Jr.. This letter enclosed a copy of DD5 #93 and explicitly informed the District Attorney that this exculpatory document had been suppressed from the defense.

500.    Upon information and belief, District Attorney Vance personally reviewed the letter and the attached DD5.

501.    Upon information and belief, District Attorney Vance, acting as the final policymaker for the administration of the Office, made the specific determination not to investigate the suppression or concede the *Brady* violation.

502.    Instead, the District Attorney made a final policy decision to ratify the prior suppression and instructed his Chief Assistant, Karen Friedman Agnifilo, to convey that refusal to Plaintiff's counsel.

503.    On April 25, 2017, acting on the express instructions and authority of the District Attorney, Chief Assistant Agnifilo issued a letter officially adopting the position that the suppressed DD5 was "not . . . significant and powerful *Brady* material" and instead falsely asserted that it "corroborate[d]" the People's case. In violation of Supreme Court case law, Vance and Agnifilo failed to analyze the materiality of the DD5 with the other items of *Brady* material the DANY was at the time actively suppressing.  *See* ¶¶ 70, 74-87, 97-105; 117-130; 132-139, 143-146, 151.

504.    Alternatively, if District Attorney Vance did not personally review the April 4, 2017 letter or direct the response, he explicitly or implicitly delegated his final policymaking authority regarding post-conviction *Brady* compliance and case review to Chief Assistant Agnifilo who did.

505.    Upon information and belief, District Attorney Vance granted Chief Assistant

Agnifilo unconstrained, and unreviewed, discretion to reject claims of evidence suppression without meaningful review.

506. Accordingly, when Chief Assistant Agnifilo issued the April 25, 2017 letter refusing to investigate the suppression of DD5 #93, she was exercising this delegated final authority. Her administrative determination that the document was "not *Brady*" constituted the official policy of the District Attorney's Office and the City of New York for this case, directly causing the continuation of Plaintiff's malicious prosecution and wrongful imprisonment.

507. By directing his subordinate to issue this denial, the District Attorney expressly ratified the unconstitutional suppression of evidence committed by his subordinates in 1998, establishing it as the official policy of the agency.

508. On May 5, 2017, Plaintiff's counsel sent a second letter directly to District Attorney Vance, explicitly requesting that he "personally review this matter" because the Chief Assistant's denial was factually and legally indefensible. This letter placed the District Attorney on heightened notice that his subordinates were enforcing an unconstitutional policy of suppression.

509. On May 23, 2017, Chief Assistant Agnifilo responded "on behalf of District Attorney Vance." Instead of correcting the error or ordering a search for other suppressed documents (such as the "Mustafa" notes), the letter stated: "We adhere to our prior determination."

510. This double ratification—first in April, then reaffirmed in May—demonstrates the requisite "deliberate indifference" to Plaintiff's constitutional rights. By closing the door on Plaintiff's claim, the District Attorney ratified the original *Brady* violation and adopted it as the agency's own.

511. The acts of the FOIL Appeals Officer and the District Attorney were the "moving force" that continued Mr. Velazquez's wrongful incarceration. Had the District Attorney

acknowledged in 2017 that DD5 #93 was suppressed *Brady* material, considered it cumulatively with the other evidence the office was suppressing, and disclosed that evidence, Mr. Velazquez's conviction would have been vacated seven years earlier. Instead, the Office's official policy of denial and ratification directly caused his continued loss of liberty.

512.    By virtue of the foregoing, and pursuant to *Monell v. Dept. of Social Services of the City of New York,* 436 U.S. 658 )(1978), Defendant City is liable for having substantially caused the foregoing violations of Plaintiff's constitutional rights and his resultant injuries.

## NINTH CAUSE OF ACTION

**Malicious Prosecution Under New York Law**
*Against Defendants Falzarano, Litrenta, Carboni, Mooney, and John and Jane Doe Defendants #1–20*

513.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

514.    By virtue of the foregoing, FALZARANO, LITRENTA, CARBONI, MOONEY acting in concert with each other and with additional persons for whose acts they are liable, initiated, continued, and/or caused the initiation or continuation of, criminal proceedings against Velazquez.

515.    The criminal proceedings terminated in Mr. Velazquez's favor.

516.    There was no probable cause for the commencement or the continuation of the criminal proceedings.

517.    The Defendants acted with actual malice.

518.    The City is liable for these wrongs under the principle of *respondeat superior* for the damages set forth in ¶¶ 334(a)-(k), above.

## TENTH CAUSE OF ACTION

**New York State Constitutional Due Process Pursuant to *Respondeat Superior*; *Buari v. City of New York*, 2021 WL 1198371 (S.D.N.Y. 2021); *Bolt v. City of New York*, 21 CV 2218 (Report & Recommendation, Sept. 15, 2023) (Kuo, M.J.); *Johnson v. City of New York*, 21 CV 2220 (Sept. 15, 2023) (Kuo, M.J.) (Report & Recommendation, Sept. 15, 2023)**
*Against Defendant City of New York*

519.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

520.    Defendants LITRENTA, FALZARANO, CARBONI, POTTER, MOONEY, GIORGIO, and JOHN DOEs 1-20,  by virtue of their acts and omissions detailed above, violated Mr. Velazquez's rights under the Due Process and Equal Protection provisions of the New York State Constitution (a) to be free of unlawful arrest not based on probable cause, (b) to not have a government officer acting in an investigating capacity fabricate evidence against him, (c) to due process of law, (d) to a fair trial, (e) to not be convicted based on false or misleading evidence and argument, and suppression of *Brady* material, (f) to not be convicted of a crime he did not commit, and to not be incarcerated when actually innocent; and (g) to not have evidence sealed under CPL § 160.50 unlawfully used against him.

521.    As a direct and proximate result of these Defendants' actions, Mr. Velazquez spent more than 26 years, 7 months, and 28 daysthan 23 years wrongfully convicted (of which he spent 23 years, 7 months, and 7 days wrongfully incarcerated, and two and a half years wrongfully subject to DOCCS supervision)and suffered other grievous and continuing injuries set forth in ¶ 334(a)-(k), above.

522.    As to the CPL § 160.50 violation, that statute provides the NYPD must seal and return or destroy photographs relating to any arrest that terminates in an accused person's favor, and prohibits the NYPD from making those sealed records available to any person or public or

112

private agency.

523.    Mr. Velazquez had a protected interest in the sealing of and the return or destruction of any such photographs by the NYPD under the statute.

524.    Nevertheless, the NYPD has a systematic policy and/or practice of refusing to comply with the mandatory requirements of CPL § 160.50.

525.    The Defendants had a policy and/or practice of using and disclosing photographs sealed pursuant to §160.50 for law enforcement purposes without first obtaining a court order, as a matter of course.

526.    Pursuant to Defendants' policy and/or practice, the Defendants did not seal Plaintiff's photograph and instead provided it to others, including pre-1998 arrest records, or return or destroy his photographs and fingerprints, and disclosed and made those records, including photographs, available to persons, including LITRENTA, CARBONI, and Brown.

527.    Mr. Velazquez was injured as a result as that photograph was used in connection with detectives fabrication of Augustus Brown's purported "identification" of Mr. Velazquez, which was a contributing factor  to Mr. Velazquez damages set forth in ¶¶ 334(a)-(k).

528.    Such actions, including the violation of the statute and the intentional misuse of the photograph, violated Mr. Velazquez's New York State Constitutional right to due process and caused him the damages set forth in ¶¶334(a)-(k).

529.    The City is liable under *respondeat superior* for the acts and omissions of LITRENTA, FALZARANO, CARBONI, POTTER, MOONEY, GIORGIO, and JOHN DOEs 1-20, within the scope of their employment, for Mr. Velazquez's damages.

## **ELEVENTH CAUSE OF ACTION**

**Intentional Infliction of Emotional Distress (New York Law)**
*Against Defendants Litrenta, Falzarano, Carboni, Potter, Mooney, Jack Roe (as Administrator*

113

*of the Estate of Gennaro Giorgio), and John and Jane Doe Defendants #1–20*

530.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

531.    Defendants engaged in extreme, outrageous, reckless conduct, which would shock the conscience of any reasonable person  hearing of such conduct and which any reasonable person would find intolerable and outside the normal bounds of decency, including fabricating evidence, coercing witnesses, suppressing exculpatory material, and causing the wrongful conviction and decades-long incarceration of Jon-Adrian Velazquez.

532.    Defendants knew that their conduct would cause severe emotional distress to Mr. Velazquez.

533.    Mr. Velazquez's emotional distress was a direct, foreseeable, and proximate result of Defendants' conduct.

534.    Mr. Velazquez suffered severe emotional distress, psychological injury, and other damages as a result of Defendants' actions.

535.    Defendants' conduct was intentional, and/or reckless and occurred without regard for the devastating emotional consequences to Mr. Velazquez.

## TWELFTH CAUSE OF ACTION

### Negligent Infliction of Emotional Distress (State Law)
*Against Defendants Litrenta, Falzarano, Carboni, Potter, Mooney, Jack Roe (as Administrator of the Estate of Gennaro Giorgio), The City of New York, and John and Jane Doe Defendants #1–20*

536.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

537.    Defendants engaged in extreme, outrageous, reckless, and/or negligent conduct, which would shock the conscience of any reasonable person  hearing of such conduct and which

any reasonable person would find intolerable and outside the normal bounds of decency including fabricating evidence, coercing witnesses, suppressing exculpatory material, and causing the wrongful conviction and decades-long incarceration of Jon-Adrian Velazquez.

538.   Defendants knew or should have known that their conduct would cause severe emotional distress to Mr. Velazquez, yet Defendants engaged in such conduct without exercising any reasonable care to avoid inflicting emotional distress on Mr. Velazquez.

539.   Mr. Velazquez's emotional distress was a direct, foreseeable, and proximate result of Defendants' conduct.

540.   Mr. Velazquez suffered severe emotional distress, psychological injury, and other damages as a result of Defendants' actions.

541.   Defendants' conduct was intentional, and/or  reckless, and/or negligent, and occurred without regard for the devastating emotional consequences to Mr. Velazquez.

542.   Defendant The City of New York is responsible for the foregoing conduct and resultant damages under the doctrine of respondeat superior.

WHEREFORE, Mr. Velazquez demands judgment against defendants as follows:

(a)  For compensatory damages of not less than $100,000,000;

(b)  For punitive damages against the individual defendants as determined by the finders of fact;

(c)  For reasonable attorneys' fees, together with costs;

(d)  For pre-judgment interest as allowed by law; and

(e)  For such other and further relief as this Court may deem just and proper.

Dated:    New York, New York
          December 24, 2025

By:    \_\_s/ Karen A. Newirth\_\_\_\_\_
          Karen A. Newirth

          \_\_s/ Charles F. Linehan\_\_\_\_
          Charles F. Linehan

          NEWIRTH LINEHAN PLLC
          43 West 43rd Street, Suite 160
          New York, NY 10036
          (917) 426-5551
          karen@newirthlinehan.com
          charlie@newirthlinehan.com

          \_\_s/ Oscar Michelen_____
          Oscar Michelen

          MICHELEN LAW P.C.
          200 Old Country Road
          Suite 2 South
          Mineola NY 11501
          (516) 788-0375
          oscar@michelenlaw.com

          *Attorneys for Plaintiff Jon-Adrian Velazquez*